# EXHIBIT 1

Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Sean Pena, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>City of Phoenix, a governmental entity; County of Maricopa, a governmental entity; Michael Sullivan, Chief of the Phoenix Police Department; Jeri L. Williams, former Chief of the Phoenix Police Department; Deputy Maricopa County Attorney Jeffrey Roseberry and Jane Doe Roseberry; Maricopa County Deputy Attorney Catherine Fu and John Doe Fu; Maricopa County Deputy Attorney Sandra Anderson and John Doe Anderson; Maricopa County Attorney Samantha Caplinger and John Doe Caplinger; Maricopa County Attorney Michael Baker and Jane Doe Baker; Michael Walker; and Jane Doe Walker; Cynthia Ramirez; Krystoffer Lee; Lisa Gutierrez; Jarrett Maupin and Jane Doe Maupin; and Iesha Stanciel and John Doe Stanciel,<br><br>Defendants. | Case No.: CV-23-02156-PHX-SPL<br><br>**PLAINTIFF'S REQUESTS FOR ADMISSION TO DEFENDANT LISA GUTIERREZ**<br><br>(Assigned to the Honorable Steven P. Logan) |

**TO: LISA GUTIERREZ**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

Pursuant to Fed. R. Civ. P. 36, Plaintiff Sean Pena, by and through his attorneys, requests that Defendant Lisa Gutierrez admit the following requests in writing, and serve her response upon the undersigned attorneys at 5055 N. 12th Street, Suite 101, Phoenix, Arizona, 85014, to swoods@millsandwoods.com, within thirty (30) days of service of these requests for admission.

## DEFINITIONS

1.  "**Complaint**" means the operative Complaint in the above-captioned action.

2.  "**Defendant**" "**You**" or "**Your**" means Lisa Gutierrez, Defendant in the above-captioned action, and her subsidiaries, divisions, predecessor and successor companies, affiliates, parents, any joint venture to which she may be a party, and/or each of her employees, agents, officers, directors, representatives, consultants, accountants and attorneys, including any person who served in any such capacity at any time during the relevant time period specified herein.

3.  "**Plaintiff**" or "**Sean Pena**" means Plaintiff Sean Pena in the above-captioned action.

4.  The term "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise), including, without limitation, written, oral, or electronic transmissions.

5.  The term "Document(s)" means all materials within the scope of Fed. R. Civ. P. 34, including, but not limited to, all writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations, including electronically stored information, that are stored in any medium whatsoever from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, as well as any tangible things. Documents include, but are not limited to, electronic mail or e-mail, text messages, facsimiles, instant messages (IMs), calendars, diaries, appointment books, agendas, journals, drafts, voicemail messages, post cards, post-it notes, reports, logs, message slips, invoices, checks, paystubs, letters, memoranda, agreements, contracts, tax returns, bank statements, video recordings, audio recordings, computer programs, printouts, and all other written, graphic or electronic materials of any nature whatsoever. A draft or non-identical copy of a document is a separate document within the meaning of this term. A document includes all appendices, schedules, exhibits and other attachments. The term Documents includes all other documents encompassed by the Federal Rules of Civil Procedure and every "writing," "recording," and "photograph," as those terms are broadly defined in Fed. R. Evid. 1001, including all attachments or addenda annexed thereto, in your possession, custody, or control, dated, generated, transmitted, or received. The term "document" includes electronically stored information ("ESI") as specified in Fed. R. Civ. P. 26 & 34 and other authority.

6.  The terms "electronically stored information" and "ESI" as used in these discovery requests are defined broadly to give the full scope of those terms as contemplated by Fed. R. Civ. P. 34 and shall include originals and all copies of information on operational systems including without limitation accounting, financial, legal, distribution, or manufacturing systems; E-mail; Instant Messages (IM); Web pages; text messages; cell phone data; Excel spreadsheets and underlying formulae; metadata; computer databases (i.e., Access); customer relationship management ("CRM") data; erased, fragmented or damaged data; Blackberry or other similar messaging services' data; and anything stored on computer or other electronic means located on or in, but not limited to cache memory;

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

optical disks; magnetic tapes/back-up tapes; magnetic disks (hard drive, floppy disks, etc.); tablets; PDAs, iPhones; iPads; Blackberries and Palm Pilots; cell phones; IM tools; flash drives; and network storage.

7.    The term "Writing" as used in this request for identification and production is a broadly inclusive term referring to any and all written or other graphic material, however produced or reproduced, of every kind and description and to everything upon which sounds, words, symbols or pictures are recorded or depicted by magnetic or electrical impulse, photography, or otherwise. The term "writing" includes, by way of example and not limitation, the following and anything similar to any of the following:

    a.  Letters, telegrams, telexes, cables, TXWs, memoranda, E-mails, interoffice correspondence and other forms of correspondence and written communication;

    b.  Agreements, contracts, policies, handbooks, practice guidelines, reports, studies, records, books, journals, papers, statements, pamphlets, circulars, publications, stenographic notebooks, files and their contents, file folders, file covers, file jackets, and notes;

    c.  Summaries, abstracts, indexes, tabulations, graphs, charts, lists and inventories;

    d.  Calendars, desk calendars, appointment books, schedules, logs, telephone messages, diaries, time sheets, minutes of meetings, and transcripts;

    e.  Financial statements, checks, invoices and accounting records and books;

    f.  Pleadings, deposition transcripts, trial transcripts, interrogatories, answers to interrogatories, affidavits, declarations, papers filed or lodged with courts, and papers filed with or sent to administrative agencies; and,

    g.  Tape recordings, sound reproductions, objects, photographs, motion pictures, microfilm, computer data stored on magnetic tape, computer printouts, data processing cards or tapes, portable magnetic storage including without limitation USB drives and enclosed hard drives, and computer disks or diskettes.

8.    "Relate," "related" or "relating" means, in addition to their usual and customary meanings, concerning, referring to, reflecting, regarding, pertaining to, addressing, discussing, alluding to, describing, evidencing, constituting or otherwise having any logical or factual connection with the subject matter addressed.

9.    The words "and" and "or" shall be construed disjunctively or conjunctively to bring within the scope of each request for production all responses which otherwise might be construed to be outside the scope of a request for admission.

10.    The word "any" shall be construed to include "all" and vice versa.

11.    The word "each" shall be construed to include "every" and vice versa.

12.    Any word in the singular form shall also be construed as plural and vice versa.

13.    The masculine form shall also be construed to include the feminine and vice versa.

14.    "Identify" with respect to a person means to give, to the extent known, the person's (a) full name; (b) present or last known address; and (c) current or last known place of employment.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

3

15. "Identify" with respect to a document means to give, to the extent known, the (a) type of document; (b) general subject matter; (c) date of the document; and (d) author(s), addressee(s) and recipient(s). In the alternative, the responding party may produce the documents, together with identifying information sufficient to satisfy Rule 33 of the Arizona Rules of Civil Procedure.

16. "Identify" with respect to communications means to give, to the extent known, (a) a description of the substance of the communication; (b) the form of the communication (e.g., telephone, facsimile, email, etc.); (c) the identity of all parties to and/or present at the time of the communication, as well as the full name, present or last known address, and the current or last known place of employment of each person; (d) the identity of the person whom you contend initiated the communication; and (e) the time, date, and place of the communication.

17. "Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity, organization, or association.

18. "Statement" or "statements" as used herein refers to a written expression signed or otherwise adopted or approved by the person making it or a stenographic, mechanical, electronic, or other record, or a transcription thereof, which is a substantially verbatim recital of an oral expression by the person making it.

## **INSTRUCTIONS**

1. Unless you properly object to a request, you must, under Federal Rule of Civil Procedure 36, admit, specifically deny, or state in detail why you cannot truthfully admit or deny each of the following requests based on knowledge and information in your possession, custody or control, or in the possession, custody or control of your representatives, agents, or attorneys. If you do not respond to each of these requests within thirty (30) days, the requests will be deemed admitted under Federal Rule of Civil Procedure 36.

2. If you object to or refuse to answer any request for admission on the ground that the answer reflects or would reveal the substance of a confidential or privileged communication, identify:

    a.    the nature of the privilege claimed;

    b.    the person who made the communication, whether oral or in writing;

    c.    if the communication was oral, all persons present while the communication was made;

    d.    if the communication was written, the author, addressees and any other recipients;

    e.    the relationship of the author of the communication to each recipient;

    f.    the relationship of the persons present to the person who made the communication;

    g.    the date and place of the communication; and

    h.    the general subject matter of the communication.

3. The answer shall specifically admit or deny the matter, or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter.

4. A denial shall fairly meet the substance of the requested admission, and when good faith requires that you qualify an answer or deny only a part of the matter of which

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

4

an admission is requested, you shall specify so much of it as is true and qualify or deny the remainder, setting forth in detail the reasons specifically as requested herein.

5.    You may not give lack of information or knowledge as a reason for failure to admit or deny, unless you include a statement that you have made reasonable inquiry and that the information known or readily obtainable by you is insufficient to enable you to admit or deny the matter in question. The answer to any such request for admission also must include the responding party's explanation as to why, after reasonable inquiry, the responding party was unable to admit or deny.

6.    If you consider that a matter as to which an admission has been requested presents a genuine issue for trial, you may not, on that ground alone, object to the request. Subject to the provisions of Fed. R. Civ. P. 37(e), you may deny the matter, or set forth reasons why you cannot admit or deny such matter.

7.    If you fail to admit the truth of any matter requested herein and that matter is thereafter proved upon the trial of this action or otherwise, you may be required to pay to Plaintiff the reasonable expenses, including attorney's fees, incurred in proving the truth of such matter. If you consider that a matter as to which an admission has been requested presents a genuine issue for trial, you may not, on that ground alone, object to the request. You may, subject to the provisions of Fed. R. Civ. P. 37(e), deny the matter or set forth reasons why you cannot admit or deny such matter.

8.    These requests for admission are continuing in nature. If you receive or otherwise become aware of information that would change your answer to any of these requests for admission after you have served your response, you must comply with Federal Rules of Civil Procedure 26(e) and 36(b) by promptly supplementing your answers or filing the appropriate motion

9.    Answers to these requests for admission shall be served upon the undersigned attorneys at MILLS + WOODS LAW, PLLC, 5055 N. 12th St. Suite 101, Phoenix Arizona, 85014, to swoods@millsandwoods.com, within thirty (30) days of service of these requests.

## **REQUESTS FOR ADMISSION ("RFAs")**

**RFA 1:** Admit that Sean Pena did not expose his genitals to you.

ADMIT _____        DENY _____

**RFA 2:** Admit that Sean Pena did not touch you in any way that you did not consent to.

ADMIT _____        DENY _____

**RFA 3:** Admit that you did not at any time feel intimidated by Sean Pena.

ADMIT _____        DENY _____

**RFA 4:** Admit that you did not have any sexual relations with Sean Pena.

ADMIT _____        DENY _____

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

5

1  **RFA 5:** Admit that you received more than $400,000 from the City of Phoenix.

2      ADMIT _____        DENY _____

3

4

5      **RESPECTFULLY SUBMITTED** this 29th day of October 2025.

6                              **MILLS + WOODS LAW, PLLC**

7

8                              By____*/s/ Sean A. Woods*_____
                                   Robert T. Mills
9                                  Sean A. Woods
                                   5055 N 12th Street, Suite 101
10                                 Phoenix, AZ 85014
                                   *Attorneys for Plaintiff*
11

12

13                         **CERTIFICATE OF SERVICE**

        I hereby certify that on October 29, 2025, I electronically transmitted the foregoing
14
    document to the following via email:
15

16  Lisa L. Gutierrez
    Kennb2021@gmail.com
17  Kennb2020@gmail.com
    400 W Baseline Rd., Lot 330
18  Tempe, AZ 85283
    (480) 294-8236
19  *Defendant*
20

21      _____*/s/ Ben Dangerfield*_____
22

23

24

25

26

27

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

# EXHIBIT 2

Clerk of the Superior Court
*** Electronically Filed ***
M. De La Cruz, Deputy
9/7/2023 3:43:06 PM
Filing ID 16560873

Sean A. Woods (Arizona Bar #028930)
Robert T. Mills (Arizona Bar #018853)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiff*

## IN THE MARICOPA COUNTY SUPERIOR COURT

SEAN PENA, an individual;

              Plaintiff,

    vs.

CITY OF PHOENIX, a governmental entity; COUNTY OF MARICOPA, a governmental entity; MICHAEL SULLIVAN, Chief of the Phoenix Police Department; JERI L. WILLIAMS, former Chief of the Phoenix Police Department; DEPUTY MARICOPA COUNTY ATTORNEY JEFFREY ROSEBERRY and JANE DOE ROSEBERRY; MARICOPA COUNTY DEPUTY ATTORNEY CATHERINE FU and JOHN DOE FU; MARICOPA COUNTY DEPUTY ATTORNEY SANDRA ANDERSON and JOHN DOE ANDERSON; MARICOPA COUNTY ATTORNEY SAMANTHA CAPLINGER and JOHN DOE CAPLINGER; MARICOPA COUNTY ATTORNEY MICHAEL BAKER and JANE DOE BAKER; MICHAEL WALKER and JANE DOE WALKER; CYNTHIA RAMIREZ; KRYSTOFFER LEE; LISA GUTIERREZ; JARRETT MAUPIN and JANE DOE MAUPIN; and IESHA STANCIEL and JOHN DOE STANCIEL,

              Defendants.

**CASE NO:** CV2023-012031

## FIRST AMENDED COMPLAINT

### (JURY TRIAL DEMANDED)

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Plaintiff Sean Pena ("Sean"), by and through his attorneys, Mills + Woods Law PLLC, for his Complaint against Defendants City OF PHOENIX, a governmental entity; COUNTY OF MARICOPA, a governmental entity; MICHAEL SULLIVAN, Chief of the Phoenix Police Department; JERI L. WILLIAMS, former Chief of the Phoenix Police Department; DEPUTY MARICOPA COUNTY ATTORNEY JEFFREY ROSEBERRY and JANE DOE ROSEBERRY; DEPUTY MARICOPA COUNTY ATTORNEY CATHERINE FU and JOHN DOE FU; DEPUTY MARICOPA COUNTY ATTORNEY SANDRA ANDERSON and JOHN DOE ANDERSON; DEPUTY MARICOPA COUNTY ATTORNEY SAMANTHA CAPLINGER and JOHN DOE CAPLINGER; MICHAEL WALKER and JANE DOE WALKER;    CYNTHIA RAMIREZ; KRYSTOFFER LEE; LISA GUTIERREZ; JARRETT MAUPIN and JANE DOE MAUPIN; and, IESHA STANCIEL and JOHN DOE STANCIEL (collectively "Defendants") alleges and states as follows:

## **INTRODUCTION**

1.    Plaintiff Sean Pena ("Sean") was a decorated Phoenix Police Officer dedicated to fighting the fentanyl epidemic in Phoenix Streets.

2.    Sean was falsely accused of three sexual assaults while on-duty as a Phoenix Police Officer.

3.    Sean's accusers were Defendants Cynthia Ramirez ("Ramirez"), Krystoffer Lee ("Lee") and Lisa Gutierrez ("Gutierrez") (collectively the "Accusers").

4.    Ramirez', Lee's and Gutierrez' accusations against Sean were demonstrably false, as would have been revealed by even a cursory investigation by the Phoenix Police Department or the Maricopa County Attorney's Office.

2

5.      The Accusers were malicious liars who were each highly motivated to make false accusations against Sean. At least two of them profited mightily, receiving hundreds of thousands of dollars each based on their lies.

6.      Despite the Accusers' lack of credibility and the complete lack of any physical evidence supporting the accusations, Defendants pushed the investigation hastily and recklessly, and terminated Sean's employment without just cause.

7.      Defendants knew that Sean had submitted to, and passed, a polygraph examination during which he denied ever having sexual contact with anyone while on duty as a Phoenix Police officer.

8.      Defendants nonetheless initiated and continued a criminal prosecution of Sean, charging him with multiple felonies based on the accusations of Ramirez, Lee and Gutierrez.

9.      Not surprisingly, Sean was found not guilty of all charges

10.     Defendants, and each of them, knowingly participated in a conspiracy to have Sean falsely imprisoned, maliciously prosecuted, defamed, wrongfully fired from the job he loved, and left with his career in law enforcement ruined. Defendants conspired to, and did, inflict severe emotional distress on Sean and violated his constitutional rights.

## THE PARTIES

11.     Plaintiff Sean Pena ("Sean") is an adult individual who resides in Maricopa County, Arizona.

12.     Sean is a former police officer who was employed by the City of Phoenix Police Department.

13.     Sean was a decorated Officer who was assigned, by his choosing, to the toughest beat in Phoenix – the South Mountain Precinct.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

3

14.     As an Officer of the Phoenix Police Department, Sean worked tirelessly to get fentanyl pills off the street.

15.     In his work, Sean developed relationships with Street Sources.

16.     Sean was highly successful in tracing the origins of fentanyl pills and developing an understanding of criminal distribution structures.

17.     Sean's efforts to rid the streets of fentanyl gained him enemies among the dealers, and users, in the South Mountain Precinct. These individuals were anxious to get him out of the way.

18.     Defendant County of Maricopa ("Maricopa") is a governmental entity that acts by and through its officials, employees and agents, including without limitation the Maricopa County Attorneys' Office, and each of the Defendants Sandra Anderson, Samantha Caplinger, Michael Baker, Michael Roseberry, and Catherine Fu.

19.     Defendant City of Phoenix ("COP") is a governmental entity that acts by and through its officials, employees and agents, including without limitation the Phoenix Police Department, and each of the Defendants Michael Sullivan, Jeri L. Williams, Michael Walker, and Allison Steinberger.

20.     Defendant Michael Sullivan ("Sullivan") is Chief of the Phoenix Police Department and is sued in his official and individual capacity. He is tasked with oversight of the Phoenix Police Department and is responsible for all policies and procedures promulgated by the Phoenix Police Department. He is an agent of COP and the Phoenix Police Department, operating in his official and individual capacity in Maricopa County, Arizona.

21.     Defendant Jeri L. Williams ("Williams") was Chief of the Phoenix Police Department from 2016 until 2022. She is sued in her official and individual capacity. She was tasked with oversight of the Phoenix Police Department and was responsible for all

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

policies and procedures promulgated by the Phoenix Police Department. She is an agent of COP and the Phoenix Police Department, operating in her official and individual capacity in Maricopa County, Arizona.

22.     Defendant Jeffrey Roseberry ("Roseberry") is a Deputy Maricopa County Attorney employed by, and serving as an agent of, Maricopa County, Arizona, and the Maricopa County Attorney's office. At all relevant times he was operating in his official and individual capacity in Maricopa County, Arizona.

23.     Defendant Catherine Fu ("Fu") is a Deputy Maricopa County Attorney employed by, and serving as an agent of, Maricopa County, Arizona, and the Maricopa County Attorney's office. At all relevant times she was operating in her official and individual capacity in Maricopa County, Arizona.

24.     Roseberry and Fu conducted the criminal trials and are collectively referred to as the "Trial Prosecutors".

25.     Defendant Sandra Anderson ("Anderson") is a Deputy Maricopa County Attorney employed by, and serving as an agent of, Maricopa County, Arizona, and the Maricopa County Attorney's office. At all relevant times she was operating in her official and individual capacity in Maricopa County, Arizona.

26.     Defendant Samantha Caplinger ("Caplinger") is a Deputy Maricopa County Attorney employed by, and serving as an agent of, Maricopa County, Arizona, and the Maricopa County Attorney's office. At all relevant times she was operating in her official and individual capacity in Maricopa County, Arizona.

27.     Michael Baker ("Baker") is a Maricopa County Attorney employed by, and serving as an agent of, Maricopa County, Arizona, and the Maricopa County Attorney's office. At all relevant times he was operating in his official and individual capacity in Maricopa County, Arizona.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

5

28.    Caplinger, Anderson, and Baker were the prosecutors who presented to the grand juries and are collectively referred to herein as the "Grand Jury Prosecutors".

29.    The Trial Prosecutors and Grand Jury Prosecutors are collectively referred to herein as the "Prosecutors".

30.    Defendant Michael Walker ("Walker") is a Police Detective employed by, and serving as an agent of, COP and the Phoenix Police Department. At all relevant times he was operating in his official and individual capacity in Maricopa County, Arizona.

31.    Defendant Cynthia Ramirez is an individual residing in Maricopa County. All of her acts alleged herein occurred in Maricopa County, Arizona.

32.    Defendant Krystoffer Lee is an individual residing in Maricopa County. All of her acts alleged herein occurred in Maricopa County, Arizona.

33.    Defendant Lisa Gutierrez is an individual residing in Maricopa County. All of her acts alleged herein occurred in Maricopa County, Arizona.

34.    Defendant Jarrett Maupin ("Maupin") is an individual residing in Maricopa County. All of his acts alleged herein occurred in Maricopa County, Arizona.

35.    Defendant Iesha Stanciel ("Stanciel") is an individual residing in Maricopa County. All of her acts alleged herein occurred in Maricopa County, Arizona.

36.    Defendants Roseberry, Fu, Anderson, Caplinger, Baker, Walker, Maupin and Stanciel were acting for the benefit of their respective marital communities, if any, and therefore their respective marital communities are liable for their actions as set forth herein. Accordingly, Defendants Jane Doe Roseberry, John Doe Fu, John Doe Anderson, John Doe Caplinger, Jane Doe Baker, Jane Doe Walker, Jane Doe Maupin, and John Doe Stanciel are named as Defendants herein.

37.    Defendant COP is vicariously liable under the principle of *respondeat superior* for the actions and inactions of the employees of the Phoenix Police Department

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

6

and any private contractors including those employees or contractors named as defendants in this action, as to any claims that are asserted by Plaintiff as a result of violations of the Arizona Constitution and Arizona common law because, at all relevant times, those Defendants were acting within the course and scope of their employment or contract with COP or entities privately contracted with COP.

38.    Defendant Maricopa is vicariously liable under the principle of *respondeat superior* for the actions and inactions of the employees of the Maricopa County Attorney's Office and any private contractors including those employees or contractors named as defendants in this action, as to any claims that are asserted by Plaintiff as a result of violations of the Arizona Constitution and Arizona common law because, at all relevant times, those Defendants were acting within the course and scope of their employment or contract with Maricopa or entities privately contracted with Maricopa.

39.    For purposes of Plaintiffs' claims arising under Federal law, including without limitation the United States Constitution and 42 U.S.C. §1983 *et seq.*, and as may be relevant to Plaintiff's state law claims, at all relevant times described herein, Defendants were acting under color of state law.

## JURISDICTION AND VENUE

40.    Pursuant to 42 U.S.C. §1983 *et seq.*, Plaintiffs bring this action for violations of the United States Constitution, including without limitation the Fourth, Eighth, and Fourteenth Amendments, and Arizona common and statutory laws.

41.    The amount in controversy exceeds the minimal jurisdictional limits of this Court.

42.    To the extent applicable, and without conceding that said statute applies, Plaintiffs have served their Notice of Claim upon Defendants in compliance with A.R.S.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

7

§12-821.01, *et seq.* More than sixty (60) days have expired since Plaintiffs served their Notice of Claim and Defendants have not responded in any manner to said Notice of Claim.

43.     Pursuant to Article 6, Section 14 of the Arizona Constitution, this court has original subject matter jurisdiction in this Complaint because the claims relate to causes of action, the underlying acts and/or omissions for which, at all times relevant, have caused the events alleged herein to occur with primary effect in Maricopa County, Arizona.

44.     Venue is proper in that the specific acts giving rise to the causes of action alleged herein occurred with primary effect in Maricopa County, Arizona.

## FACTUAL ALLEGATIONS

### CYNTHIA RAMIREZ' FALSE ACCUSATIONS

45.     On or about August 26, 2018, Sean requested that Officer Antonio Felix follow-in on a suspicious vehicle parked in Sherman Park in Phoenix.

46.     When Sean and Officer Felix arrived they found  Ramirez and German Martinez, who had been having sex in the vehicle.

47.     Ramirez lied to the Officers and gave them a false name.

48.     Ramirez had a history of providing false names to police officers on numerous occasions.

49.     The Officers also found Marijuana in the vehicle.

50.     Ramirez later admitted under oath that she was aware at that time that a felony warrant from Yavapai County had been issued for her arrest.

51.     She testified that she was so fearful of arrest that she contacted friends to find out whether there were any police around Sherman Park before she and German went there.

52.     After Martinez gave the Officers Ramirez' correct name, the Officers were able to determine that there was an outstanding felony warrant for Ramirez in Yavapai County. The Officers then arrested Ramirez and took her into custody.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

53.     Officer Felix advised Sean to put gloves on because Ramirez had an apparent infected wound on her body.

54.     Ramirez told Police that she had seen Sean before. She told Detective Walker that she had seen Sean "four days prior when he arrested her friend Christina near 35th Avenue and Washington."

55.     Sean transported Ramirez in his patrol vehicle to be processed at the South Mountain Precinct, and after processing, to the Fourth Avenue Jail in Phoenix.

56.     While in transit, Ramirez was crying and pleaded with Sean to let her go. She said "I can't go to jail." She insisted that she could not get arrested because her baby and her stepmother were waiting for her. She said her stepmother had heart conditions and Ramirez was her only caretaker.

57.     Desperate to avoid jail, Ramirez offered to give Sean oral sex if he would let her go free.

58.     Sean ignored Ramirez' offer.

59.     While in transit to the Fourth Avenue Jail, they had to stop briefly at a railroad crossing on Third Avenue due to the presence of a train. They were stopped at the crossing for only one minute and 39 seconds.

60.     While stopped at the crossing Sean had a telephone conversation with Officer Felix. The conversation lasted approximately 30 seconds.

61.     Ramirez testified that she was furious that Sean had a "smirk" on his face when he dropped her off at the jail.

62.     Ramirez admitted that prior to her arrest, she and Martinez had been doing "speedballs." She described a "speedball" as a mixture of opiates and Methamphetamine.

63.     She admitted that she had used Fentanyl that night.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

9

64.    She agreed at trial that she had taken a "pretty heavy combo of drugs" prior to her arrest.

65.    She admitted that she was under the influence of drugs during the time that she was transported to the Fourth Avenue Jail.

66.    Ramirez was desperate to obtain release from jail.

67.    She testified that she tried to get the attention of personnel at the 4th Avenue jail, but they all told her to "shut up" because she was still intoxicated or "coming down" and was hallucinating.

68.    It was obvious to the corrections officers and staff at the Fourth Avenue Jail that Ramirez was intoxicated.

69.    Ramirez told medical staff at the jail that Sean had sexually assaulted her while in transit to the jail.

70.    Ramirez also told a nurse at the jail that Sean had not touched her, except for her hair.

71.    A medical staff member reported Ramirez' accusation to the Phoenix Police Department, which immediately began an investigation.

72.    Ramirez told Detective Walker that Sean's patrol vehicle had come to a stop at a railroad crossing. She alleged that while stopped there, Sean had his telephone conversation. She claimed that Sean then told her to show him her breasts, and claims she did. She claimed that Sean then exited the driver's seat of the vehicle, walked back to the rear driver's side, opened the rear driver's side door, and put his erect penis in her mouth for approximately three minutes – all while still stopped in the middle of a public street in Phoenix.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

10

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

73.     This is clearly a lie.  At the second criminal trial, Maricopa County Superior Court Case # CR2020-128297, on August 8, 2022, the prosecution stipulated to the fact that Sean's car was stopped for exactly one minute and thirty-nine seconds.

74.     Not only was the street public, but there was traffic on it. In fact, surveillance video from a nearby business shows a white car drive past Sean's patrol vehicle at the exact moment he was allegedly standing at the backseat door assaulting Ramirez – a fact that was never presented to a grand jury

75.     Ramirez repeatedly insisted to Detective Walker that after the alleged assault, Sean drove over the railroad tracks and proceeded to the Fourth Avenue jail. When Walker told her that her story didn't add up, she changed her story and said that she laid down in the back after the alleged assault and didn't actually see the route they took to the jail.

76.     When asked at trial whether she thought the accusations against Sean would keep her from getting sentenced on the outstanding warrant, Ramirez responded "Something like that."

77.     At trial, Ramirez testified that Sean had his duty belt on when he "leaned in" to the back seat of his patrol vehicle, put one hand on her head and put his penis in her mouth. Given the configuration of the patrol vehicle, it would have been virtually impossible for Sean to do what Ramirez described.

78.     If the alleged assault had actually occurred, Ramirez would have had clear and ready access to Sean's firearm, Taser, and pepper spray at the time the assault was occurring.

79.     Ramirez testified at trial under oath that Sean had actually ejaculated in her mouth.

80.     Ramirez acknowledged that Sean had been on the phone directly before the alleged assault.

81.     Ramirez told investigators that while approaching the railroad crossing, Sean's patrol vehicle was following a Maricopa County Sheriff's van. She said the van pulled into a private drive, turned around and parked in a lot within view of Sean's patrol vehicle while stopped at the crossing.

82.     The investigators determined that there were no witnesses to the sexual assault alleged by Ramirez.

83.     She claimed that at the time of the alleged assault, Sean's penis was erect and she "did not believe he was circumcised."

84.     She later changed her story again and admitted that she does not know what circumcision means.

85.     She said she did not spit or wipe her face after the alleged assault.

86.     On August 26, 2018 Walker – took circumoral swabs of Ramirez' mouth and buccal swabs of her cheeks.

87.     Walker took it upon himself to do so because a "Forensic Nurse" was unavailable to perform the collection.

88.     DNA lab results from Walker's swabs provided insufficient genetic information and no conclusions could be drawn.

89.     On August 27, 2018,a forensic nurse  took swabs of Ramirez' mouth.

90.     When interviewed, Ramirez told Walkerthat the test results would show Martinez' DNA and Sean's DNA.

91.     The swabs were taken within the recommended time frame to detect biological evidence.

92.     The lab results from the forensic nurse's swabs showed that Martinez' DNA could **not** be excluded from the results, but that Sean's DNA was excluded.

93.     Automatic Vehicle Location records of Sean's patrol vehicle showed that the vehicle was stopped at the railroad crossing for only one and a half minutes.

94.     The investigators also obtained video surveillance footage from nearby businesses that confirmed Sean's patrol vehicle was stopped at the railroad crossing for only a minute and a half.

95.     Detective Walker sent Sean a "confrontation" text. Walker texted Sean and pretended to be Ramirez in order to obtain admissions from Sean.

96.     The "confrontation" failed. Sean did not make any admissions during the text conversation.

97.     Sean eventually told the texter (who he believed to be Ramirez) to stop contacting him. Sean then *immediately* reported the text exchange to his supervisor and chain of command.

98.     COP's Police Department closed its investigation of Sean on or about September 1, 2018, finding no corroboration of Ramirez's claims.

99.     The Maricopa County Attorney did not charge or seek an indictment of Sean based on the accusations of Ramirez at that time.

100.     Furthermore, COP's internal Administrative Inquiry (the "Ramirez Inquiry") documentation dated August 28, 2018 specifically stated that "There is no evidence to support the allegation of officer misconduct by Officer Pena."

101.     As Walker told Ramirez at her September 5, 2018 interview:

"The DNA, the video, the surveillance, the time frames –
MS. RAMIREZ: Uh-huh.

DET. WALKER: -- the other officers involved, all these things, do not show, do not corroborate your statements at all. At all.

***

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

13

DET. WALKER: But remember how I told you we had two profiles come up –

MS. RAMIREZ: Uh-huh.

DET. WALKER: -- with DNA.

MS. RAMIREZ: Yeah.

DET. WALKER; Okay? One of them is definitely Herman.

MS. RAMIREZ: Uh-huh.

DET. WALKER: And the other one is definitely not our officer. We got the results back this week. It is definitely not him."

102.    Although the investigation of Ramirez' accusations was closed, the investigation and Ramirez' claims were no secret. They were well known to many employees of COP and its Police Department.

103.    Word of Ramirez' accusations and the investigation of Sean passed to members of the general public as well.

104.    Ramirez had and continues to have a history of making accusations of sexual assault following drug use.

105.    In 2015 Ramirez' ex-boyfriend took her to Banner Hospital Estrella after she had become unresponsive following use of both methamphetamine and heroin with some other men. Ramirez told nursing staff at the hospital that she might have been sexually assaulted by someone while she was passed out at a Phoenix hotel the previous night.

106.    When police arrived to investigate the possible assault, Ramirez indicated that she did not want to talk about it at that time and ignored them.

107.    In 2017 Ramirez was arrested for possession of a stolen vehicle and possession of a burglary tool. At the time of her arrest, she had lied to the arresting Officer by giving him a false name.

14

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

108.    In April 2018, Ramirez was arrested for possession of a dangerous drug (methamphetamine) and for an outstanding felony warrant. While in custody she reported to police that she may have been sexually assaulted by a transient man who she met through Facebook. She told the Officer that at her first physical meeting with the man she allowed him to inject her with a mixture of heroin and methamphetamine. She woke up the next morning feeling pain in her vagina. She said that these encounters continued over the course of a "few weeks" and that she did not remember whether she had ever given the man consent or the last time they had sex. She told the Officers that she did not want prosecution.

109.    COP and the Prosecutors knew or consciously and recklessly disregarded all of these facts regarding Ramirez.

110.    Later, in July 2021 COP Police Officers responding to an emergency call found Ramirez unconscious and laying on the ground from a drug overdose. She was transported to a hospital. She later reported to hospital staff that she thought she had been sexually assaulted because she was naked. In fact, the nursing staff had cut her clothes off to facilitate emergency examination and treatment.

111.    In November 2021, Ramirez was arrested for possession of methamphetamine and for an outstanding felony warrant from Maricopa.

112.    Despite the fact that the investigation of Ramirez' accusations had been closed three years earlier for lack of evidence, the Prosecutors in 2021 proceeded to charge Sean with sexual assault of Ramirez.

113.    At the time of Sean's trial, Ramirez was incarcerated for felony possession of a stolen vehicle and she had to be escorted to court by law enforcement personnel.

### KRYSTOFER LEE'S FALSE ACCUSATIONS

114.    Lee has a history of illegal drug use and mental illness.

15

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

115.     On or about June 1, 2019, the Arizona Department of Child Safety removed Lee's children from her custody.

116.     Later that same day, Sean, Officer Felix and one other Officer responded to a call for a wellness check on a woman who was wandering in the street and appeared to be extremely intoxicated. They located Lee who fit the description provided by the caller.

117.     Lee was wandering in the street with no shoes on.

118.     Lee's speech was slurred.

119.     Officer Felix testified that when he and Sean found Lee she was wandering around, knocking on doors, yelling and screaming.

120.     In Lee's purse the Officers discovered foil used for smoking fentanyl.  This was drug paraphernalia.

121.     Sean also confirmed that Lee had an outstanding misdemeanor warrant from COP.

122.     Sean told Lee he would let her go if she showed him where she got the fentanyl. She agreed.

123.     Lee told Sean that the dealer's name was "Angel."  Angel was a known violent drug dealer in Sean's beat. Lee told Sean that Angel had started selling drugs out of his cousin's house because he knew Sean was on to him.

124.      Lee was handcuffed with her hands behind her back and with her seatbelt fastened in the back seat of Sean's vehicle as they drove to Angel's location and Lee pointed out the house from which Angel was selling drugs.

125.     Lee then directed Sean to drop her off at 11th Avenue and West Lynne Lane. Sean drove her to that location. Sean then uncuffed Lee and let her out of the back seat. She walked away.

126.     When Sean released Lee, he was parked on a public street.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

127.    In October 2019, Lee attended the Arizona State Fair with her friend Iesha Stanciel and Iesha's two children. At the Fair, they met with the Reverend Jarrett Maupin, a well-known activist in Phoenix.

128.    The meeting with Maupin had been planned in advance and was not mere coincidence.

129.    Maupin previously plead guilty to making false statements to the FBI about then Phoenix Mayor Phil Gordon. In the plea agreement dated April 9, 2009, Maupin admitted that he falsely informed the FBI that he had seen evidence of Mayor Gordan engaging in criminal activity, and that he did so "in an effort to smear Mayor Gordon politically, even though I knew at all times there was no truth to the allegations I made to the FBI."

130.    On information and belief, Maupin and Lee discussed the fact that Lee had been taken into custody by Sean. They discussed bringing a lawsuit as a means of getting money from COP.

131.    On information and belief, Maupin introduced Lee to a lawyer with whom Maupin was familiar.

132.    Maupin accompanied Lee to her meetings with the civil lawyer.

133.    On information and belief, Maupin and/or the lawyer advised Lee that in order to bolster the chance of a successful lawsuit, Lee should first make a police report of an alleged assault.

134.    On November 20, 2019, nearly six months after her encounter with Sean, Lee told a Phoenix Police Officer at a Circle K that Sean had touched her breasts and had her masturbate his penis during that encounter.

135.    If Lee's account of the encounter was correct, she would have had easy access to Sean's firearm, Taser and pepper spray at the time it occurred.

17

1    136.    Lee admitted that she was drunk at the time she reported the incident.

2    137.    The Phoenix Police Department began an investigation of Lee's accusations.

3    138.    The other Officers who were with Sean when Lee was detained did not recall

the encounter and did not recall anything improper on the part of Sean.

4

5    139.    After Lee's report, the Phoenix Police Department conducted a canvass of

females who had been transported by Sean in the course of his duties from March through

November 2019. All persons who they were able to interview gave only positive feedback.

6

7

8    140.    The police investigation revealed no physical evidence corroborating Lee's

9    accusation against Sean. No DNA or semen was found in Sean's patrol vehicle even though

Lee claimed Sean had ejaculated while seated in the vehicle.

10

11    141.    In fact, Detective Walker emphasized the fact that Sean's vehicle was

12    impounded and evidence examination had been performed. Sean told Walker that there

13    would be no DNA evidence in the vehicle:

14

15

16    DET. WALKER: Okay. It was a first shift car that you were driving that day,
that car we've taken and we've put into the crime lab, and we've done some
evidence examination on the seat, the steering wheel, and such. The crime lab
has the ability to use what's called alternate light sourcing, I'm not sure if you're
familiar with it, but –

17

18

19    OFC. PENA: I get it. I know what it is.

20

21    DET. WALKER: -- it's essentially black lighting, and they can search for
biological- evidence with regards to semen. What do you think about -- is your
semen in that car?

22

23    OFC. PENA: No.

24    142.    Lee told the Police detectives investigating her accusation "that she did not

25    wish to press charges because she had 'played a part' in the incident. However, Ms. Lee

26    stated that she would participate in prosecution if other victims were located."

27

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

18

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

143.    At her initial interview by COP investigators on November 20, 2019, she told investigators that she was standing outside the driver's side door of Sean's patrol vehicle and reached through the open window to give him a handjob.

144.    Lee told investigators that she did not want to press charges against Sean.

145.    At her second interview on December 3, 2019, she told investigators that at the time of the alleged assault she was seated in the front driver's seat of Sean's patrol vehicle.

146.    She later admitted at trial that this would have been physically impossible.

147.    Incredibly, none of the Police investigators – including Walker – challenged or pressed Lee on this story or on the fact that it differed dramatically from the story she told just two weeks earlier at her November 20, 2019 interview.

148.    Instead, Walker pressed her at the second interview on whether she would be willing to assist in a prosecution of Sean if there were "multiple victims."

149.    Lee agreed that she would come forward if there were multiple victims.

150.    After the interview, Walker dredged up the old accusations of Ramirez, even though that investigation had long since been closed for lack of evidence, in order to convince Lee that there were in fact "multiple victims."

151.    Walker's actions demonstrate a shocking level of malice and a sadistic manipulation of the alleged "victims."

152.    Upon information and belief, at that time, Lee, Maupin and the civil lawyer were already planning a civil lawsuit for money damages against COP.

153.    On the day she made her report, Lee told police investigators that after Sean dropped her off at the location she requested, she got out of the back seat of the patrol vehicle, walked around to the front driver's side and made small talk with Sean. The driver's door was closed and Sean was seated in the driver's seat. Lee said she reached into

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

the patrol vehicle through the open window and masturbated Sean to ejaculation. Lee told the police investigators that she then "walked home and she told her friend Iesha Stanciel over the phone about the incident."

154.    On November 21, 2019, Stanciel responded to a police investigator that Lee had called her and related that a police officer had taken out his penis and asked her for oral sex, which she refused. According to the Police Report: "Sgt. Gonzalez asked Stanciel, regarding her earlier statement that the officer asked Lee for oral sex while he was seated in the front seat, if she was aware of Lee actually having any sexual contact with the officer. Stanciel said she doesn't know if anything occurred and wasn't sure Lee would be comfortable enough to share those specifics."

155.    Stanciel told the investigator that "the rest of the details Lee told her that night were blurry to her and she couldn't remember everything said."

156.    Lee told investigators that after leaving Sean's patrol vehicle that evening she went to Stanciel's house and told Stanciel what had occurred between Lee and Sean.

157.    Lee did not go to Stanciel's house on the night of the alleged assault.

158.    Stanciel told investigators that "although she couldn't remember all the details of the conversation with Ms. Lee, she did recall that Ms. Lee told her that the officer transporting her in his vehicle, pulled down his pants and requested oral sex."

159.    Stanciel also told investigators that Lee adamantly denied that she had oral sex or any other type of sex with Sean, stating:

> … I don't want to put words in her mouth, you know, but what I can remember is that the officer pulled his pants down and was telling her to, you know, give him oral sex and stuff. And I – I was asking her, did she do it, you know, what happened. She was, like, I was so scared, but no, I didn't.

160.    Stanciel further stated:

> She said I really need to talk to you, you know, you're the only person I have, and you know, some shit happened. Tell me why I get pulled over by the

20

police and these mother fuckers, like, **Try** to fucking rape me. (emphasis added).

161.    On or about November 25, 2020. Lee filed a civil Complaint (the "Lee Complaint") against Sean and COP of Phoenix seeking money damages based on her accusations of misconduct on the part of Sean.

162.    In the Complaint, Lee alleged that Sean told Lee to get in the front seat of his patrol vehicle where he "forced [Lee's] head toward his penis and demanded oral sex. [Lee], in fear for her life, ***performed oral sex*** on Defendant Pena." (emphasis added).

163.    On December 1, 2020, Lee, accompanied by Maupin and Stanciel, held a press conference in front of Phoenix Police Headquarters.

164.    At the press conference, Maupin said that Pena had told Lee that "He liked nasty black street bitches."

165.    The reporter asked Maupin if that was really what Pena had said.

166.    Maupin responded "Yes."

167.    This accusation was false. Sean did not tell Lee that "He liked nasty black street bitches."

168.    Maupin then said that Pena was as dangerous as Mark Goudeau – a convicted serial rapist and murderer.

169.    Maupin stated that Lee had first come to him about a year ago.

170.    Maupin stated that Pena forced Lee to engage in sexual acts and endure horrific verbal abuse.

171.    On December 7, 2020, the Phoenix New Times ("PNT") published an article about Lee's accusations against Sean.

172.    According to the article, Lee related to PNT that her encounter with Pena took place while she "was trying to unwind after getting through a stressful day at her job at a local Popeyes and took a quick detour to a convenience store to buy some cigarettes."

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

21

173.    In fact, the Arizona Department of Child Safety had taken Lee's children from her that same day.

174.    The Phoenix New Times article continued: "That same night, according to Lee, she would be violent [sic] sexually assaulted by a Phoenix police officer."

175.    The article states that an Officer told her she had a warrant, handcuffed her and put her in the back of "one of the squad cars." The driver, Sean, then "got behind the wheel and asked her to locate the house of a drug dealer. Lee had no idea who Pena was talking about. 'He asked me to find some drug dealer. I can't remember what he said his name was,' she said. 'I don't know who it was.'"

176.    Lee told PNT that she then directed Sean to a "random house close by." No one was home.

177.    Lee then related to PNT that after she led Sean to the "random" house:

"Lee asked if Pena could take her home. He said yes, and they drove off. But Pena didn't take her home. He drove to a nearby vacant lot at 11th Avenue and West Lynne Lane. There, he unhandcuffed Lee, forced her into the passenger seat in the front of the car, and started playing a porn video on his phone. 'He was watching porn. He was pulling his pants down,' Lee said. 'He was putting my head down. He had his hand on his gun. I didn't want to move. I was scared … I was crying.' Pena groped Lee's breasts and tried to put his hands down her pants, she said. 'He was telling me to suck his dick, telling me that I was beautiful, that he wanted it like in the pornos, that he wanted it nasty "like how Black girls do it in porn," Lee said. 'Just some weird stuff you don't expect a cop to be saying.' He started masturbating and forced Lee to give him a hand job. Afterwards, he told her to come back to the same location the next night and that he would 'find and kill' her if she didn't. She bolted from the scene."

178.    Lee told PNT that she then ran to Stanciel's house in a "hysterical" state and told Stanciel what happened.

179.    Stanciel told PNT that "'She was just banging on my door,'… 'She was like "oh my gosh, oh my gosh." She was hyperventilating. She was like "No one is going to believe me'."

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

22

180.    Lee told PNT that she took her children to live with her father in Buckeye because she was "too scared to be in Phoenix after the assault."

181.    In fact, the government had already removed Lee's children from her custody.

182.    Despite having knowledge of Lee's and Stanciel's extreme deviations from each previous story, the Prosecutors, COP, Maricopa, Walker, and Chief Williams still moved forward with sham charges against Sean.

183.    Maupin was also featured prominently in the PNT article, stating to PNC that Lee, Ramirez and a "third victim" (Gutierrez) had been "raped" by Sean.

184.    In or about June, 2021, Lee settled her lawsuit against COP.

185.    On information and belief, COP paid Lee $425,000.

186.    Lee then paid a portion of the settlement proceeds to Maupin.

187.    During a break in testimony at trial, Maupin approached Sean's Defense Counsel and told them outright that he did not believe that Lee was sexually assaulted by Sean despite his ridiculous public outcry and being paid a portion of Lee's settlement from her Civil Lawsuit.

188.    Now, after the filing of this lawsuit, Maupin told the Arizona Republic that it was "absolutely false" that he had taken a portion of Lee's settlement.

189.    Lee has a history of numerous prior and subsequent incidents of shoplifting.

190.    Upon information and belief, Lee has subsequently been arrested for Burglary tools possession and Drug Paraphernalia-possess/use in Maricopa Superior Court Case # CR2023-102071.

191.    That case was filed on January 18, 2023.

192.    Lee pled to reduced charges of Drug Paraphernalia/Use in Maricopa Superior Court Case # CR2023-110831.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

193.    In May 2022, Lee testified at the trial of criminal charges against Sean based upon her accusations.

194.    At the First Trial, Lee testified that the alleged sexual assault consisted of Sean touching her breasts and Lee masturbating Sean through the driver's window of his patrol vehicle.

195.    On May 19, 2022, a Maricopa jury found Sean **Not Guilty** of the sexual assault alleged by Lee.

196.    Despite Sean's acquittal and Lee's wildly changing accounts of an alleged assault, the Trial Prosecutors decided to call Lee to testify in the Second Trial of charges based on accusations made by Ramirez and Gutierrez.

197.    At the Second Trial, in August 2022, Lee's lies about Sean and her total lack of credibility, all of which was well known to Defendants, were fully exposed for all the world to see. Her story changed dramatically from any previous version.

198.    At Sean's Second Trial on August 1, 2022, Lee testified that she does not recall if Sean had ejaculated.

199.    She further testified that she gave Sean a hand job and was standing between the front door of Sean's Tahoe and the front seat where Sean was seated and that she was somehow pulled into the driver's seat with him.

200.    She further testified that she unzipped Sean's pants for him and could not remember where his utility belt was.

201.    She admitted that "Angel" was a drug dealer from whom she got drugs every week or two.

202.    Incredibly, when confronted about her allegations in the PNT article, Lee stated that the version of events the reporter attributed to her were lies.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

203.    Lee admitted that she did not go to Stanciel's house after the alleged assault, even though Stanciel's house is only two blocks away from the location where she had Sean drop her off.

204.    She testified that she knew who Stanciel was, but that Stanciel was "kinda stand-offish."

205.    She also admitted that she told Stanciel that the alleged sexual encounter with Sean was partially Lee's fault.

206.    The State did not call Stanciel to testify at the Second Trial.

## LISA GUTIERREZ' FALSE ACCUSATIONS

207.    Gutierrez has a history of engaging in falsehoods and fraud. In 2013, the Arizona Attorney General ("the AG") charged Lisa Gutierrez with Illegally Conducting An Enterprise, Attempted Fraudulent Schemes And Artifices, Computer Tampering, and Forgery. *Grand Jury Indictment, CR2013-002470-073*. The facts underlying the charges showed that Ms. Gutierrez "intentionally presented known forged checks and documents to Walmart, Bashas/Food City and VComm with the intent to defraud those companies for money." *Probable Cause Statement, CR2013-002470-073*. Overall, the scheme resulted in a "total known financial loss" of over $133,000.00. *Id*. The charges against Ms. Gutierrez were dismissed after Ms. Gutierrez completed 50 hours of community service pursuant to a deferred prosecution agreement with the AG. *Pena's Consent To Participate In Deferred Prosecution Program And Acknowledgement, CR2013-002470-073*.

### *A Routine Call*

208.    On or about August 5, 2019, Gutierrez called the Phoenix Police Department and reported that one of her fiancé's friends was using drugs and threatening her at her front doorstep. Sean and Officer Felix responded to the call.

209.    Officer Felix arrived at the scene first and was the lead Officer on the call.

25

210.    Both Officer Felix and Sean spoke to Gutierrez in front of her house. Neither entered the house at any time.

211.    Officer Felix told Sean to take Gutierrez in his patrol vehicle and have her show him where her fiancé's friend lived.

212.    Sean objected to transporting Gutierrez in his patrol vehicle due to Ramirez' previous, albeit completely false, accusations. Officer Felix directed Sean to do it anyway, and Sean complied.

213.    Gutierrez rode with Sean in his patrol vehicle to show him where the suspect lived.

214.    Gutierrez sat in back prisoner compartment of Sean's patrol vehicle.

215.    Officer Felix followed in his patrol car, and knocked on the suspect's door. No one answered.

216.    Sean drove Gutierrez back to her house and dropped her off there.

217.    Later, while Sean was working on a Report of the incident, he attempted to call Gutierrez to ask whether she wanted to press charges against the suspect when they found him. She did not answer her phone.

218.    He drove over to Gutierrez' house to ask her and to get additional details regarding the suspect.

219.    As he parked his car across the street from the house, he encountered Gutierrez who was walking home from a store. They spoke briefly. He told her they had not caught the suspect yet.

220.    Gutierrez told Sean that her fiancé was selling Fentanyl and was abusing her. Sean triad to follow up, but she told him she could not talk about it at that moment. She said her fiancé, who "hates cops" was in the house. She told Sean to meet her later in an empty lot near the house and she would give him more details.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

26

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

### *The Tempe Investigation*

221.     In April 2020, Gutierrez reported to the City of Tempe Police Department that she was assaulted at gunpoint by a drug dealer after she had "found" a red cell phone belonging to one of them. She said the drug dealers drove up next to her and said "Bitch, give me your phone." She said they tried to kidnap her but she managed to fight them off.

222.     The Tempe Police Department began an investigation of Gutierrez' allegations.

223.     Three suspects were arrested and taken into custody.

224.     The three suspects said that Gutierrez had actually stolen the cell phone.

225.     In the course of the Tempe investigation, Gutierrez met with Tempe Detective Ratko Aleksis.

226.     Gutierrez spoke with Detective Aleksis numerous times from April through July 2020, and says she had a "relationship" with him.

227.     Detective Aleksis confirmed that their relationship was such that Gutierrez felt comfortable discussing her personal life with him.

228.     Gutierrez also interacted with numerous other Tempe Police Officers during the course of the Tempe Investigation.

### *Sean's Indictment Goes Public*

229.     On June 19, 2020, COP and the Maricopa Attorney's Office announced that Sean had been indicted for the alleged sexual assaults of Lee and Ramirez.

230.     The indictment and the allegations received widespread coverage in the press and quickly became common knowledge. Word also spread quickly among law enforcement personnel in Phoenix, Tempe and elsewhere.

### *Gutierrez Decides That "She Too" Will Accuse Sean*

27

231.     On June 25, 2020 KTAR posted an article detailing the criminal charges against Sean.

232.     On July 23, 2020 at 10:30am, KTAR posted another news article with the headline "Phoenix PD fires officer accused of sex crimes against women in his custody."

233.     Later that same day at approximately 7:00 P.M. Gutierrez for the first time told Detective Aleksis that she too had been sexually assaulted by Sean.

234.     Despite her "relationship" and comfort felt with Det. Aleksis, Gutierrez never even mentioned her false allegations to Det. Aleksis until the day the news broke that Sean had been fired – after months of communications with Det. Aleksis.

235.     Detective Aleksis testified at trial that Gutierrez told him Sean had come to her house in response to a domestic violence call.

236.     Gutierrez told Detective Aleksis that Sean was "new" and had been "recently assigned to the precinct." He did not follow up to ask Gutierrez how she knew that.

237.     Gutierrez told Detective Aleksis that Sean threatened to arrest her fiancé on an outstanding warrant unless she performed a sex act on Sean.

238.     Gutierrez hired the same civil lawyer who represented Lee.

239.     On information and belief, Maupin encouraged Gutierrez to make accusations against Sean for monetary gain.

240.     Maupin told the PNT that he had spoken with Gutierrez and that Gutierrez "was known to me through the community."

241.     Gutierrez lied under oath at trial when she testified that she did not even know who Jarrett Maupin was.

### COP Investigates Gutierrez' Accusations

242.     Gutierrez was interviewed by Walker.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

243. Gutierrez gave Walker an account of the alleged assault that differed substantially from the one she gave Detective Aleksis.

244. According to Walker's report, Gutierrez told him that later in the evening after Sean dropped her off at her house she walked to a store to buy milk. She left her young child in the care of her fiancé, whom she later described as "very abusive."

245. She claimed that as she was walking back to her house, she heard Sean call her name from his patrol vehicle, which was parked on the same street as her house.

246. She said she walked over to Sean's patrol vehicle and talked to Sean. The driver's window was down. He told her he had not yet caught the suspect she had identified.

247. She said she was holding a gallon of milk in one hand when Sean reached through the window, took her other hand, and placed it on his exposed penis. She said she jerked her hand away, and went home.

248. She said that Sean called her later on and asked her to meet him in a field near her house. So, she left her child and her fiancé at home and went out in the dark of night to meet Sean at the field.

249. Gutierrez claimed that Sean asked her for oral sex, but she refused. But when he asked her to masturbate him, she did so while he was still seated in the car. She said he touched her breast. She said Sean ejaculated on her breast and dress. She then left and walked home. Sean said nothing to her as she walked away.

250. She says that she told her fiancé what had happened.

251. Despite her testimony that she was wearing a dress covered in semen, she also testified that her fiancé did not believe her and called her a "ho."

252. She testified that she took off the dress and hung it in the bathroom.

253. She testified that she moved out of the house two or three days later and did not take the dress with her.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

254.     She did not make any effort to preserve the dress even though it would have contained the only physical evidence of the alleged sexual assault.

255.     Her fiancé did not report the alleged incident to police or take any other action in response to Gutierrez' claims.

256.     Gutierrez did not produce to any investigator any article of clothing she was wearing at the time of the alleged assault even though she claimed Sean had ejaculated on her. Apparently, no investigator tried to locate the clothing.

### SEAN PASSES A LIE DETECTOR TEST

257.     In an interview with Sean following Lee's accusations, Walker asked Sean to take a polygraph test. Walker told Sean:

> But obviously, if you didn't do these things, and you've got two of these [accusers], a polygraph to say I've never done this, and you come out passing, it's going to be a big thumbs up for the department, okay? That's going to help you, that's going to help them look at this administratively and say, we don't have any evidence to prove it, we don't have anything else to say this happened, and he's taken a polygraph and passed it, he's showing no deception, all right.

258.     On July 6, 2020, Sean submitted to a polygraph examination administered by an independent professional polygraph examiner.

259.     The polygraph examination was conducted in accordance with American Polygraph Association Standards of Practice.

260.     During the course of the examination Sean was asked the following questions and provided the following answers:

> "While on duty as an officer, did you ever touch anyone's bare sex organs?
> Answer:  No
> While on duty as an officer, did you ever have bare sex organ contact with anyone else?
> Answer:  No
> While on duty as an officer, did you ever engage in any sex act with someone else?
> Answer:  No"

30

261.    The professional polygraph examiner prepared a written report of the examination in which she concluded that "there were **NO SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION.**"

262.    While the polygraph took place after the accusations of Ramirez and Lee, it also covered the time period in which Gutierrez claimed she had been assaulted.

263.    On August 5, 2020, one week prior to the second Grand Jury convening to consider charges based on the accusations of Ramirez, Lee and Gutierrez, Sean's criminal attorney, Jess Lorona, emailed a letter to Samantha Caplinger, a Deputy County Attorney with the Maricopa Attorneys' Office.

264.    In the letter, Lorona informed Caplinger that Sean had taken and passed a polygraph test.

265.    Lorona attached to the letter a copy of the polygraph examiner's written report.

266.    In the letter Lorona requested that the Grand Jury be informed that Sean had taken and passed a polygraph.

267.    The Grand Jury Prosecutors did not even mention the polygraph exam to the jurors.

## THE FATALLY FLAWED INVESTIGATION
## UNITED STATES DEPARTMENT OF JUSTICE ANNOUNCES
## INVESTIGATION INTO THE PHOENIX POLICE DEPARTMENT

268.    The United States department of Justice ("USDOJ") announced on August 5, 2021 that it had begun an investigation of the Phoenix Police Department. A portion of the text of the announcement follows:

Attorney General Merrick B. Garland and Assistant Attorney General Kristen Clarke for the Civil Rights Division announced today that the Justice

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Department has opened a pattern or practice investigation into the City of Phoenix and the Phoenix Police Department (PhxPD).

This investigation will assess all types of use of force by PhxPD officers, including deadly force. The investigation will also seek to determine whether PhxPD engages in retaliatory activity against people for conduct protected by the First Amendment; whether PhxPD engages in discriminatory policing; and whether PhxPD unlawfully seizes or disposes of the belongings of individuals experiencing homelessness. In addition, the investigation will assess the City and PhxPD's systems and practices for responding to people with disabilities. The investigation will include a comprehensive review of PhxPD policies, training, supervision, and force investigations, as well as PhxPD's systems of accountability, including misconduct complaint intake, investigation, review, disposition, and discipline.

\*\*\*

The investigation is being conducted pursuant to the Violent Crime Control and Law Enforcement Act of 1994, which prohibits state and local governments from engaging in a pattern or practice of conduct by law enforcement officers that deprives individuals of rights protected by the Constitution or federal law. The statute allows the Department of Justice to remedy such misconduct through civil litigation. This is the seventy-third investigation of a law enforcement agency conducted pursuant to this statute since it was enacted in 1994. The department will be assessing law enforcement practices under the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as under the Safe Streets Act of 1968; Title VI of the Civil Rights Act of 1964; and Title II of the Americans with Disabilities Act.

*Retrieved February 2, 2023* from https://www.justice.gov/opa/pr/justice-department-announces-investigation-city-phoenix-and-phoenix-police-department

269.    The USDOJ's comprehensive investigation of COP and its Police Department continued through the time of the First Trial and the Second Trial and the time COP denied the appeal of Sean's termination.

270.    COP, Walker, Williams, and the Prosecutors were all aware of the USDOJ investigation and wanted to demonstrate to the USDOJ that they were taking action to root out "bad cops." To that end, Sean's career was sacrificed.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

271.     Upon information and belief, the USDOJ investigations heavily influenced both the internal investigation and the prosecution of Sean.

### THE "ME TOO" MOVEMENT

272.     Following exposure of sexual abuse allegations against film producer Harvey Weinstein in October 2017, the so called "Me Too" movement became headline news across the United States.

273.     The Me Too movement sought to bring to light the problem of sexual harassment and abuse, and encouraged people to come forward with personal accounts of such treatment.

274.     According to Wikipedia "Widespread media coverage and discussion of sexual harassment, particularly in Hollywood, led to high-profile terminations from positions held, as well as criticism and backlash."

275.     The Me Too movement ended the careers of many individuals outside Hollywood as well. For example, United States Senator Al Franken of Minnesota resigned on January 2, 2018 after allegations of sexual misconduct were made against him.

276.     COP, Walker, Williams, and the Prosecutors were all well aware of the Me Too movement.

277.     The Me Too movement heavily influenced and biased both the internal investigation and the prosecution of Sean.

278.     In an interview following Ramirez' accusations, Detective Walker actually told Sean that he needed to understand that the accusations came in the midst of the Me Too movement and that was where society was at.

### COP'S SLIPSHOD INVESTIGATION AND RUSH TO JUDGMENT AGAINST SEAN

279.     COP, Walker, and the Prosecutors all knew that none of the three Accusers was credible.

33

280.    With respect to Ramirez they knew for example: 1) that she was intoxicated on narcotics and methamphetamine at the time of the alleged assault; 2) that she was desperate to obtain release from custody, and was highly motivated to make up a story about Sean; 3) that there was no DNA evidence supporting her accusation despite the facts that DNA tests were conducted and that she testified under oath that Sean had ejaculated in her mouth; and 4) that Ramirez had a unique history making wild accusations of sexual assault following periods of intoxication.

281.    With respect to Lee they knew for example: 1) that she was extremely intoxicated at the time of the alleged assault; 2) that she was despondent because the State had taken her children away that very day; 3) that she did not report the alleged assault for months after it allegedly happened; 4) that she reported the alleged assault only after meeting with Jarrett Maupin and planning civil litigation against COP; 5) that her account of the alleged assault changed wildly and in contradictory fashion over time; and 6) that, as with Ramirez, there was no physical or DNA evidence supporting her accusations.

282.    With respect to Gutierrez they knew for example: 1) that she had a history of engaging in fraud; 2) that she did not make her accusations against Sean until nearly a year after the alleged assault; 3) that she did not report the alleged assault until after the original indictment of Sean was announced; 4) that she knew Jarrett Maupin and had hired the same civil lawyer as Lee; 5) that there was no DNA evidence supporting her accusations despite the fact that she claimed Sean had ejaculated on her and her dress; and 6) that she was highly motivated by financial gain to press accusations against Sean.

283.    Each of the three Accusers gave accounts of their alleged assaults that changed substantially and directly contradicted their earlier accounts.

284.    Each of the three Accusers was highly motivated to accuse Sean of wrongdoing either to secure their personal freedom or for financial gain, or both.

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

34

285.    Both Lee and Gutierrez had a relationship with Jarrett Maupin, and both hired the same civil attorney to seek money damages from COP.

286.    Maupin held a press conference on December 1, 2020 on the steps of Phoenix Police Headquarters on behalf of Lee and Gutierrez. There Maupin made wild accusations of "rape" and cover-up to stir public opinion and provoke monetary settlements with COP.

287.    Maupin received a portion of the proceeds of COP's settlement with Lee.

288.    On information and belief, Maupin received a portion of the proceeds of COP's settlement with Gutierrez.

289.    COP and the Prosecutors ignored the fact that none of the Accusers was credible, and focused instead on the fact that accusations were made.

290.    COP and the Prosecutors disregarded the fact that Sean passed a polygraph test.

291.    In its haste to avoid a continuing public spectacle whipped up by the Accusers and Maupin, COP failed to conduct anything resembling a reasonable or fair investigation of Sean.

292.    For example, COP's internal Administrative Inquiry (the "Ramirez Inquiry") documentation dated August 28, 2018 specifically stated that "There is no evidence to support the allegation of officer misconduct by Officer Pena."

293.    In the Ramirez Inquiry, Sean specifically told investigators that they should retrieve his "patrol vehicle's black box" data to pull seatbelt fastening history.

294.    The "black box" is a feature on all modern vehicles called the Event Data Recorder ("EDR").

295.    A vehicle's EDR records multiple data points to assist accident reconstruction or criminal investigations.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

296.    One of the many data points recorded include seat belt fasten data that shows when seatbelts are engaged and when they are disengaged.

297.    Astonishingly, COP and the State failed to retrieve that crucial data despite being reminded to do so by Sean.

298.    The EDR data was readily available to COP during its investigation because Sean's patrol vehicle was impounded as evidence.

299.    Still, despite having the availability of clearly exculpatory evidence and the findings of the Ramirez Inquiry, COP and the State pressed forward with charges against Sean that they had already decided were unfounded.

300.    COP and the State did so maliciously because they believed that they needed to offer a sacrificial lamb to avoid public backlash.

301.    Among numerous other failures, Walker and COP:

- Failed to obtain surveillance footage from the Fourth Avenue Jail regarding Ramirez' arrival and incarceration there.
- Failed to attempt to recover Gutierrez' dress even though she apparently did not wash or dispose of it.
- Failed to request or obtain phone records from any of the Accusers.
- Failed to obtain any surveillance tape from the store located beside the empty lot where Gutierrez alleged the assault had taken place.
- Failed to conduct any investigation of the relationships between the Accusers.
- Failed to interview Maupin and failed to conduct any investigation of the involvement of Maupin in the accusations made by Lee and Gutierrez.
- Failed to investigate whether Ramirez received any portion of the settlement proceeds COP paid to Lee and Gutierrez.
- Failed to determine whether there were any witnesses to the alleged assaults even though all three allegedly occurred in public places.
- Failed to pull AVL records to confirm Sean's statements that it was not uncommon for him to park his vehicle in certain locations.
- Failed to investigate the "Black Box" in Sean's patrol vehicle to confirm that he was in the driver's seat with the seatbelt fastened

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

during the entire stop at the railroad tracks with Ramirez – despite the fact that Sean specifically requested that they do so.

- Failed to take into consideration that Sean was excluded from DNA evidence taken from Ramirez and that there was no other DNA evidence linking Sean to any of the other Accusers.

302.    Moreover, the alleged assaults took place in a very high crime area of Phoenix where drug sales and use were prevalent. Both dealers and users of drugs, especially Fentanyl, in that area were anxious to get rid of Sean and his crusade against such drugs. COP failed to investigate this situation and failed to take it into consideration in the course of its investigation.

303.    COP's investigations of the Accusers' allegations were one-sided and biased against Sean from the beginning.

## COP SETTLES THE CIVIL SUITS BROUGHT BY LEE AND GUTIERREZ FOR HUNDREDS OF THOUSANDS OF DOLLARS EACH WITHOUT CONDUCTING ANY DISCOVERY

304.    COP reached agreements to settle the lawsuits brought by Lee and Gutierrez for $425,000 each.

305.    COP did not conduct any discovery in the lawsuits, and both cases were dismissed after settlement.

306.    Lee's case was filed originally on November 25, 2020 in the Maricopa Superior Court, Case # CV2020-015466.

307.    Lee's case was removed to the United States District Court of Arizona on December 22, 2020 in case # 2:20-cv-02456.

308.    COP City Council approved settlement to Lee on June 2, 2021 as part of their Formal Meeting on the same date.

309.    The case was dismissed on June 17, 2021 after COP settled with Lee and agreed to pay her four hundred twenty-five thousand dollars ($425,000).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

310.     Gutierrez filed her lawsuit in Maricopa Superior Court on June 18, 2021 – one day after Lee's lawsuit had been dismissed.

311.     Gutierrez' lawsuit was removed to the United States District Court of Arizona in case # 2:21-cv-01297.

312.     Again, no discovery was performed in Gutierrez' case.

313.     In fact, COP did not file any responsive pleading.

314.     COP City Council approved settlement to Gutierrez on November 17, 2021 as part of their Formal Meeting on the same date.

315.     The parties to Gutierrez' case stipulated to dismiss the case on November 30, 2021.

316.     Again, COP paid Gutierrez four hundred twenty-five thousand dollars ($425,000).

317.     COP took no action to dispute the accusations of Lee and Gutierrez.

318.     COP did not investigate the damages alleged by either Lee or Gutierrez, or whether either of those Accusers had sustained any damages.

319.     COP could and would have won both of these lawsuits had it taken them to trial.

## **THE PROSECUTION**

320.     COP needed to secure criminal convictions of Sean in order to justify its total payments of eight hundred fifty thousand dollars ($850,000) to Lee and Gutierrez.

321.     As discussed herein, Maricopa, COP, the Prosecutors, and Walker lacked probable cause to bring any charges against Sean based on the false accusations of Ramirez, Lee and Gutierrez.

322.     COP had closed its investigation into the accusations of Ramirez due to a lack of evidence.

38

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

323.    Walker admitted to Sean that there was no probable cause to bring charges based on Ramirez' accusations. Walker told Sean at a December 4, 2019 interview that the Ramirez case was closed because it "cannot be proved."

324.    Neither COP nor the Prosecutors obtained any additional evidence to support Ramirez' accusations.

325.    Even though COP and its investigators had concluded there was no evidence of wrongdoing on the part of Sean and thus no probable cause to charge him based on Ramirez' accusations, they nonetheless chose to proceed with a *criminal prosecution* with a "beyond a reasonable doubt" standard of proof.

326.    Maricopa and the Prosecutors decided to prosecute Sean for alleged sexual assault based on the accusations of Ramirez and Lee.

327.    Maricopa, COP, and the Prosecutors knew they did not have probable cause to arrest or proceed with prosecution based upon the accusations of either Ramirez or Lee.

328.    COP and Walker admittedly had no probable cause with respect to Ramirez's accusations.

329.    Nor did they have probable cause with respect to Lee's accusations. As discussed herein, Lee was heavily intoxicated on fentanyl, a hallucinogenic drug, at the time of her alleged assault, and her story changed substantially every time she spoke about it. Her various descriptions would have made the alleged assault physically impossible. And she had already received a huge payout from COP.

330.    The entirety of the Probable Cause ("PC") statement relied upon by COP, Walker, Maricopa, and the Prosecutors for Ramirez and Lee states:

> On 8/26/18, Victim A (an adult female) reported to Phoenix Police an allegation of sexual assault by the officer who arrested her earlier that day. Victim A was arrested by Officer Sean Pena for an outstanding felony warrant out of Yavapai County after she was stopped in a city park after hours. Pena was the primary unit for this call, with assistance from another

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

officer. Pena transported Victim A to the South Mountain Precinct for prisoner processing, then to the Fourth Avenue Jail. Victim A alleged that Pena forced oral/penile sex while she was handcuffed in the back of his patrol vehicle and they were stopped at the railroad tracks near Third Avenue and Buchanan Street. A sexual assault examination was completed on Victim A and the evidence sent to the crime lab for processing. Pena's DNA profile was excluded from the profiles found on the evidence swabs. Pena adamantly denied the allegations of sexual assault or having any sexual contact with Victim A. He also stated it was Victim A who offered him oral sex if he would release her. The video surveillance obtained from multiple locations could not corroborate or refute the allegations.

2019-2028342

On 11/20/2019 Victim B (an adult female) reported she was sexually abused by an on-duty Phoenix Police Officer who had contact with her in June 2019. Victim B reported the Officer touched her breasts and had her masturbate his penis when he was alone with her. Victim B was contacted in June 2019 reference a check welfare call (CFS# 19000934327), which was placed on her for wandering around in the street near 23rd and St. Anne Avenues. Victim B was transported from that area by Officer Sean Pena to South 11th Avenue and West Lynne Lane, where the sexual contact allegedly occurred after she was released from his custody. A friend of Victim B's, was interviewed and stated, Victim B called her that night and told her some details of the incident with Pena. AVL records from Pena's patrol vehicle corroborated that he was at the drop-off location for approximately ten minutes. No biological evidence was found in the patrol vehicle upon examination by the crime lab staff. There was no other evidence which would serve to corroborate or refute this allegation. Pena denied the allegations of engaging in any sexual conduct with Victim B.

331.    This PC statement was submitted to the South Mountain Justice Court in Phoenix, Arizona as the basis for Sean's arrest on March 9, 2020.

332.    Both PC statements for Ramirez and Lee state that there was no DNA or other evidence to corroborate the allegations made against Sean.

333.    The State later decided to prosecute Sean based upon the false accusations of Gutierrez.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

334.    The PC statement for Gutierrez was a majority of a copy and paste from police reports.

335.    COP, Walker, Maricopa, and the Prosecutors disregarded the fact that Gutierrez came forward with her allegations only after the Phoenix local news ran a story about Sean's indictments on Lee's and Ramirez' allegations.

336.    Gutierrez' did not report the alleged assault for nearly one year after her encounter with Sean.

337.    The PC statement further states that Gutierrez was able to identify Sean in a photo lineup.

338.    This is unsurprising.

339.    On June 25, 2020 KTAR posted an article detailing the criminal charges against Sean.

340.    On July 23, 2020 at 10:30am, KTAR posted another news article with the headline "Phoenix PD fires officer accused of sex crimes against women in his custody."

341.    Gutierrez' police report to Ratko Aleksis was reported on July 23, 2020 at approximately 7:00 P.M.

342.    Furthermore, the ties between Lee and Gutierrez become clear from the evidence and statements by Maupin that he was working with another Victim to come forward.

343.    Upon information and belief, she already had.

344.    The fix was in and Maupin was able to direct both Lee and Gutierrez to a local attorney for the purposes of filing a civil suit for both against COP and Sean.

**THE MISLEADING GRAND JURY PRESENTATIONS**

345.    A Grand Jury convened on June 19, 2020 to consider charges based upon the accusations of Ramirez and Lee.

41

346.    Michael Baker and Samantha Caplinger presented to this Grand Jury.

347.    A second Grand Jury convened on August 12, 2020 to consider charges based upon the accusations of all three of the Accusers.

348.    Grand Jury Prosecutors Samantha Caplinger and Sandra Anderson presented to this Grand Jury.

349.    None of the Accusers was presented separately to a grand jury, instead, their accusations were presented only in combination with the accusations of one or more of the other Accusers.

350.    Sean was precluded from providing his statement to both Grand Juries

351.    The State's only witness to the Grand Juries was Detective Walker.

352.    Walker relayed the false accusations of Ramirez, Lee and Gutierrez, and his investigation.

353.    The Grand Jury Prosecutors did not present to the Grand Jury clearly exculpatory evidence of which the State was aware. For example, the Grand Jury was not presented evidence that:

- Sean passed a polygraph test in which he denied ever having sexual contact with anyone while on duty as a Phoenix Police Officer.
- Both Ramirez and Lee were intoxicated on extremely potent and hallucinogenic drugs at the times they were allegedly assaulted.
- Ramirez had a unique history of making reports of sexual assault following bouts of intoxication.
- Surveillance video showed a white car driving past Sean's patrol vehicle which was stopped on a public street at the exact moment Sean was allegedly standing at the backseat door assaulting Ramirez.
- The accounts of all three Accusers would have necessitated Sean exposing his firearm, his Taser, and his pepper spray to the alleged victim.
- Lee's account of her alleged assault changed substantially from her first to her second interview.
- Lee had just lost her children to DCS and was not only extremely intoxicated but also despondent and angry with authorities at the time of the alleged assault.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

42

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

- Lee had gone to the location of the alleged assault in order to buy more fentanyl, and was angry that Sean and the other officers had interrupted her efforts.
- No biological evidence was found in Sean's patrol vehicle upon examination by COP's Police Department Crime Lab. Several items of evidence were examined in the lab for semen and none was found.
- Lee and Gutierrez were motivated by financial gain to make their accusations.
- It would have been physically impossible to commit the alleged assaults based on the statements given by Sean's Accusers.
- Sean was on the phone for at least thirty (30) seconds with his partner, Felix, during the one minute and thirty-nine second stop at the railroad tracks while transporting Ramirez.
- Investigators had failed to check the Black Box in Sean's patrol vehicle to see whether Sean's seatbelt was fastened while parked at the railroad tracks – despite Sean's request that they do so.
- There was extensive media coverage of Sean's first indictment immediately before Gutierrez made her accusations against Sean.
- The DNA results from the Ramirez investigation specifically excluded Sean.

354.    Walker and the Prosecutors presented misleading testimony about the DNA evidence to the Grand Juries for the purpose of obtaining indictments.

355.    The Prosecutors were motivated by the need to justify COP's settlements with Sean's Accusers, by the Me Too movement, and by the USDOJ's investigation.

## THE CRIMINAL TRIALS

356.    Sean maintained his innocence throughout the prosecution.

357.    The State went to trial against Sean in May, 2022 on charges of sexual assault based on the accusations of Ramirez, Lee and Gutierrez.

358.    The testimony of the three Accusers at trial differed substantially from the second-hand (hearsay) accounts of their accusations that Walker told the Grand Jury.

359.    At the end of trial the jury found Sean not guilty of sexually assaulting Lee.

360.    The jury did not reach a verdict of the charges based on the accusations of Ramirez and Gutierrez.

43

361.    The State again went to trial against Sean in August 2022 based on the accusations of Ramirez and Gutierrez.

362.    The testimony given by the three Accusers at the Second Trial differed substantially from the testimony they gave at the First Trial.

363.    In a desperate effort to boost her credibility at the second trial, Gutierrez testified that she had been "reminded" after the first trial that there was another person present at her house when she told her fiancé that she had been assaulted by Sean.

364.    Stunningly, Defendant Roseberry admitted that Gutierrez had told him about this alleged witness at least a week prior to her admission, but he did not disclose this information to counsel for Sean.

365.    During trial defense counsel got access to a text message the alleged witness sent to Gutierrez in which he told her "…I'll be your slave at the snap of a finger."

366.    As an alleged "victim" Gutierrez was allowed to sit through and listen to the testimony of all the witnesses at both trials. She then adjusted her testimony accordingly. After hearing Sean testify at the First trial that she had told him about her violent and abusive fiancé, she insisted at the Second trial that she "never said anything about domestic violence."  She went on to testify under oath that her fiancé was "four feet tall" and she wasn't afraid of him.

367.    As noted above, Gutierrez had also told Detective Aleksis that she had contacted the Phoenix Police Department due to domestic violence.

368.    On August 19, 2020, ABC15, a Phoenix ABC News affiliate, posted a story about a woman claiming that she had been sexually assaulted by a Phoenix Police Officer during a traffic stop. The story was updated on November 19, 2020.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

44

369.     According to the report at some point during the alleged assault, the woman cried out for someone to call the police. The woman said the Officer then slammed her up against her car and said "How you going to call the police on the damn police."

370.     Apparently inspired by the news report, Gutierrez repeatedly insisted at trial "You can't call the police on the police," as if the phrase could cure her lack of credibility.

371.     Ramirez testified that Sean ejaculated in her mouth.

372.     When pressed on details of the alleged assault, Ramirez kept saying over and over again that "It happened real fast" and strenuously resisted providing details.

373.     Lee introduced for the first time a story that Sean had somehow pulled her into the front seat with him with the driver's side door open at the time of the alleged assault. She also admitted that it would be physically impossible for two adults to be seated in the driver's seat at the same time.

374.     At the end of the Second Trial, the jury found Sean not guilty on all charges.

375.     The jury deliberated for only approximately 30 minutes.

## COP WRONGFULLY TERMINATES SEAN'S EMPLOYMENT

376.     According to the Memorandum of Understanding adopted by COP and the Phoenix Police Department, and governing Sean's employment, any reason for termination must meet a "Just Cause" standard.

377.     According to Arizona Revised Statutes 38-1101, "Just Cause" is defined as:

(a) The employer informed the law enforcement officer of the possible disciplinary action resulting from the officer's conduct through agency manuals, employee handbooks, the employer's rules and regulations or other communications to the officer or the conduct was such that the officer should have reasonably known disciplinary action could occur.
(b) The disciplinary action is reasonably related to the standards of conduct for a professional law enforcement officer, the mission of the agency, the orderly, efficient or safe operation of the agency or the officer's fitness for duty.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

(c) The discipline is supported by a ***preponderance of evidence*** that the conduct occurred.
(d) The discipline is not excessive and is reasonably related to the seriousness of the offense and the officer's service record.
(emphasis added).

378.     "Preponderance of evidence" is an even higher standard of proof than probable cause.

379.     COP did not have probable cause to believe Sean was guilty of wrongdoing with respect to either Ramirez or Lee.

380.     COP could not prove wrongdoing on the part of Sean by a preponderance of evidence.

381.     COP fired Sean on July 27, 2020 based on the accusations of Ramirez and Lee.

382.     Sean appealed his termination by COP to the CSB.

383.     In late November and early December 2022, Hearing Officer Peter Reinstein conducted a hearing on Sean's appeal.

384.     At that time COP knew Sean had been acquitted of all charges based upon the false accusations of the three Accusers. COP knew that Sean had passed a polygraph test. But COP had already fired Sean and had paid two of his Accusers $425,000 each.

385.     COP knew that none of the Accusers was credible and that their accusations were false.

386.     COP knew that it did not have just cause to terminate Sean's employment.

387.     COP decided to destroy Sean's career in order to justify the fact that it had paid $850,000 pf taxpayer money to two demonstrable liars.

388.     Defendant Chief Jeri Williams testified at the hearing that she had served as the Chief of PPD for six years retiring on October 31, 2022.

389.    Chief Williams further testified that one of her duties as Police Chief included disciplinary decisions.

390.    Chief Williams testified that she conducted a Loudermill Hearing on July 2nd, 2020, to determine the discipline for Sean.

391.    Chief Williams stated that she considered both the SID and PSB investigations in making her decision.

392.    Chief Williams testified that she also considered that the Appellant had been indicted by a Grand Jury.

393.    She stated that she believed that a police officer who had been indicted could not be retained by the department.

394.    Chief Williams stated that the fact that Appellant was ultimately acquitted of the charges would not change her decision given the different standards of proof required.

395.    If fact, the standard of proof applicable to her decision was "preponderance of evidence," which is a different and higher standard of proof than "probable cause."

396.    Chief Williams further testified that she signed the Discipline Notice dated July 27, 2020, wherein Sean was terminated from his employment as a Phoenix police officer.

397.    She believed that the level of discipline imposed was not excessive and reasonably related to the offenses despite the complete lack of evidence and the clearly false and wildly inconsistent statements of Sean's Accusers.

398.    On December 12, 2022, Hearing Officer Reinstein issued a report recommending that the Civil Service Board affirm Sean's termination.

399.    Reinstein's recommendation was unsupported by the evidence and was unsupportable.

400.    Reinstein reached the incredible and stunning conclusion that:

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

> Neither Ms. Ramirez nor Ms. Lee possessed a motive for coming forward with their allegations against [Sean]. Ms. Ramirez and Ms. Lee received no benefit from their allegations. Ms. Lee was very reluctant to press her allegations against [Sean].

401.    As discussed herein, COP had already paid Lee $425,000 based on her allegations. That amount of money overcomes a lot of reluctance. Lee was intoxicated on fentanyl at the time of her encounter with Sean.

402.    COP did not even dispute the fact that Ramirez was high on hallucinogenic drugs and was desperate to obtain release from custody when she made her allegations.

403.    Reinstein also concluded that "Ms. Ramirez and Ms. Lee did not recant their allegations even when inconsistencies were pointed out by the investigators."

404.    In fact, as set forth herein, when Ramirez and Lee were confronted with inconsistencies, they simply changed their stories, and in dramatic fashion.

405.    Reinstein concluded that "the status of Ms. Ramirez and Ms. Lee made them relatively easy targets for exploitation." This, of course, simply ignores the fact that by serving as a beat cop in a high crime, drug infested neighborhood, Sean was also an "easy target" for false accusations by users and dealers alike.

406.    On February 22, 2023, following Sean's acquittal of all charges, the CSB voted to nonetheless affirm the termination of his employment.

407.    Only two of the five members of the CSB voted to affirm the termination of Sean's employment. One voted to re-instate Sean's employment. The other two were absent.

408.    Following the affirmation of Sean's termination, the Arizona Peace Officer Standards and Training Board requested that Sean sign a "Consent Agreement" by which he would permanently relinquish his Arizona peace officer certification.

409.    Sean declined to sign it.

48

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

## DEFENDANT CHIEF JERI WILLIAMS' HISTORY OF CONCEALING FACTS AND USING SCAPEGOATS

410.     Jeri Williams and her executive staff – including Assistant Police Chiefs – regularly used Signal, an instant messaging app that provides encrypted messaging and the ability to delete messages with no ability to recover them.

411.     Signal was used by Jeri Williams to discuss lawsuits, or other matters that involved the fabrication of criminal charges against individuals.

412.     In fact, an ABC15 article exposed the use of the Signal application by Jeri Williams and her executive team.

413.     The Phoenix Police Director of Communications Donna Rossi said in August 2022 that, "Chief Williams asked that Signal not be used by her executive team for work-related issues and deleted her app from her phone in 2020. Chief Kurtenbach does not have the app on his work phone."

414.     This was shown to be a false statement by the Phoenix Police Department.

415.     Screenshots of the Signal application being used by Jeri Williams and her executive staff far past 2020 came to light.

416.     One of the purposes for the use of the Signal application was to discuss the fact that COP, the Maricopa County Attorney's Office, and Phoenix Police employees – including Jeri Williams – had participated in a scheme to invent charges against police protestors in 2021.

417.     Mass Liberation Arizona issued a statement regarding this, stating:

> Chief Williams not only lied about deleting the app, she actively used Signal to intentionally destroy evidence long after she claimed to have told her staff not to use the app. Chief Williams is a liar. She absolutely must not be permitted to retire in good standing; she must be fired. She must also be Brady listed immediately. No public official should be using the Signal app, least of all the chief of the nation's deadliest police department.

49

418.    In response to the scandal, Jeri Williams demoted three Assistant Police Chief to Commanders – using them as scapegoats according to a lawsuit filed in the Maricopa County Superior Court on April 18, 2022.

419.    COP – through Jeri Williams – and Maricopa County – through its employees – adopted practices to invent charges against individuals in the hopes of obtaining criminal convictions for political gain.

420.    This same pattern, practice, and policy was used in the wildly false charges levied against Sean.

421.    This same pattern, practice, and policy was used to "scapegoat" Sean in the wake of the ME TOO pressure put on COP.

422.    As discussed herein, Detective Walker actually told Sean that he needed to understand that the accusations came in the midst of the Me Too movement and that was where society was at.

423.    This is due to the pattern, practice, and policy pushed by Jeri Williams and COP to find scapegoats to offer to the public to avoid public scrutiny.

424.    This pattern, practice, and policy was further emboldened by the fact that COP and Phoenix Police Officer Anthony Armour were directly in the middle of another sexual assault case brought by a member of the public against Armour in the District Court of Arizona case entitled Anderson v. Armour (2:16-cv-03563).

425.    Armour was not terminated.

426.    That case was filed in October 14, 2016 and was heating up towards trial at the time that Sean was fired by Jeri Williams.

### THE AFTERMATH

427.    As the result of the Defendants' conduct alleged herein, Sean's life was left in ruins.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

50

428.    Sean had been married for only three weeks when Ramirez made her false accusations against Sean.

429.    Sean had intended to serve a full 25 years as a Phoenix Police Officer, and then retire with a pension in the same manner as his father.

430.    Instead, Sean's career in law enforcement was destroyed by Defendants.

431.    His good reputation was ruined.

432.    His ability to earn income to support his family has been severely and irreparably impaired.

433.    His ability to earn his retirement pension was taken away from him.

434.    Following his termination by COP, Sean started a small business selling custom dog houses.

435.    A customer complained to a local television news program, KTVK's Arizona's Family, about Sean's delay in providing a doghouse she had ordered.

436.    In fact, the delay was attributable to the fact that Sean was busy defending himself from the wrongful and malicious prosecution described herein.

437.    Arizona's Family aired the customer's complaint on television, including the customer's statement that she had researched Sean's background and discovered the accusations made by Ramirez, Lee and Guttierez. She cited those accusations as a reason not to do business with Sean. Arizona's Family likewise implied on the broadcast that Sean was an infamous person.

438.    Sean's dog house business was forced to close down.

439.    The Arizona's Family broadcast incident demonstrates in part the extent to which Sean's capacity to earn income has been damaged and impaired by Defendants' conduct.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

51

440.    Sean has been forced to seek counseling due to the stress brought on by Defendants' conduct.

441.    Sean has been diagnosed with post-traumatic stress disorder and has been forced to receive treatment as a direct and proximate result of Defendants' conduct.

442.    Sean was paid $27.74 per hour at the time and was also paid overtime.

443.

444.    Sean had fringe benefits including without limitation health insurance, medical expense reimbursement, and vacation leave which would have increased depending on his years of service:
- 1-5 Years of Service = 8 hours per month (96 hours/year)
- 6-10 Years of Service = 10 hours per month (120 hours/year)
- 11-15 Years of Service = 11 hours per month (132 hours/year)
- 16-20 Years of Service = 13 hours per month (152 hours/year)
- 21 Years+ = 15 hours per month (180 hours/year)

445.    Many of those benefits would have continued after Sean's retirement.

446.    Sean's lifelong goal was to become a Detective with COP.

447.    Each promotion brings with it a pay increase.

448.    After 25 years, Sean could have retired with a full pension.

449.    According to a 2017 news article from AZCentral.com, the average pension for Phoenix Police employees was approximately $63,000 per year at that time.

450.    That amount will increase substantially by the time Sean reaches retirement age.

451.    Furthermore, Phoenix Police Officers can participate in a deferred retirement option plan ("DROP") by working an additional seven years.

452.    By doing so, they are eligible for an additional lump sum payment.

52

453.    Pension payments that would have been paid to a retiree not in the DROP system are deposited into a fund that guarantees a return rate of between approximately 6.6 to 7.4 percent.

454.    Once the DROP participant officially ends his/her employment, the amount deposited plus interest is paid to the employee as a lump sum payment.

455.    After receiving his DROP payment, Sean would have then received his yearly pension for each year thereafter.

456.    While engaged in the conduct alleged herein Defendants acted in concert with each other. Defendants are thus jointly and severally liable for Sean's damages. A.R.S. § 12-2506 D(1).

## COUNT I – WRONGFUL TERMINATION/BREACH OF EMPLOYMENT AGREEMENT
### (COP)

457.    Sean restates and re-alleges the allegations of Paragraphs 1 through ____ above as if fully set forth herein.

458.    Sean was employed as a Police Officer by COP pursuant to a written agreement called a Memorandum of Understanding ("MOU").

459.    The MOU is an enforceable contract governing the rights and obligations of COP and Sean pertaining to his employment.

460.    Pursuant to the terms of the MOU, COP could terminate Sean's employment only for "just cause."

461.    COP breached the MOU by terminating Sean's employment without just cause.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

462.    As a direct result of COP's breach of the MOU, Sean sustained damages in an amount to be proven at trial.

## COUNT II – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
## (COP)

463.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

464.    Sean's employment agreement with COP contained a duty to act fairly and good faith.

465.    This duty required that COP not do anything that would prevent Sean from receiving the benefits of the agreement.

466.    COP breached its duty of good faith and fair dealing by failing to give Sean a fair and reasonable opportunity to demonstrate that the termination of is employment was not supported by just cause, and by ignoring the evidence of Sean's innocence of the accusations made against him.

467.    As a direct result of COP's breach of the duty of good faith and fair dealing, Sean sustained damages in an amount to be proven at trial.

## COUNT III -- MALICIOUS PROSECUTION -- RAMIREZ
## (COP, WALKER, MARICOPA, PROSECUTORS, AND RAMIREZ)

468.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

469.    Defendants COP, Walker, County, the Prosecutors and Ramirez instituted and continued criminal proceedings against Sean.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

54

470.    The criminal proceedings ended in favor of Sean with his acquittal on all charges.

471.    The criminal proceedings were brought as a result of false accusations of sexual misconduct made by Ramirez.

472.    Defendants COP, Walker, Maricopa, the Prosecutors and Ramirez did not have probable cause to institute the criminal proceedings against Sean.

473.    COP, Walker, Maricopa, and the Prosecutors knew or were reckless in not knowing that the accusations of Ramirez were false.

474.    Neither COP, Walker, Maricopa, the Prosecutors, or Ramirez believed in good faith that the accusations were true or that Sean was guilty of the crimes with which he was charged.

475.    A reasonable person under the same or similar circumstances would not have believed that Sean was guilty of the crimes with which he was charged.

476.    COP, Walker, Maricopa, and the Prosecutors were able to secure indictments against Sean only by knowingly presenting to the Grand Jury the false accusations of Ramirez, and by failing to present to the Grand Jury clearly exculpatory evidence demonstrating that the accusations were false and that Ramirez was not credible.

477.    Walker and the Prosecutors presented false and/or misleading testimony to the Grand Juries for the purpose of obtaining indictments.

478.    COP, Walker, Maricopa, the Prosecutors, and Ramirez acted with malice in instituting and continuing criminal proceedings against Sean.

479.    Ramirez' primary motives in making her accusations against Sean was to avoid prosecution and punishment for her own crimes and her personal hatred of Sean.

480.    As discussed herein, COP, Walker, Maricopa, and the Prosecutors were primarily motivated by the desire to create the appearance that they were rooting out "bad

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

55

cops" without regard to the credibility of the Accusers. They were also motivated to justify COP's payment of hundreds of thousands of dollars to Lee and Gutierrez.

481.    As a direct and proximate result of the criminal prosecution Sean was forced to spend substantial amounts of time and money defending himself. Sean also suffered, among other things, public humiliation, the loss of his career and the permanent impairment of his ability to secure gainful employment. Sean sustained damages in an amount to be proven at trial.

## COUNT IV – MALICIOUS PROSECUTION – LEE
## (COP, WALKER, MARICOPA, PROSECUTORS, AND LEE)

482.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

483.    Defendants COP, Walker, Maricopa, the Prosecutors, and Lee instituted and continued criminal proceedings against Sean.

484.    The criminal proceedings ended in favor of Sean with his acquittal on all charges.

485.    The criminal proceedings were brought as a result of false accusations of sexual misconduct made by Lee.

486.    Defendants COP, Walker, Maricopa, the Prosecutors,  and Lee did not have probable cause to institute the criminal proceedings against Sean.

487.    COP, Walker, Maricopa, and the Prosecutors knew or were reckless in not knowing that the accusations of Lee  were false.

488.    Neither COP, Walker, Maricopa, the Prosecutors, or Lee believed in good faith that the accusations were true or that Sean was guilty of the crimes with which he was charged.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

489.    A reasonable person under the same or similar circumstances would not have believed that Sean was guilty of the crimes with which he was charged.

490.    COP, Walker, Maricopa, and the Prosecutorswere able to secure indictments against Sean only by knowingly presenting to the Grand Jury the false accusations of Lee, and by failing to present to the Grand Jury clearly exculpatory evidence demonstrating that the accusations were false and that Lee was not credible.

491.    Walker and the Prosecutors presented false and/or misleading testimony to the Grand Juries for the purpose of obtaining indictments.

492.    COP, Walker, Maricopa, the Prosecutors, and Lee acted with malice in instituting and continuing criminal proceedings against Sean.

493.    Lee's primary motives in making her accusations against Sean was financial gain.

494.    As discussed herein, COP, Walker, Maricopa, and the Prosecutors were primarily motivated by the desire to create the appearance that they were rooting out "bad cops" without regard to the credibility of the Accusers. They were also motivated to justify COP's payment of hundreds of thousands of dollars to Lee and Gutierrez.

495.    As a direct and proximate result of the criminal prosecution Sean was forced to spend substantial amounts of time and money defending himself. Sean also suffered, among other things, public humiliation, the loss of his career and the permanent impairment of his ability to secure gainful employment. Sean sustained damages in an amount to be proven at trial.

## COUNT V – MALICIOUS PROSECUTION – GUTIERREZ
## (COP, WALKER, MARICOPA, PROSECUTORS, AND GUTIERREZ)

496.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

497.    Defendants COP, Walker, Maricopa, the Prosecutors, and Gutierrez instituted and continued criminal proceedings against Sean.

498.    The criminal proceedings ended in favor of Sean with his acquittal on all charges.

499.    The criminal proceedings were brought as a result of false accusations of sexual misconduct made by Gutierrez.

500.    Defendants COP, Walker, Maricopa, the Prosecutors, and Gutierrez did not have probable cause to institute the criminal proceedings against Sean.

501.    COP, Walker, Maricopa, and the Prosecutors knew or were reckless in not knowing that the accusations of Gutierrez were false.

502.    Neither COP, Walker, Maricopa, the Prosecutors, or Gutierrez believed in good faith that the accusations were true or that Sean was guilty of the crimes with which he was charged.

503.    A reasonable person under the same or similar circumstances would not have believed that Sean was guilty of the crimes with which he was charged.

504.    COP, Walker, Maricopa, and the Prosecutors were able to secure indictments against Sean only by knowingly presenting to the Grand Jury the false accusations of Gutierrez, and by failing to present to the Grand Jury clearly exculpatory evidence demonstrating that the accusations were false and that Gutierrez was not credible.

505.    Walker and the Prosecutors presented false and/or misleading testimony to the Grand Juries for the purpose of obtaining indictments.

506.    COP, Walker, Maricopa, the Prosecutors, and Gutierrez acted with malice in instituting and continuing criminal proceedings against Sean.

507.    Gutierrez' primary motive in making her accusations against Sean was financial gain.

508.    As discussed herein, COP, Walker, Maricopa, and the Prosecutors were primarily motivated by the desire to create the appearance that they were rooting out "bad cops" without regard to the credibility of the Accusers. They were also motivated to justify COP's payment of hundreds of thousands of dollars to Lee and Gutierrez.

509.    As a direct and proximate result of the criminal prosecution Sean was forced to spend substantial amounts of time and money defending himself. Sean also suffered, among other things, public humiliation, the loss of his career and the permanent impairment of his ability to secure gainful employment. Sean sustained damages in an amount to be proven at trial.

## COUNT VI – ABUSE OF PROCESS -- RAMIREZ
## (COP, WALKER, MARICOPA, PROSECUTORS, AND RAMIREZ)

510.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

511.    COP, Walker, Maricopa, the Prosecutors, and Ramirez brought criminal proceedings against Sean in Maricopa County Superior Court.

512.    As alleged herein, COP, Walker, Maricopa, the Prosecutors, and Ramirez used the criminal proceedings primarily to accomplish a purpose for which the process was not designed.

513.    Ramirez' primary motives in making her accusations against Sean was to avoid prosecution and punishment for her own crimes and her personal hatred of Sean.

514.    As discussed herein, COP, Walker, Maricopa, and the Prosecutors were primarily motivated by the desire to create the appearance that they were rooting out "bad cops" without regard to the credibility of the Accusers. They were also motivated to justify COP's payment of hundreds of thousands of dollars to Lee and Gutierrez.

515.    As a direct and proximate result of this misuse of the legal process Sean was forced to spend substantial amounts of time and money defending himself. Sean also

suffered, among other things, public humiliation, the loss of his career and the permanent impairment of his ability to secure gainful employment. Sean sustained damages in an amount to be proven at trial.

## COUNT VII – ABUSE OF PROCESS – LEE
## (COP, WALKER, MARICOPA, PROSECUTORS, AND LEE)

516.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

517.    COP, Walker, Maricopa, the Prosecutors,   and Lee brought criminal proceedings against Sean in Maricopa County Superior Court.

518.    As alleged herein, COP, Walker, Maricopa, the Prosecutors, and Lee used the criminal proceedings primarily to accomplish a purpose for which the process was not designed.

519.    Lee's primary motive in making her accusations against Sean was financial gain.

520.    As discussed herein, COP, Walker, Maricopa, and the Prosecutors were primarily motivated by the desire to create the appearance that they were rooting out "bad cops" without regard to the credibility of the Accusers. They were also motivated to justify COP's payment of hundreds of thousands of dollars to Lee and Gutierrez.

521.    As a direct and proximate result of this misuse of the legal process Sean was forced to spend substantial amounts of time and money defending himself. Sean also suffered, among other things, public humiliation, the loss of his career and the permanent impairment of his ability to secure gainful employment. Sean sustained damages in an amount to be proven at trial.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

## COUNT VIII – ABUSE OF PROCESS – GUTIERREZ
## (COP, WALKER, MARICOPA, PROSECUTORS AND GUTIERREZ)

522.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

523.    COP, Walker, Maricopa, the Prosecutors, and Gutierrez brought criminal proceedings against Sean in Maricopa County Superior Court.

524.    As alleged herein, COP, Walker, Maricopa, the Prosecutors, and Gutierrez used the criminal proceedings primarily to accomplish a purpose for which the process was not designed.

525.    Gutierrez' primary motive in making her accusations against Sean was financial gain.

526.    As discussed herein, COP, Walker, Maricopa, and the Prosecutors were primarily motivated by the desire to create the appearance that they were rooting out "bad cops" without regard to the credibility of the Accusers. They were also motivated to justify COP's payment of hundreds of thousands of dollars to Lee and Gutierrez.

527.    As a direct and proximate result of this misuse of the legal process Sean was forced to spend substantial amounts of time and money defending himself. Sean also suffered, among other things, public humiliation, the loss of his career and the permanent impairment of his ability to secure gainful employment. Sean sustained damages in an amount to be proven at trial.

## COUNT IX – ABUSE OF PROCESS
## (LEE AND GUTIERREZ)

528.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

529.    Lee and Gutierrez, brought civil actions against Sean as alleged herein.

530.    The primary purpose of the civil proceedings was to obtain money damages based upon the false accusations of Ramirez, Lee and Gutierrez.

531.    Civil proceedings in Arizona were not designed for such purposes.

532.    Defendants' use of civil proceedings in this manner was wrongful.

533.    Those civil proceedings were motivated by malice in that both Lee and Ramirez were angry that a) Sean had either arrested them or attempted to have them become informants to assist in arresting others; b) Lee had her children removed from her custody by DCS on the very same day that Sean arrested her; and, c) Lee was angry that Sean stopped her from obtaining drugs

534.    The civil proceedings were begun and maintained without probable cause.

535.    The civil proceedings were based on the false accusations of Ramirez, Lee and Gutierrez.

536.    Ramirez, Lee and Gutierrez were not credible.

537.    A reasonable investigation of the claims of Ramirez, Lee and Gutierrez would have demonstrated that the claims were false and that the Accusers were not credible.

538.    The civil proceedings were terminated on June 17, 2021 and December 2, 2021 when the civil actions of Lee and Gutierrez were dismissed with prejudice.

539.    As a direct and proximate result of this misuse of the legal process, Sean suffered, among other things, public humiliation, the loss of his career and the permanent impairment of his ability to secure gainful employment. Sean sustained damages in an amount to be proven at trial.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

1
2

**COUNT X – TORTIOUS INTERFERENCE WITH CONTRACT AND**
**REASONABLE BUSINESS EXPECTANCY**
**(ALL DEFENDANTS EXCEPT COP)**

3
4

540.     Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

5
6

541.     Each of the Defendants knew that Sean was employed as a Police Officer by COP.

7
8

542.     Sean was employed by COP pursuant to a written employment agreement.

9

543.     Sean had a reasonable expectation of continued employment by COP.

10
11

544.     Each of the Defendants knew that Sean had an employment agreement with COP and/or that he had a reasonable expectancy of continued employment by COP.

12
13
14

545.     Each of the Defendant knowingly and intentionally interfered with Sean's employment agreement with COP and with Sean's reasonable expectancy of continuing employment by COP by the conduct of each alleged herein.

15
16

546.     Each of these Defendants' interference was wrongful and without legal privilege or justification.

17
18
19
20
21
22

547.     As a direct and proximate result of Defendants' tortious interference, Sean suffered, among other things, the loss of his employment and career as a Police officer, the permanent impairment of his ability to earn income, public humiliation and emotional distress,and the time and expense associated with defending himself against false claims. Sean sustained damages in an amount to be proven at trial.

23
24

**COUNT XI – FALSE ARREST AND IMPRISONMENT 03/09/2020**
**(COP AND MARICOPA COUNTY)**

25
26

548.     Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

27
28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

549.    COP Police Officers arrested Sean on March 9, 2020 for the alleged sexual assault of Lee.

550.    Sean was booked into the Fourth Avenue Jail, which is operated by the Maricopa County Sheriff's Office.

551.    COP acted intentionally to restrain Sean to an area within COP's control.

552.    Maricopa County acted intentionally to restrain Sean to an area within Maricopa County's control.

553.    Both COP and Maricopa County acted without lawful authority and without Sean's consent.

554.    The acts of COP and Maricopa County resulted in the direct restraint of Sean's liberty or freedom of movement, either by actual force or from Sean's fear of force.

555.    The acts of COP and Maricopa County would have caused a reasonably prudent person in the same situation as Sean to believe that he was restrained.

556.    Sean was aware of and was harmed by the restraint.

557.    As a direct and proximate result of his false imprisonment by COP and by Maricopa County Sean sustained damages in an amount to be proven at trial.

## COUNT XII – FALSE ARREST AND IMPRISONMENT 7/24/20
## (COP AND MARICOPA)

558.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

559.    On July 24, 2020, COP Police Officers arrested Sean for the alleged sexual assault of Gutierrez.

560.    Sean was again booked into the Fourth Avenue Jail.

561.    COP acted intentionally to restrain Sean to an area within COP's control.

562.    Maricopa acted intentionally to restrain Sean to an area within Maricopa County's control.

64

563.     Both COP and Maricopa acted without lawful authority and without Sean's consent.

564.     The acts of COP and Maricopa resulted in the direct restraint of Sean's liberty or freedom of movement, either by actual force or from Sean's fear of force.

565.     The acts of COP and Maricopa would have caused a reasonably prudent person in the same situation as Sean to believe that he was restrained.

566.     Sean was aware of and was harmed by the restraint.

567.     As a direct and proximate result of his false imprisonment by COP and by Maricopa County Sean sustained damages in an amount to be proven at trial.

## COUNT XIII – INSTIGATING OR PARTICIPATING IN FALSE ARREST AND IMPRISONMENT
## (ALL DEFENDANTS)

568.     Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

569.     Sean was falsely arrested and falsely imprisoned as alleged herein.

570.     Each Defendant intentionally instigated and/or participated in the unlawful restraint of Sean by his/her/its words and acts alleged herein.

571.     The words of acts of each Defendant directed, requested, invited or encouraged the act of false imprisonment.

572.     Each Defendant participated in the act of false imprisonment by aiding COP and Maricopa County in restraining Sean.

573.     COP participated in the act of false imprisonment by Maricopa by aiding Maricopa County in restraining Sean.

574.     Maricopa participated in the act of false imprisonment by COP by aiding COP in restraining Sean.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

65

575.    As a direct and proximate result of each Defendant's instigation or participation in false arrest and imprisonment, Sean was sustained damages in an amount to be proven at trial.

### COUNT XIV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (ALL DEFENDANTS)

576.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

577.    The conduct of each Defendant alleged herein was extreme and outrageous.

578.    The conduct of each Defendant alleged herein was intentional in that each Defendant sought to cause Sean emotional distress.

579.    The conduct of each Defendant alleged herein was reckless in that each Defendant was aware of and disregarded the near certainty that the conduct would result in emotional distress.

580.    As a direct and proximate result of each Defendant's intentional infliction of emotional distress Sean sustained damages in an amount to be proven at trial.

### COUNT XV – AIDING AND ABETTING (ALL DEFENDANTS)

581.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

582.    Each Defendant engaged in malicious prosecution, abuse of process, false arrest and imprisonment, and intentional infliction of emotional distress as alleged herein.

583.    Each Defendant knew that one or more of the other Defendants were engaging in malicious prosecution, abuse of process, false arrest and imprisonment, and intentional infliction of emotional distress as alleged herein.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

584.     By the words and acts alleged herein, each Defendant provided substantial assistance and encouragement to such other Defendant or Defendants COP with the intent of promoting the tortious conduct.

585.     As a direct and proximate result of each Defendant's aiding and abetting Sean sustained damages in an amount to be proven at trial.

## COUNT XVI – CONSPIRACY
## (ALL DEFENDANTS)

586.     Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

587.     Defendants agreed to engage in a course of conduct to terminate Sean's employment, maliciously prosecute Sean and to defame and inflict emotional distress on him.

588.     These purposes were unlawful.

589.     Defendants used unlawful means to accomplish these purposes as described herein.

590.     As alleged herein, each of the Defendants performed overt acts in support of the conspiracy and in furtherance of its objectives.

591.     Sean was subjected to unlawful discharge from his employment, malicious prosecution, abuse of process, false arrest and imprisonment and intentional infliction of emotional distress as alleged herein.

592.     In addition, the accusations of sexual misconduct made against Sean alleged herein were false, and Defendants knew they were false.

593.     The accusations of sexual misconduct made by Maupin and Stanciel at the Press Conference and to the PNT as alleged herein were false and outrageous. Defendants knew that these accusations were false.

67

594.    The allegations of sexual misconduct against Sean were defamatory, and defamatory *per se* in that they were alleged sexual misconduct and disparaged Sean's performance in his job as a Police Officer.

595.    The accusations severely damaged his reputation in the community and impaired his ability to earn income.

596.    As a direct and proximate result of this defamation, Sean sustained damages in an amount to be proven at trial.

597.    By agreeing to engage in the course of conduct to accomplish the unlawful purposes described herein, each Defendant is liable for the tortious conduct of each other Defendant committed in the course of the conspiracy.

598.    As a direct and proximate result of the tortious conduct alleged in this Complaint, Sean sustained damages in an amount to be proven at trial.

### COUNT XVII -- MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983 - RAMIREZ (COP, MARICOPA, PROSECUTORS, RAMIREZ, WALKER)

599.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

600.    42 U.S.C. § 1983 provides individuals with a cause of action to sue for violations of his or her constitutional rights. The 14th Amendment protects individuals from constitutional violations of State and local authorities. As incorporated by the 14th Amendment, the 4th Amendment protects individuals from malicious prosecution. The Defendants, while acting in their official capacity and individual capacities and under the color of law, violated Sean Pena's rights to freedom from malicious prosecution in regards to Cynthia Ramirez' false allegations.

601.    COP, Maricopa, the Prosecutors, Ramirez, and Walker acted willfully, knowingly, and with specific intent to deprive Sean Pena of his rights under the Fourth

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

68

Amendment of the United States Constitution, including his right to be protected from malicious prosecution.

602.    COP, Maricopa, the Prosecutors, , Ramirez, and Walker acted unreasonably by failing to have PC to arrest and prosecute Sean as discussed herein.

603.    COP, Maricopa, the Prosecutors, , Ramirez, and Walker were able to secure indictments against Sean only by knowingly presenting the perjured testimony of Ramirez to the Grand Jury and by failing to present to the Grand Jury clearly exculpatory evidence demonstrating that the accusations were false and that these Accusers were not credible.

604.    Walker and the Prosecutors presented false and/or misleading testimony to the Grand Juries for the purpose of obtaining indictments.

605.    COP, Maricopa, the Prosecutors, Ramirez, and Walker acted with malice in instituting and continuing criminal proceedings against Sean.

606.    Ramirez' primary motives in making her accusations against Sean was to avoid prosecution and punishment for her own crimes and her personal hatred of Sean.

607.    As further discussed herein, the real motive to arrest and prosecute Sean was to make an example of a sacrificial lamb during the climate of this nation putting Police Departments under intense scrutiny due to the ME TOO movement, the defund the police movement, and ultimately due to the fact that COP paid both Lee and Gutierrez four hundred twenty-five thousand dollars ($425,000) each in their respective civil suits against COP and Sean and needed to secure his conviction to justify their actions.

608.    This was clearly malicious in nature.

609.    The criminal actions were brought in bad faith, and even when COP, Maricopa, the Prosecutors, Ramirez, and Walker had knowledge of the lies being perpetrated by the Accusers – including Ramirez – they pressed forward with prosecution.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

69

610.     Roseberry hid evidence **during Sean's second trial** that only came to light when Gutierrez let slip on the stand that she had additional potentially exculpatory evidence and that she had given it to the Trial Prosecutors at least a week prior to her testimony.

611.     This is evidence that the prosecution was acting maliciously and in bad faith in continuing to prosecute Sean.

612.     The whole purpose of the prosecution was to save COP from a black eye in public perception.

613.     The prosecution of these criminal charges were not brought for the purpose of bringing the defendant to justice.

614.     Finally, Sean was acquitted of all charges for the allegations of Ramirez on August 15, 2022.

615.     Sean's arrest and prosecution was the direct result of COP's, Maricopa, the Prosecutors', Ramirez', and Walker's actions and inactions.

616.     Additionally, the acts of Defendants and their employees and agents, as set forth above, demonstrate gross and wanton negligence in that each of them knew or had reason to know that their acts individually and collectively created an unreasonable risk of Constitutional violations to Sean's rights, and a high probability that substantial harm would result.

617.     In causing the utter devastation of Sean Pena's life through the malicious prosecution, Defendants and their employees and agents acted with an evil mind and a malignant heart warranting an award of punitive damages.

## COUNT XVIII -- MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983 - LEE
### (COP, MARICOPA, PROSECUTORS, LEE, WALKER)

618.    Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

619.    42 U.S.C. § 1983 provides individuals with a cause of action to sue for violations of his or her constitutional rights. The 14th Amendment protects individuals from constitutional violations of State and local authorities. As incorporated by the 14th Amendment, the 4th Amendment protects individuals from malicious prosecution. The Defendants, while acting in their official capacity and individual capacities and under the color of law, violated Sean Pena's rights to freedom from malicious prosecution in regards to Krystofer Lee's false allegations.

620.    COP, Maricopa, the Prosecutors,, Lee, and Walker acted willfully, knowingly, and with specific intent to deprive Sean Pena of his rights under the Fourth Amendment of the United States Constitution, including his right to be protected from malicious prosecution.

621.    COP, Maricopa, the Prosecutors,, Lee, and Walker acted unreasonably by failing to have PC to arrest and prosecute Sean as discussed herein.

622.    COP, Maricopa, the Prosecutors,, Lee, and Walker were able to secure indictments against Sean only by knowingly presenting the perjured testimony of Lee to the Grand Jury and by failing to present to the Grand Jury clearly exculpatory evidence demonstrating that the accusations were false and that these Accusers were not credible.

623.    Walker and the Prosecutors presented false and/or misleading testimony to the Grand Juries for the purpose of obtaining indictments.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

71

624.    COP, Maricopa, the Prosecutors,, Lee, and Walker acted with malice in instituting and continuing criminal proceedings against Sean.

625.    Lee's primary motives in making her accusations against Sean was to avoid prosecution and punishment for her own crimes and her personal hatred of Sean.

626.    As further discussed herein, the real motive to arrest and prosecute Sean was to make an example of a sacrificial lamb during the climate of this nation putting Police Departments under intense scrutiny due to the ME TOO movement, the defund the police movement, and ultimately due to the fact that COP paid both Lee and Gutierrez four hundred twenty-five thousand dollars ($425,000) each in their respective civil suits against COP and Sean and needed to secure his conviction to justify their actions.

627.    This was clearly malicious in nature.

628.    The criminal actions were brought in bad faith, and even when COP, Maricopa, the Prosecutors,, Lee, and Walker had knowledge of the lies being perpetrated by the Accusers – including Lee – they pressed forward with prosecution.

629.    Roseberry hid evidence *during Sean's second trial* that only came to light when Gutierrez let slip on the stand that she had additional potentially exculpatory evidence and that she had given it to the prosecutors at least a week prior to her testimony.

630.    This is evidence that the prosecution was acting maliciously and in bad faith in continuing to prosecute Sean.

631.    The whole purpose of the prosecution was to save COP from a black eye in public perception.

632.    The prosecution of these criminal charges were not brought for the purpose of bringing the defendant to justice.

633.    Finally, Sean was acquitted of all charges for the allegations of Lee on May 19, 2022.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

72

634.     Sean's arrest and prosecution was the direct result of COP's, Maricopa's, Prosecutors', Lee's, and Walker's actions and inactions.

635.     Additionally, the acts of Defendants and their employees and agents, as set forth above, demonstrate gross and wanton negligence in that each of them knew or had reason to know that their acts individually and collectively created an unreasonable risk of Constitutional violations to Sean's rights, and a high probability that substantial harm would result.

636.     In causing the utter devastation of Sean Pena's life through the malicious prosecution, Defendants and their employees and agents acted with an evil mind and a malignant heart warranting an award of punitive damages.

### COUNT XIX -- MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983 - GUTIERREZ (COP, MARICOPA, PROSECUTORS, GUTIERREZ, WALKER)

637.     Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

638.     42 U.S.C. § 1983 provides individuals with a cause of action to sue for violations of his or her constitutional rights. The 14th Amendment protects individuals from constitutional violations of State and local authorities. As incorporated by the 14th Amendment, the 4th Amendment protects individuals from malicious prosecution. The Defendants, while acting in their official capacity and individual capacities and under the color of law, violated Sean Pena's rights to freedom from malicious prosecution.

639.     COP, Maricopa, the Prosecutors,, Gutierrez, and Walker acted willfully, knowingly, and with specific intent to deprive Sean Pena of his rights under the Fourth Amendment of the United States Constitution, including his right to be protected from malicious prosecution.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

640.    COP, Maricopa, the Prosecutors,, Gutierrez, and Walker acted unreasonably by failing to have PC to arrest and prosecute Sean as discussed herein.

641.    COP, Maricopa, the Prosecutors,, Gutierrez, and Walker were able to secure indictments against Sean only by knowingly presenting the perjured testimony of Ramirez, Lee and Gutierrez to the Grand Jury and by failing to present to the Grand Jury clearly exculpatory evidence demonstrating that the accusations were false and that these Accusers were not credible.

642.    Walker and the Prosecutors presented false and/or misleading testimony to the Grand Juries for the purpose of obtaining indictments.

643.    COP, Maricopa, the Prosecutors,, Gutierrez, and Walker acted with malice in instituting and continuing criminal proceedings against Sean.

644.    Gutierrez' primary motives in making her accusations against Sean was to avoid prosecution and punishment for her own crimes and her personal hatred of Sean.

645.    As further discussed herein, the real motive to arrest and prosecute Sean was to make an example of a sacrificial lamb during the climate of this nation putting Police Departments under intense scrutiny due to the ME TOO movement, the defund the police movement, and ultimately due to the fact that COP paid both Lee and Gutierrez four hundred twenty-five thousand dollars ($425,000) each in their respective civil suits against COP and Sean and needed to secure his conviction to justify their actions.

646.    This was clearly malicious in nature.

647.    The criminal actions were brought in bad faith, and even when COP, Maricopa, the Prosecutors,, Gutierrez, and Walker had knowledge of the lies being perpetrated by the Accusers – including Gutierrez – they pressed forward with prosecution.

74

648.     Roseberry hid evidence *during Sean's second trial* that only came to light when Gutierrez let slip on the stand that she had additional potentially exculpatory evidence and that she had given it to the Trial Prosecutors at least a week prior to her testimony.

649.     This is evidence that the prosecution was acting maliciously and in bad faith in continuing to prosecute Sean.

650.     The whole purpose of the prosecution was to save COP from a black eye in public perception.

651.     The prosecution of these criminal charges were not brought for the purpose of bringing the defendant to justice.

652.     Finally, Sean was acquitted of all charges for the allegations of Gutierrez on August 15, 2022.

653.     Sean's arrest and prosecution was the direct result of COP's, Maricopa's, the Prosecutors', Gutierrez', and Walker's actions and inactions.

654.     Additionally, the acts of Defendants and their employees and agents, as set forth above, demonstrate gross and wanton negligence in that each of them knew or had reason to know that their acts individually and collectively created an unreasonable risk of Constitutional violations to Sean's rights, and a high probability that substantial harm would result.

655.     In causing the utter devastation of Sean Pena's life through the malicious prosecution, Defendants and their employees and agents acted with an evil mind and a malignant heart warranting an award of punitive damages.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

### COUNT XX

### MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983 – GUTIERREZ – *Monell* – CUSTOM AND PRACTICE
### (COP, SULLIVAN, WILLIAMS)

656.     Plaintiff incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

657.     As previously explained, U.S.C. § 1983 provides individuals with a cause of action to sue for violations of their constitutional rights.

658.     Defendants COP's, Sullivan's, and Williams' acts or failure to act deprived Sean of his constitutional rights.

659.     COP, the Phoenix Police Department, Defendant Sullivan, and Defendant Williams instituted a policy to ignore evidence involving sexual abuse allegations because of the ME TOO movement and for years acted pursuant to their customs and practices, which is an expressly adopted official policy or custom within the Phoenix Police Department.

660.     COP, Sullivan, and Williams were aware of the Phoenix Police Department's history of allowing the invention and fabrication of criminal charges.

661.     The customs and practices of COP, the Phoenix Police Department, Williams and Sullivan show that the invention of criminal charges is not enforced through written policy but established and ratified by custom and practice.

662.     Despite the Phoenix Police Department's and COP's ministrations, these techniques and practices to obtain convictions via falsehoods are upon information and belief the norm.

663.     If true justice was truly a priority, Sean would still have his job today.

664.     The policies and procedures in place have failed and established a police force that has consistently acted with blatant disregard to the public's and Sean's constitutional rights and extreme indifference to the value of his life and livelihood.

665.     It is unquestionable that there is a systemic failure by COP, the Phoenix

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Police Department, Williams and Sullivan that have allowed, supported, and established the commonplace use of scapegoats and invented criminal charges violative of the rights of the citizens of Phoenix, Arizona.

666.    Therefore, the established customs and practices led directly to the firing of Sean and the devastation of his life.

667.    COP, Williams, and Sullivan are liable for Sean's damages due to its established customs, patterns, and practices.

### COUNT XXI
### VIOLATION OF PLAINTIFF'S CIVIL RIGHTS UNDER 42 U.S.C. § 1985 - CIVIL CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS
### (COP, SULLIVAN, WILLIAMS, MARICOPA, PROSECUTORS, WALKER)

668.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth herein.

669.    At all relevant times, Defendants were acting under color of state law in their actions and inactions.

670.    42 U.S.C. § 1985(3) provides, in pertinent part: If two or more persons in any State...conspire...for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws, or of the equal privileges and immunities under the law...in any case of conspiracy set forth in this section, if one or more persons engage therein due, or cause to be done, any act and furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising and rights or privilege of a citizen of the United States, the party so injured or deprived may have an action for recovery of the damages occasioned by such injury or deprivation, against one or more of the conspirators.

671.    Two or more of the Defendants conspired for the purpose of depriving, directly or indirectly, Plaintiff of his rights under both the United States Constitution and the Arizona Constitution, as alleged herein.

672.    As a direct and proximate consequence of Defendants' civil conspiracy,

Plaintiff has suffered, and will continue to suffer, damages, including but not limited to, physical and/or mental anxiety and anguish in an amount to be proven at trial.

## COUNT XXII

## DEFAMATION

## (ALL DEFENDANTS)

673.    Sean restates and re-alleges the allegations of all previous Paragraphs of this Amended Complaint as if fully set forth herein.

674.    Each of the Defendants COP, Walker, Maricopa, Roseberry, Fu, Maupin, Stanciel, Ramirez, Lee and Gutierrez made false statements of fact about Sean as alleged herein; specifically, that he had committed sexual assault.

675.    Each of these false statements was defamatory in that it tended to bring Sean into disrepute, contempt or ridicule, or to impeach Sean's honesty, integrity, virtue, or reputation.

676.    Each of these false statements was defamatory *per se* in that it imputed to Sean: a) a criminal offense punishable by imprisonment or regarded by public opinion as involving moral turpitude; b) unfitness for the proper conduct of his lawful business, trade, or profession; and c) serious sexual misconduct. Thus, damages are presumed.

677.    Each of the Defendants COP, Walker, Maricopa, Roseberry, Fu, Maupin, Stanciel, Ramirez, Lee and Gutierrez made, said or wrote these false statements to a third person.

678.    Each of the Defendants COP, Walker, Maricopa, Roseberry, Fu, Maupin, Stanciel, Ramirez, Lee and Gutierrez was negligent in failing to determine the truth of these false statements.

679.    At the time that each of the Defendants COP, Walker, Maricopa, Roseberry, Fu, Maupin, Stanciel, Ramirez, Lee and Gutierrez made, said or wrote these false statements, he, she or it knew that the statement was false or acted in reckless disregard of whether the statement was true or false. Each of these Defendants had serious doubts as to whether these false statements were true or false, or consciously disregarded whether these false statements was true or false.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

680.    Defendants' false statements caused Sean to be damaged as alleged herein.

## JURY TRIAL DEMAND

681.    Plaintiffs hereby demand a jury trial in this matter as to all claims and against all Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs requests that the Court enter judgment against the Defendants and in favor of the Plaintiffs, as follows:

a)    For compensatory, general and special damages against each and every Defendant, jointly and severally, in an amount to be proven at trial;

b)    For all other non-pecuniary damages as to be proven at trial;

c)    For punitive and exemplary damages against Defendants in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future;

d)    For pre-and post judgment interest to the extent provided by law;

e)    For Plaintiffs' incurred costs, including all incurred attorneys' fees and court costs, pursuant to 42 U.S.C. §1988 and as otherwise authorized by any other statute or law; and

f)    For such other relief as this Court may deem proper.

**RESPECTFULLY SUBMITTED** this 7th day of September 2023.

**MILLS + WOODS LAW, PLLC**

By      */s/ Sean A. Woods*
    Sean A. Woods
    Robert T. Mills
    5055 North 12th Street, Suite 101
    Phoenix, Arizona 85014
    *Attorneys for Plaintiff*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**ORIGINAL** filed this 7th day of September, 2023
via AZTurboCourt with the Clerk of the
Maricopa County Superior Court


_____ /s/ Ben Dangerfield _____

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

# EXHIBIT 3

# UNITED STATES DISTRICT COURT

for the

District of Arizona

_____ Division

| | |
|---|---|
| Sean Pena | )    Case No.   CV-23-02156-PHX-SPL |
| | ) |
| | )    *(to be filled in by the Clerk's Office)* |
| *Plaintiff(s)* | ) |
| *(Write the full name of each plaintiff who is filing this complaint.* | )    Jury Trial: *(check one)*    Yes ☐ No |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) |
| *please write "see attached" in the space and attach an additional* | ) |
| *page with the full list of names.)* | ) |
| -v- | ) |
| | ) |
| Lisa Gutierrez, et al., | ) |
| | ) |
| **Defendants.** | ) |
| *Defendant(s)* | ) |
| *(Write the full name of each defendant who is being sued. If the* | ) |
| *names of all the defendants cannot fit in the space above, please* | ) |
| *write "see attached" in the space and attach an additional page* | ) |
| *with the full list of names.)* | ) |

## THE DEFENDANT'S ANSWER TO THE COMPLAINT

### I.    The Parties Filing This Answer to the Complaint

Provide the information below for each defendant filing this answer or other response to the allegations in the plaintiff's complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Lisa Gutierrez |
| Street Address | 400 W Baseline rd |
| City and County | Tempe |
| State and Zip Code | Arizona |
| Telephone Number | (480)294-8236 |
| E-mail Address | KENNB2021@gmail.com |

### II.    The Answer and Defenses to the Complaint

#### A.    Answering the Claims for Relief

On a separate page or pages, write a short and plain statement of the answer to the allegations in the complaint. Number the paragraphs. The answer should correspond to each paragraph in the complaint, with paragraph 1 of the answer corresponding to paragraph 1 of the complaint, etc. For each paragraph in the complaint, state whether: the defendant admits the allegations in that paragraph; denies the allegations; lacks sufficient knowledge to admit or deny the allegations; or admits certain allegations but denies, or lacks sufficient knowledge to admit or deny, the rest.

**B.** **Presenting Defenses to the Claims for Relief**

Write a short and plain statement identifying the defenses to the claims, using one or more of the following alternatives that apply.

1.  The court does not have subject–matter jurisdiction over the claims because *(briefly explain why there is no federal–question jurisdiction or diversity–of–citizenship jurisdiction; see the complaint form for more information)*

    The rights of the plaintiff ( Sean Pena) were not violated by Lisa Gutierrez. Every testimony made by Lisa was true and without malice, within the criminal trial case #CR2020-128297-001. As a victim Lisa had every right to explain entirely all details of the incident that occurred on August

2.  The court does not have personal jurisdiction over the defendant because *(briefly explain)*

3.  The venue where the court is located is improper for this case because *(briefly explain)*

4.  The defendant was served but the process–the form of the summons–was insufficient because *(briefly explain)*

5.  The manner of serving the defendant with the summons and complaint was insufficient because *(briefly explain)*

    The summons/complaint was served by plaintiff after the specified time given by this court via Honorable Steven P. Logan. Within the content of the Preliminary Order it states pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, the complaint has to be served to the Defendant(s)

6.  The complaint fails to state a claim upon which relief can be granted because *(briefly explain why the facts alleged, even if true, are not enough to show the plaintiff's right to recover)*

    The Defendant (Lisa Gutierrez) had every right to speak the truth about the plaintiff in the previous trial case#CR2020-128297-001 as a victim. The allegations presented in the plaintiffs claim does not present enough to show right to recover according to the documents and

7.  Another party *(name)* _____ needs to be joined (added)

    in the case.  The reason is *(briefly explain why joining another party is required)*

    a.      If the basis for subject–matter jurisdiction is diversity of citizenship, state the effect of adding the other party:

The other party is a citizen of the State of *(name)* _____ .

Or is a citizen of *(foreign nation)* _____ . The amount of damages sought from this other party is *(specify the amount)* _____ .

    b.      If the claim by this other party is based on an alleged violation of a federal constitutional or statutory right, state the basis:

## C.    Asserting Affirmative Defenses to the Claims for Relief

Identify an affirmative defense or avoidance that provides a basis for the defendant to avoid liability for one or more of the plaintiff's claims even if the basis for the claim is met. Any affirmative defense or avoidance must be identified in the answer. Include any of the following that apply, as well as any others that may apply.

The plaintiff's claim for *(specify the claim)*
1. compensatory, general and special damages
2. other non-pecuniary damages
3. punitive and exemplary damages

is barred by *(identify one or more of the following that apply)*:

1.      Accord and satisfaction *(briefly explain)*

2.      Arbitration and award *(briefly explain)*

3.      Assumption of risk *(briefly explain)*

4.      Contributory or comparative negligence of the plaintiff *(briefly explain)*

5.      Duress *(briefly explain)*

6.  Estoppel *(briefly explain)*


7.  Failure of consideration *(briefly explain)*


8.  Fraud *(briefly explain)*


9.  Illegality *(briefly explain)*


10. Injury by fellow employee *(briefly explain)*


11. Laches (Delay) *(briefly explain)*


12. License *(briefly explain)*


13. Payment *(briefly explain)*


14. Release *(briefly explain)*


15. Res judicata *(briefly explain)*

16.     Statute of frauds *(briefly explain)*

_____

17.     Statute of limitations *(briefly explain)*

_____

18.     Waiver *(briefly explain)*

_____

19.     Other *(briefly explain)*
        The Defendant (Lisa) has not violated any of the plaintiffs rights, she is only guilty of not
        speaking  up sooner than the year it took her to come forth (due to fear of an officer of the law,
        traumatization she incurred from that incident) and not producing the evidence (the dress she
        _____

**D.**     **Asserting Claims Against the Plaintiff (Counterclaim) or Against Another Defendant
        (Cross–Claim)**

        For either a counterclaim against the plaintiff or a cross–claim against another defendant, state briefly the
        facts showing why the defendant asserting the counterclaim or cross–claim is entitled to the damages or
        other relief sought.  Do not make legal arguments.  State how each opposing party was involved and
        what each did that caused the defendant harm or violated the defendant's rights, including the dates and
        places of that involvement or conduct.  If more than one counterclaim or cross–claim is asserted, number
        each claim and write a short and plain statement of each claim in a separate paragraph.  Attach
        additional pages if needed.

1.      The defendant has the following claim against the plaintiff *(specify the claim and explain it;
        include a further statement of jurisdiction, if needed)*:

_____

2.      The defendant has the following claim against one or more of the other defendants *(specify the
        claim and explain it; include a further statement of jurisdiction, if needed)*:

_____

3.      State briefly and precisely what damages or other relief the party asserting a counterclaim or
        cross–claim asks the court to order.  Do not make legal arguments.  Include any basis for
        claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any
        actual damages claimed for the acts alleged and the basis for these amounts.  Include any
        punitive or exemplary damages claimed, the amounts, and the reasons that are alleged to entitle
        the party to actual or punitive money damages.

a. The defendant asserting the counterclaim or cross–claim against *(specify who the claim is against)* _____ alleges that the following

injury or damages resulted *(specify)*:

_____

b. The defendant seeks the following damages or other relief *(specify)*:

_____

## III. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this answer: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the answer otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:

Signature of Defendant _____

Printed Name of Defendant _____

### B. For Attorneys

Date of signing: _____

Signature of Attorney _____

Printed Name of Attorney _____

Bar Number _____

Name of Law Firm _____

Street Address _____

State and Zip Code _____

| | |
|---|---|
| Telephone Number | (480) 294-8236 |
| E-mail Address | kennb2021@gmail.com |

# AFFIDAVIT OF TRUTH

### (Lisa Gutierrez Response)

### INTRODUCTION

I, Defendant (Lisa Gutierrez), representing self, answer the complaint brought forth by Plaintiff (Sean Pena) and Attorneys Mills + Woods Law PLLC.

Lisa Gutierrez asks this court to **Dismiss with Prejudice**, the complaint brought forth by the plaintiff. I write within this answer, correspondence to the allegations/accusations that are **FALSELY** placed upon me also each count which is **BLATANT** revenge for speaking truth to the fiction concocted by the Plaintiff and Defense Attorneys at trial case# CR2020-128297-001.

Ref.

To survive a Motion of Dismiss under Rule 12(b)(6) of the Federal Law of Civil Procedures, the complaint must "state a claim to relief that is plausible on its face". *Bell Atlantic corp.* v. *Twombly*, 550 U.S 544 570 (2007). A motion to dismiss should only be granted if there is "no set of facts" to support (the plaintiff's) claims which would entitle (the plaintiff) to relief". *Conley* v. *Gibson*, 355 U.S 41 45-46 (1957). The seventh circuit court of appeals has interpreted this standard to mean that, to survive a motion to dismiss for failure to state claim, the plaintiff's complaint "must contain either direct or respiting all the material elements necessary to sustain a recovery under same viable legal theory". *Car carriers, Inc.* v. Ford Motor co., 745 F.2d 1101 (7th Cir. 1984) (quoting *Sutliff, Inc.* v. *Donovan* cos., 1989)

## LISA GUTIERREZ' FALSE ACCUSATION (RESPONSE)

**207.**    In regard to this statement: In 2013 I was a victim of fraud; I made a police report stating my wallet (which had all my personal information in it) was stolen while at a casino (I mistakenly left it in the bathroom). Months later, 15 task force agents came to my elderly grandmother's house and "snatched me out like I was a criminal", took me to jail for a crime I did not commit. Being uneducated in law and in fear of my freedom, I took the deal that was presented to me. I was told if the 50 hours of community service was completed that the case will be dismissed (which it was) and no prison time. Before any of this ever occurred, I had no record or jail time for anything, just tickets for speeding.

### *A Routine Call* (Response)

**208, 209, 210 and 211**   All of these statements are true, no denying.

**212.**    True to the best of my knowledge; no denying.

**213, 214**  All of these statements are true, no denying.

**215 and 216**    As officer Felix proceeded to go knock at the door, the Plaintiff (Pena) and Defendant (Gutierrez) drove back to her home to be dropped off. After the Plaintiff opened and let the Defendant out of the patrol vehicle (back prisoner compartment), the plaintiff then said, "Do you know your shirt is see through", the defendant responded, "I appreciate the skin I am in". Then the plaintiff proceeded to tell the defendant that her fiancé had a warrant (insinuating he could arrest him if he wanted), instead of just focusing on the crime that the plaintiff and partner were called for.

**217, 218,219 and 220**    Later on after walking home from the store the defendant saw a patrol vehicle parked directly across the street from the defendant's home. Walking with milk in her hand the officer called out her name and invited her to the patrol vehicle. Approaching the

patrol vehicle, the defendant noticed it was the officer from earlier that day (the plaintiff). The defendant asked the plaintiff has he and his backup patrol officer caught the guy that committed the crime earlier. The plaintiff replied "no", then he commented on the dress the defendant was wearing. The plaintiff proceeded to grab the defendants' hand and placed it on his bare penis. The defendant yanked her hand back in shock. The plaintiff continued to say that he will be calling her later to meet him in the field. Not knowing that the plaintiff jotted the defendant's phone number down off the police report from earlier, really placed a shriek of fear within the defendant.

Regarding **220**: This whole statement was fiction created by the plaintiff and his attorneys, there wasn't any conversation about the defendant's fiancé at all on August 5, 2019. F.Y.I The defendant's fiancé wasn't a drug dealer (he collected cans and bottles for a living). Yes, during the trial on stand the defendant said that her fiancé was abusive, but she did not say this to the plaintiff throughout their interactions on August 5, 2019.

### *The Tempe Investigation* (Response)

**221.**    This statement is partially true: The defendant (Gutierrez) found a red phone after picking up her niece at her friend's house in the complex parking lot. Being the thoughtful individual she is, she wanted to give it back to its rightful owner. The defendant waited, when someone called looking for the phone, she said she was willing to meet up with them to return it. The phone started to alert (loud buzzing/find your phone) sound (There was a text that came also stating "Don't call the police Bitch, coming over with a gun"). She went outside called the police and told them she had found the phone (didn't want the police to think she stole it, scared), as she was on the phone with the police (being recorded), the

owner of the phone with two others pulled up and brandished a gun. The guy tried to pull her into the car (pulling the hand that was holding the phone holding it so tightly she couldn't let it go to give it to him), meanwhile the operator was still on the phone (she called 911 on the found phone). The defendant did not know who the phone belonged to that she had found.

**222.**     All of this statement is true, no denying.

**223.**     After the three suspects were arrested one of the suspects gave the detective on the scene a written statement apologizing for what had just transpired.

**224.**     This statement is not true; The defendant did not know any of them at all. Earlier that day she was in class for DCS. Why would the defendant jeopardize her DCS case (involving her child) with this nonsense about a phone?

**225.**     This statement is true, no denying.

**226 and 227**     This statement is partially true: The Defendant had only spoken to Det. Ratko Aleksis once (about the case with the three suspects ONLY) before she met with him for an interview in person about the case involving the three suspects ONLY, then spoke over the phone two more times after the meet. During the third and final phone call with Det. Aleksis the Defendant was so distraught, upset and feeling unjust because one of the suspects was granted leave to go out of state to be with his family. She felt the urge to say how she felt about an officer who assaulted her a year prior to Det. Aleksis (according to the Defendant at this time that statement "really slipped out" due to how she was feeling at that time). Detective Aleksis stated he would speak to his sergeant about the information the defendant had slipped up and told him, so he asked basic questions about the incident between the Defendant (Gutierrez) and the Plaintiff (Pena). The next day Detective Walker called the Defendant.

**228.** This statement is only true to the extent of the Defendant having to speak with whomever the detective was investigating the case with the three suspects. she only spoke to three Det. Aleksis, Det. Walker, and Det. Jansen (Walker's partner)

### *Sean's Indictment Goes Public* (Response)

**229 and 230** The Defendant (Gutierrez) at the time the Plaintiff (Pena) is stating that his indictment went public, the defendant did not have a TV to watch anything plus she did not like to watch the news because she was so free minded that any bad news would distract her from her spiritual path she was enduring. At that point the defendant had just moved out of a hotel into her new boyfriend's home (he didn't have a TV when she moved there). After the interview with Walker about the plaintiff the defendant found out from Walker that the plaintiff was on the news the night prior.

**231 and 232** The Defendant does not know if these statements are true or false because she never knew of this information regarding the allegations against the Plaintiff until after she was interviewed by Det. Walker. She did not know the details as far as KTAR goes, cause Walker said the indictment was aired the night prior, the Defendant told him she couldn't have known this because she doesn't have a TV and doesn't watch the news.

**233 and 234** These statements are partially true. The Defendant did tell Aleksis about the incident with the Plaintiff but as far as that time she doesn't recollect. Though she didn't know about the arrest of the plaintiff before.

**235.** This statement is true because it was a domestic violence situation with the Defendants fiancé's friend.

**236.** This statement is true. The Defendant knew that the plaintiff was new to the police department, cause the plaintiff told the defendant this: "while I was masturbating his penis, I asked questions, because I was so in fear of my life, I wanted to divert the Plaintiff's thoughts from potentially killing me, becoming another minority statistic.

**237.** This statement is false. The Defendant said to Aleksis: "the Plaintiff insinuated that he would take the Defendant's fiancé to jail (only by frequently mentioning the fact of her fiancé had a warrant), she also thought because of the plaintiff frequently mentioning the warrant, had parked directly across the street from her home the plaintiff would arrest her fiancé if she didn't cooperate meeting him in the field. The last part of this statement involving the mention of "unless she performed a sex act on Sean" is totally false, concocted by the Plaintiff and his Attorneys.

**238,239,240 and 241** These statements are partially false. Yes, the defendant hired the same civil lawyer as Lee this is true, but she was referred to that lawyer by a friend that is a lawyer (Alex Bergener) who could not handle her case because he is an accident lawyer. The Defendant, before contacting the referred civil lawyer, did not know of, see nor contact Maupin or Lee. She knew of them ONLY by attending the trial case# CR2020-128297-001. FYI: In a civil case it is against the law for a lawyer to give any information about other clients. The defendant never lied under oath; she doesn't know Maupin nor Lee till this day.

Below is a screenshot of the fee agreement dated October 7, 2020, between the (Gutierrez) and                    Defendant Alex Bergener:



## COP *Investigates Gutierrez' Accusations* (Response)

**242.** **This statement is true.**

**243.** This is true ONLY because the defendant gave as an initial statement to Aleksis: refer to **226 and 227**(Detective Aleksis stated he would speak to his sergeant about the information the defendant had slipped up and told him, so **he asked basic questions** about the incident between the Defendant (Gutierrez) and the Plaintiff (Pena))

**244.** This statement is partially true. The defendant did leave her infant home with the child's father (although the defendant and fiancé had their differences) at that time the defendant went to the store, her fiancé was cooking dinner, and the baby was asleep; she needed milk for when she wakeup plus the fiancé wouldn't harm his child.

**245,246,247,248,249,250,251,252 and 253**

These statements are all true as said by the defendant.

**254,255 and 256** According to the DCFS case (there was an incident where the defendants another one of the fiancé's friends (kicked in the door to the home running from the police) that arose post the assault by the Plaintiff, the Defendant was prohibited from returning to the home with or with out the child during this time. The fiancé was asked to bring

over the Defendants and child's clothes etc. but he was very negligent in doing so. This DCFS case lasted about 1year, which basically left her starting over with clothes/personal information (birth certificate, social security card etc.) for her and the child. The fiancé visited the child a few times but still failed to bring over any clothing, documents etc. Regarding the fiancé making a report: Refer to 251(her fiancé did not believe her and called her a "ho.") The fiancé wouldn't make a report, especially when he did not initially believe her anyway.

### *THE COUNTS* (Response)

### *Count 5 - Malicious Prosecution: "I deny all of these allegations."*

The Defendant was never malicious with her testimony against the Plaintiff. She told the truth about everything that occurred that evening on or about August 5, 2019.

### *Count 8 – Abuse of Process (Gutierrez): "I deny all of these allegations."*

The Defendant never abused any process, she told the truth about the incident that happened to her: "I don't have to lie about anything, it just absolutely "sucks" being victimized by a so-called decorated officer of the law".

### *Count 9 - Abuse of Process (Gutierrez and Lee): "I deny all of these allegations."*

The Defendant did not abuse nor conspire with any process with Lee: "I never knew of or met Kristopher Lee before being involved in the criminal trial case# CR2020-128297-001. This is a truly false allegation on the

Plaintiff (Pena) and his Attorneys behalf. My testimony wasn't by far motivated by malice nor by money. My true motivation was just to help subside a huge traumatic burden in my life (why I am still attending therapy today and started post the incident with the Plaintiff (Pena)". "To be honest for a year I didn't want to come forward with the assault in fear of retaliation, knowing he was an officer, and he knew where I lived at that time or have the ability/authority to come to my house or find me when I moved away. I was shaken even after I spoke to the Detectives about the incident when finally, I did gain the courage".

### Count 10 – Tortious interference with contract and reasonable business expectancy: "I deny all of these allegations."

The Defendant didn't interfere with the employment of the Plaintiff. According to case# CR2020-128297-001, it clearly states the Plaintiff was already terminated from his position as an officer before she spoke to the detective about what transpired on or around August 5, 2019.

### Count 12 – False arrest and imprisonment: "I deny all of these allegations."

There is no way that there were any false allegations against the Plaintiff, everything she said was the truth. "I have no reason to take time out of my day/life as a mother of two (also pregnant) to attend trial after trial, fighting for and stating the truth and he still got acquitted. There were GPS records showing where the Plaintiff was located every second, that I told to detectives. Also, what officer calls a victim eight times? Really the plaintiff is the one who lied under oath, saying that he called me because of fentanyl leads. This was never the reason why I initially called the police. I dialed 911 for help to remove someone from my home.

***Count 13 – Instigating or participating in false arrest and imprisonment: "I deny all of these allegations."***

The defendant keeps speaking the truth this all she can say, no reason to lie. She went through two pregnancies while dealing with the trials. The plaintiff and his attorneys constantly implying "the ME-TOO movement", whilst this incident (on or around August 5, 2019) factually occurred. Before the trials I hadn't heard of the Me-Too movement.

***Count 14 – Intentional infliction of emotional distress: "I deny all of these allegations."***

"It was never my intention to create emotional distress in the Plaintiff's life by telling the truth. I struggled through two pregnancies involving myself in the trials by speaking facts, postpartum depression, PTSD, insomnia, anxiety, and therapy which I am presently attending today. I have had suicidal thoughts, feeling of just ending my life so I will not have to sustain the pain and embarrassment of my name being slandered/being called a liar."

***Count 15 – Aiding and Abetting: "I deny all of these allegations."***

"I remain firm in telling the truth". During the trials the Defendant told the State and Defense about her witnesses. The witnesses were never subpoenaed to come to court. Her witnesses told the defendant the police came by their homes and took audio statements from them. These statements were never released/added to the case for the jury to hear.

***Count 16 – Conspiracy: "I deny all of these allegations."***

For a conspiracy to take place, it would have had to be one or more people involved doing something unlawful or harmful to an individual or many. The action of plotting or conspiring. To maintain this definition, you would have known the people you are allegedly conspiring with. In turn "I do not know Ramirez, Lee nor Maupin". "I don't know anyone the Plaintiff and his Attorneys are accusing me of plotting with".

***Count 19 – Malicious prosecution and violation of Penas 14th Amendment and 42 USC 1983: "I deny all of these allegations."***

"I am not the cause of the Plaintiffs (Pena) incarceration. The cause of the Plaintiff's incarceration was of his own accord/actions. Even though the plaintiff was found not guilty this doesn't mean he is NOT GUILTY."

Signed: _____

ACKNOWLEDGEMENT

On this ___11th___ day of December 2023, before me, the undersigned, a Notary Public in and for Maricopa County, personally appeared the above-signed, known to me to be the one whose name is sealed by signature on this document, and has acknowledged to me that she has executed the same.

Notary Signature: _____

My Commission: ___10/26/2027___

Seal: 

MARISOL DE LEON
Notary Public - Arizona
Maricopa County
Commission # 656408
My Comm. Expires Oct 26, 2027