Your Name: Lisa Gutierrez

Address: 400 W Baseline Rd. lot#330

City, State, Zip: Tempe, AZ, 85283

Phone Number: (480)294-8236

FILED _____ LODGED
_____ RECEIVED _____ COPY

FEB 0 4 2026

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

1
2
3
4
5

6           **IN THE UNITED STATES DISTRICT COURT**

7           **FOR THE DISTRICT OF ARIZONA**

8

9    Sean Pena              ,        Case No: 2:23-CV-02156-SPL

10              Plaintiff,

11   v.                              Motion to dismiss

12   Lisa Gutierrez,                 & Response For Admisson

13              Defendant(s).        Exhibit A.& B

14

15

16

17

18

19

20

21

22

23

24

25

26

27        THIS DOCUMENT IS **NOT** IN PROPER FORM ACCORDING
          TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
28        AND IS SUBJECT TO REJECTION BY THE COURT.

          REFERENCE LRCiv P 5.4
                        (Rule Number/Section)

Lisa Gutierrez

Case#2:23-CV-02156-SPL

# Response to:

# Response For Admission (RFA)

1    Pursuant to Fed. R. Civ. P. 36, Plaintiff Sean Pena, by and through his attorneys,

2  requests that Defendant Lisa Gutierrez admit the following requests in writing, and serve

3  her response upon the undersigned attorneys at 5055 N. 12th Street, Suite 101, Phoenix,

4  Arizona, 85014, to swoods@millsandwoods.com, within thirty (30) days of service of

5  these requests for admission.

6                                   **DEFINITIONS**

7       1.     **"Complaint"** means the operative Complaint in the above-captioned action.

        2.     **"Defendant" "You"** or **"Your"** means Lisa Gutierrez, Defendant in the
8  above-captioned action, and her subsidiaries, divisions, predecessor and successor
   companies, affiliates, parents, any joint venture to which she may be a party, and/or each
9  of her employees, agents, officers, directors, representatives, consultants, accountants and
   attorneys, including any person who served in any such capacity at any time during the
10 relevant time period specified herein.

11      3.     **"Plaintiff"** or **"Sean Pena"** means Plaintiff Sean Pena in the above-
   captioned action.

12      4.     The term "Communication" means the transmittal of information (in the
   form of facts, ideas, inquiries or otherwise), including, without limitation, written, oral, or
13 electronic transmissions.

14      5.     The term "Document(s)" means all materials within the scope of Fed. R. Civ.
   P. 34, including, but not limited to, all writings, drawings, graphs, charts, photographs,
15 sound recordings, images, and other data or data compilations, including electronically
   stored information, that are stored in any medium whatsoever from which information can
16 be obtained either directly or, if necessary, after translation by the responding party into a
   reasonably usable form, as well as any tangible things. Documents include, but are not
17 limited to, electronic mail or e-mail, text messages, facsimiles, instant messages (IMs),
   calendars, diaries, appointment books, agendas, journals, drafts, voicemail messages, post
18 cards, post-it notes, reports, logs, message slips, invoices, checks, paystubs, letters,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Case 2:23-cv-02156-SPL   Document 105-1   Filed 02/04/26   Page 4 of 108

optical disks; magnetic tapes/back-up tapes; magnetic disks (hard drive, floppy disks, etc.); tablets; PDAs, iPhones; iPads; Blackberries and Palm Pilots; cell phones; IM tools; flash drives; and network storage.

7.     The term "Writing" as used in this request for identification and production is a broadly inclusive term referring to any and all written or other graphic material, however produced or reproduced, of every kind and description and to everything upon which sounds, words, symbols or pictures are recorded or depicted by magnetic or electrical impulse, photography, or otherwise. The term "writing" includes, by way of example and not limitation, the following and anything similar to any of the following:

    a. Letters, telegrams, telexes, cables, TXWs, memoranda, E-mails, interoffice correspondence and other forms of correspondence and written communication;

    b. Agreements, contracts, policies, handbooks, practice guidelines, reports, studies, records, books, journals, papers, statements, pamphlets, circulars, publications, stenographic notebooks, files and their contents, file folders, file covers, file jackets, and notes;

    c. Summaries, abstracts, indexes, tabulations, graphs, charts, lists and inventories;

    d. Calendars, desk calendars, appointment books, schedules, logs, telephone messages, diaries, time sheets, minutes of meetings, and transcripts;

    e. Financial statements, checks, invoices and accounting records and books;

    f. Pleadings, deposition transcripts, trial transcripts, interrogatories, answers to interrogatories, affidavits, declarations, papers filed or lodged with courts, and papers filed with or sent to administrative agencies; and,

    g. Tape recordings, sound reproductions, objects, photographs, motion pictures, microfilm, computer data stored on magnetic tape, computer printouts, data processing cards or tapes, portable magnetic storage including without limitation USB drives and enclosed hard drives, and computer disks or diskettes.

8.     "Relate," "related" or "relating" means, in addition to their usual and customary meanings, concerning, referring to, reflecting, regarding, pertaining to, addressing, discussing, alluding to, describing, evidencing, constituting or otherwise having any logical or factual connection with the subject matter addressed.

9.     The words "and" and "or" shall be construed disjunctively or conjunctively to bring within the scope of each request for production all responses which otherwise might be construed to be outside the scope of a request for admission.

10.    The word "any" shall be construed to include "all" and vice versa.

11.    The word "each" shall be construed to include "every" and vice versa.

12.    Any word in the singular form shall also be construed as plural and vice versa.

13.    The masculine form shall also be construed to include the feminine and vice versa.

14.    "Identify" with respect to a person means to give, to the extent known, the person's (a) full name; (b) present or last known address; and (c) current or last known place of employment.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

15.  "Identify" with respect to a document means to give, to the extent known, the (a) type of document; (b) general subject matter; (c) date of the document; and (d) author(s), addressee(s) and recipient(s). In the alternative, the responding party may produce the documents, together with identifying information sufficient to satisfy Rule 33 of the Arizona Rules of Civil Procedure.

16.  "Identify" with respect to communications means to give, to the extent known, (a) a description of the substance of the communication; (b) the form of the communication (e.g., telephone, facsimile, email, etc.); (c) the identity of all parties to and/or present at the time of the communication, as well as the full name, present or last known address, and the current or last known place of employment of each person; (d) the identity of the person whom you contend initiated the communication; and (e) the time, date, and place of the communication.

17.  "Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity, organization, or association.

18.  "Statement" or "statements" as used herein refers to a written expression signed or otherwise adopted or approved by the person making it or a stenographic, mechanical, electronic, or other record, or a transcription thereof, which is a substantially verbatim recital of an oral expression by the person making it.

## INSTRUCTIONS

1.  Unless you properly object to a request, you must, under Federal Rule of Civil Procedure 36, admit, specifically deny, or state in detail why you cannot truthfully admit or deny each of the following requests based on knowledge and information in your possession, custody or control, or in the possession, custody or control of your representatives, agents, or attorneys. If you do not respond to each of these requests within thirty (30) days, the requests will be deemed admitted under Federal Rule of Civil Procedure 36.

2.  If you object to or refuse to answer any request for admission on the ground that the answer reflects or would reveal the substance of a confidential or privileged communication, identify:

    a.  the nature of the privilege claimed;

    b.  the person who made the communication, whether oral or in writing;

    c.  if the communication was oral, all persons present while the communication was made;

    d.  if the communication was written, the author, addressees and any other recipients;

    e.  the relationship of the author of the communication to each recipient;

    f.  the relationship of the persons present to the person who made the communication;

    g.  the date and place of the communication; and

    h.  the general subject matter of the communication.

3.  The answer shall specifically admit or deny the matter, or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter.

4.  A denial shall fairly meet the substance of the requested admission, and when good faith requires that you qualify an answer or deny only a part of the matter of which

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

an admission is requested, you shall specify so much of it as is true and qualify or deny the remainder, setting forth in detail the reasons specifically as requested herein.

5.      You may not give lack of information or knowledge as a reason for failure to admit or deny, unless you include a statement that you have made reasonable inquiry and that the information known or readily obtainable by you is insufficient to enable you to admit or deny the matter in question. The answer to any such request for admission also must include the responding party's explanation as to why, after reasonable inquiry, the responding party was unable to admit or deny.

6.      If you consider that a matter as to which an admission has been requested presents a genuine issue for trial, you may not, on that ground alone, object to the request. Subject to the provisions of Fed. R. Civ. P. 37(e), you may deny the matter, or set forth reasons why you cannot admit or deny such matter.

7.      If you fail to admit the truth of any matter requested herein and that matter is thereafter proved upon the trial of this action or otherwise, you may be required to pay to Plaintiff the reasonable expenses, including attorney's fees, incurred in proving the truth of such matter. If you consider that a matter as to which an admission has been requested presents a genuine issue for trial, you may not, on that ground alone, object to the request. You may, subject to the provisions of Fed. R. Civ. P. 37(e), deny the matter or set forth reasons why you cannot admit or deny such matter.

8.      These requests for admission are continuing in nature. If you receive or otherwise become aware of information that would change your answer to any of these requests for admission after you have served your response, you must comply with Federal Rules of Civil Procedure 26(e) and 36(b) by promptly supplementing your answers or filing the appropriate motion

9.      Answers to these requests for admission shall be served upon the undersigned attorneys at MILLS + WOODS LAW, PLLC, 5055 N. 12th St. Suite 101, Phoenix Arizona, 85014, to swoods@millsandwoods.com, within thirty (30) days of service of these requests.

### REQUESTS FOR ADMISSION ("RFAs")

**RFA 1:** Admit that Sean Pena did not expose his genitals to you.

ADMIT _____          DENY ___✓___

**RFA 2:** Admit that Sean Pena did not touch you in any way that you did not consent to.

ADMIT _____          DENY ___✓___

**RFA 3:** Admit that you did not at any time feel intimidated by Sean Pena.

ADMIT _____          DENY ___✓___

**RFA 4:** Admit that you did not have any sexual relations with Sean Pena.

ADMIT _____          DENY ___✓___

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**RFA 5:** Admit that you received more than $400,000 from the City of Phoenix.

ADMIT ___✓___    DENY _____

Feb, 4, 26

**RESPECTFULLY SUBMITTED** this 29th day of October 2025.

**MILLS + WOODS LAW, PLLC**

By___/s/ Sean A. Woods_____
Robert T. Mills
Sean A. Woods
5055 N 12th Street, Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2025, I electronically transmitted the foregoing document to the following via email:

Lisa L. Gutierrez
Kennb2021@gmail.com
Kennb2020@gmail.com
400 W Baseline Rd., Lot 330
Tempe, AZ 85283
(480) 294-8236
*Defendant*

/s/ Ben Dangerfield

6

## Dear Judge Logan:

Everything that I'm saying to you is truthful and honest I have now gone through almost three trials because of Sean Pena's (former COP police officer) actions of sexual misconduct. I live each day in trauma, misunderstanding, disbelief, and regret for telling the truth, asking myself each and every day why did I say anything especially after he was set free and justice for me wasn't gained. He got away with the assault, the defense, during trial tried to paint me out to be a horrible person, I sat on the stand pregnant not once but twice and during the two trials I had postpartum depression because of it. Before trials ever happened and before I spoke up about the assault, within the same week of the assault, police were at my house, guns drawn in my face looking for my child's father's friend, as I was building a dog house outside of the same house where the officers came to help me when I had called the police that night they arrested my child's father while I stood out in the cold with my baby. A day or two later CPS was knocking at my door looking for my child I had already took my daughter to my grandmother's house, I've been dealing with trauma, too much is going on, all I ask for is my life back I need some normalcy in my life I don't want to be looking over my shoulder thinking that this officer is going to come get me every day that he's out he got away with what he has done. I dealt with CPS, even moved out of that house, leaving my own birth certificate that I can't get back and everything I owned at that house. To be honest with you I had to move in with my grandma. My child's father was still in South Phoenix as Sean Pena was still on the force and he would see my child's father and my child's father would call me and he would tell me that he saw that cop (Sean Pena) he was looking for me. Now during the trial my witnesses were never called upon, not only that the GPS records ALSO stated he was exactly everywhere that I said he was. The defense said that all the victims knew each other, which was/is false. I didn't/don't know any of the victims in this case including Maupin. I know if it happened to me It happened to them as well. The defense was trying to say it was a me-to-movement, when I

personally didn't know what the me-to-movement was, until I looked it up after it was said in court. In addition, what officer of the law would call a victim eight times at night, It does not make sense to me and have my number saved in his phone as a detective's name. I don't know who would do that if they are not hiding something. I sued the City of Phoenix for keeping him in the force because I was the third victim not the first not the second I was the third victim and they kept him on the force after the first 2 allegations. I'm just saying I want my life back I don't want to have to sit here and be scared for my life each and every day thinking that he's going to come get me He's my boogeyman, he's not who he portrays he is, a great hero officer trying to fight drugs and fighting crime, he might have did that in front of people but behind closed doors he is a monster and I had hoped by me speaking up and speaking out that it would make me stronger than ever and hopefully God willingly he never does this again. If he does I don't want to be called to the stand to testify on what he's done because all I could say is I told you guys so I just want my sanity back too. I don't want to sit here and feel like I want to die because of all this is too much. I didn't have a mom, dad or nobody to be strong for me besides my grandmother and through all this my grandmother aka mom has passed honestly judge Logan please dismiss this with prejudice I really can't do no more still fighting for the truth after all this time as a victim thank you

Sincerely,

Lisa Gutierrez

2-4-26

# EXHIBIT A

Lisa Gutierrez

Case# 2:23-cv-02156-SPL

# Response

In response to the Request for Admission (RFAs):

At the beginning of these procedures, I had submitted an Affidavit of Truth. Within that Affidavit of Truth all the admission questions were previously answered. I will answer again due to this request.

RFAs#1: Admission that Sean Pena did not expose his genitals to you:  I checked denied:

The reason why I checked denied was because coming home from the store with the milk after Sean Pena called me over to his squad car he had placed my hand on his exposed penis, and he said did I like that as I jerked my hand back scared for what was going to occur next.

RFAs#2: Admission that Sean Pena did not touch you in any way that you did not consent to: I checked denied:

I did not consent for him to place my hand on his penis at all, nor to ejaculate on my chest, I was afraid of what he would do if I said no.

RFAs#3: admission that you did not add any time feel intimidated by Sean Pena: I checked denied:

Absolutely, I felt intimidated by Sean Pena. I called 911 for help and he made a comment about my shirt; he wrote my information down including my personal number. He knew and now knows where I live. He can use any reason to come into my house uninvited. He can abuse his power as he did. He could take my child's father to jail. He was an officer of law so you would have to do whatever the officer says, so yes, I was/is very, very intimidated.

RFAs#4: admission that you did not have any sexual relations with Sean Pena: I checked denied:

It was not consensual sexual relations with Sean Pena. He forcibly placed my hand on his genital area. He told me that he's going to call my phone and I better answer. When I answered he said to meet him in the field, when I met him there, he jammed my body between the car door and himself pulling my upper body closer to his body as he ejaculated on my chest. I did not consent to any of this.

RFAs#5: admission that you received more than $400,000 from the city of Phoenix: I checked admit:

I admit I was awarded more than $400,000 by the City of Phoenix for the negligence of the (C.O.P). Honestly the city of Phoenix should have never kept Sean Pena as an officer of the law on the force after the first victim made a claim of being sexually assaulted. After the second victim made a claim of sexual assault he also remained on the force. The victims, if they were taken seriously, then I wouldn't have become a third victim.

EXHIBIT B

1    David W. Dow (#007377)
2    Jennifer L. Ghidotti (#033071)
     **DOW LAW OFFICE**
3    3104 E. Camelback #281
     Phoenix, Arizona 85016
4    Phone: 480.776.5039
     Fax: 480.945.0553
5    Ddowlaw1@gmail.com;
6    Jlevine@ddowlaw.com
     *Attorneys for Plaintiff*
7

8                  **MARICOPA COUNTY SUPERIOR COURT**
                          **STATE OF ARIZONA**
9

10   LISA GUTIERREZ,                    | Case No.

11           Plaintiff,                 | **COMPLAINT**

12   v.

13
     CITY OF PHOENIX, a municipality and
14   jural entity; SEAN PENA, an individual
     acting under the color of law; JOHN
15   DOES I-V, an individual(s), acting under
     the color of law, and JANE DOES I-V, an
16   individual(s), acting under the color of
17   law; XYZ CORPORATIONS; ABC LLCs

18                  Defendants.
19

20       Plaintiff, Lisa Gutierrez, for her Complaint against Defendants alleges as follows:

21                    **PARTIES | JURISDICTION | VENUE**
22

23       1.      Plaintiff Lisa Gutierrez ("Plaintiff") is an individual and at all relevant times,

24   was a resident of Maricopa County, Arizona.

25

26

                                          1

2.     Defendant City of Phoenix ("COP") is and was at all times material hereto a municipal and jural entity and a political subdivision of the State of Arizona; it is located within the geographic bounds of Maricopa County, Arizona.

3.     The Phoenix Police Department ("PPD") is and was at all times relevant hereto a Phoenix agency, providing the vehicle through which the City of Phoenix fulfills its policing functions.

4.     Upon information and belief, Defendant Sean Pena ("Defendant Pena" or "Pena") is and was at all times relevant hereto a citizen of the United States and the State of Arizona, and a resident of Maricopa County, Arizona.

5.     Defendant Pena was at all relevant times employed by PPD as a duly appointed and sworn police officer and was acting in his individual capacity and/or under the color of state law and within the scope of his employment.

6.     Upon information and belief, Defendants John or Jane Does are the unnamed, as-yet unidentified individuals, including but not limited to any and all police officers that were present during the incidents/investigations and may be responsible, in part, for the actions/inactions described herein. Such Jane or John Does know or should have known about at least Defendant Pena's prior sexual assault on his first victim, ("Victim A") and/or other conduct by Defendant Pena and they should have intervened to not allow Defendant Pena to have contact with Plaintiff.

2

7.      Upon information and belief, Defendants John or Jane Does are also the unnamed, as-yet unidentified individuals who were responsible for investigating the sexual assault of Defendant Pena's first victim ("Victim A").

8.      Upon information and belief, Defendants John or Jane Does are also the unnamed, as-yet unidentified individuals who were responsible for employing,    retaining, or supervising Defendant Pena with the City of Phoenix, specifically Phoenix Police Department. This includes, but is not limited to those who reviewed Defendant Pena's employment application, employment history, inactions/actions as a police officer, discipline and/or recommendations and/or determinations related to his conduct with Victim A, and were responsible for determining whether Defendant Pena held and continued to hold the mental, psychological and/or emotional capabilities required for a position within law enforcement, or were otherwise responsible for the policies and procedures within the City of Phoenix to ensure Applicant's fitness for duty as a City of Phoenix Police Officer.

9.      Upon information and belief, Defendants John or Jane Does are also the unnamed, as-yet unidentified individuals whose true names are presently unknown to Plaintiff, but who are or may be liable to Plaintiff for the inactions and actions alleged in Plaintiff's Complaint.

10.     Upon information and belief, DOES I-X, ABC Corporations I-X and XYZ LLC's are corporations, partnerships, limited liability companies, individuals or other incorporated or unincorporated associations whose true names are presently unknown to

3

Plaintiff, but who are or may be liable to Plaintiff for the inactions and actions alleged in Plaintiff's Complaint.

11.     If and when the true names of such fictitious defendants become known, Plaintiff will seek leave of the Court to amend her Complaint to set forth their true names, capacities and relationships and request that the Amended Complaint relate back to the date this Complaint was filed.  Such individuals and/or entities may be responsible for the actions/inactions described herein.

12.     Jurisdiction and venue are proper in Maricopa County, Arizona since Defendants reside and/or caused events to occur in Maricopa County, from which the facts giving rise to this Complaint occurred.

13.     This court has personal and subject matter jurisdiction over the parties and this Complaint.

14.     This case is not subject to Arbitration.

15.     Plaintiff demands a jury trial on all issues triable by jury.

### FACTS GENERAL TO ALL COUNTS

16.     Plaintiff hereby incorporates by reference all the proceeding paragraphs as though fully set forth herein.

17.     On or about August 5, 2019, Plaintiff, a Black woman, called the Phoenix Police Department due to an incident with a family friend.

18.     Two Phoenix police officers arrived to Plaintiff's home, one of which was Defendant Pena.

4

19.    Plaintiff is informed and believes that Defendant Pena is not a Certified Officer as a Crisis Intervention Team Member, and given his prior actions, should never have been sent to a scene where a woman had requested a police response.

20.    Defendant Pena asked Plaintiff to get inside his police vehicle so that she could show him where the suspect may be; Defendant Pena then brought Plaintiff back to her home.

21.    While Plaintiff stood outside Defendant Pena's police vehicle, Defendant Pena told Plaintiff that her then-boyfriend had a misdemeanor warrant. Defendant Pena told Plaintiff that he could take her then-boyfriend into custody and sexually harassed Plaintiff when he commented that her shirt was see through.

22.    Defendant Pena asked Plaintiff for her phone number and claimed he needed her phone number in case they needed to contact her. Defendant Pena finally left the residence.

23.    That evening, Plaintiff went to the grocery store to get milk. While walking home, she saw a Phoenix Police vehicle parked almost directly in front of her house. As she walked past the vehicle, she heard someone yell her name asking her to go to his vehicle. Plaintiff looked at the vehicle and saw that it was Defendant Pena sitting alone in his police vehicle.

24.    Defendant Pena sexually harassed Plaintiff when he stated she looked nice.

5

25.    Defendant Pena told Plaintiff to come to the police vehicle where Defendant Pena unlawfully seized Plaintiff and forced her hand on his exposed penis.

26.    Plaintiff yanked her hand away from Defendant Pena's exposed penis, but Defendant Pena forced her hand back on his penis.

27.    Defendant Pena stated to Plaintiff "did you like that" and asked if "this is big enough for you?"

28.    Defendant Pena finally let go of Plaintiff's hand and Plaintiff stepped back away from his patrol vehicle.

29.    Defendant Pena continued to sexually harass and intimidate Plaintiff when Defendant Pena told Plaintiff that he would call her in an hour and that Plaintiff was required to meet him by a field.

30.    In a panic, Plaintiff walked home.

31.    Shortly thereafter, while Plaintiff was inside her home with her daughter, she received a phone call from Defendant Pena telling her to meet him in the field.

32.    Because Defendant Pena was a police officer, Plaintiff felt obligated to go to the field as she feared for the lives and safety of her child, herself and what could happen to her then-boyfriend.

33.    Plaintiff walked into the dark field and initially did not see Defendant Pena nor his patrol vehicle in the vacant lot.  While walking through the lot, Plaintiff heard

6

Defendant Pena call Plaintiff's name and Defendant Pena told Plaintiff to walk towards the patrol vehicle.

34.    Plaintiff was in fear for her life and was worried that she was going to be murdered. Plaintiff worried that she was going to be "just another dead Black woman alone in a field."

35.    Defendant Pena pulled Plaintiff toward him so that Plaintiff was trapped between the driver's side door and the driver's seat.

36.    Defendant Pena demanded oral sex, but Plaintiff begged to not be subjected to oral sex.

37.    Defendant Pena agreed that Plaintiff did not have to give him oral sex, but Defendant Pena forced Plaintiff to masturbate Defendant Pena inside his patrol vehicle where he exposed and fondled her breast.

38.    While Defendant Pena sexually assaulted Plaintiff, he made sexually explicit comments to Plaintiff.

39.    Defendant Pena ejaculated on Plaintiff's breast and dress.

40.    Humiliated, degraded and scared for her life, Plaintiff was finally allowed to go home.

41.    Defendant Pena told Plaintiff that he would see her later. Plaintiff feared for her life and walked home.

1    42.    Defendant Pena never attempted to, nor did he provide medical aid to

2    Plaintiff, including psychological or emotional aid.

3    43.    Plaintiff courageously reported the sexual assault to Tempe Police

4
5    Department.

6    44.    Upon information and belief, in November 2019, Defendant Pena was finally

7
8    placed on Administrative Leave with the City of Phoenix.

9    45.    Upon information and belief, Defendant Pena was belatedly terminated from

10    Defendant COP on July 6, 2020, which was almost two years after Defendant Pena sexually

11    assaulted Victim A and nearly one year after he sexually assaulted Plaintiff.

12
13    46.    On or about August 13, 2020, Defendant Pena was indicted in Maricopa

14    County for his sexual assault against Plaintiff and is currently facing criminal charges for

15    Sexual Assault in violation A.R.S. § 13-1406(A) and two counts of Sexual Abuse in

16
17    violation of A.R.S. § 13-1404(A).

18    47.    Defendant Pena is currently indicted and facing criminal charges related to

19    three different victims, all of whom were sexually assaulted while Defendant Pena was

20
21    acting as a Phoenix Police Officer.

22

23    **Defendant Pena's Sadistic History of Sexual Violence and**
     **Defendant COP's cursory 2018 investigation into Victim A's Sexual Assault.**
24

25    48.    Plaintiff hereby incorporates by reference all the proceeding paragraphs as

26    though fully set forth herein.

8

49.     On or about July 31, 2017, Defendant Pena was hired by Defendant COP as a Phoenix Police Officer, and upon information and belief, in January 2018, Defendant Pena completed police officer training and began acting as a City of Phoenix Police officer.

50.     Defendant Pena was hired during a City of Phoenix police shortage.

51.     On August 26, 2018, a mere eight months after Defendant Pena began his employment with Defendant COP, Defendant Pena sexually assaulted Victim A (sometimes referred to in police reports as "CR") while Defendant Pena was transporting Victim A to Fourth Ave Jail; Victim A was handcuffed in the backseat of his patrol vehicle.

52.     On August 26, 2018, the night of the sexual assault against Victim A, Defendant COP had a larger shortage of sworn officers on duty than normal and Defendant Pena was required to put in two to three hours of overtime.

53.     On August 26, 2018, at approximately 1:30 a.m., Victim A was arrested due to an outstanding warrant and was placed in Defendant Pena's patrol vehicle. Defendant Pena took Victim A to the South Mountain Precinct ("SMP") for processing. Victim A was handcuffed with her hands behind her back during the trip to SMP.

54.     Upon information and belief, during the transport to SMP, Defendant Pena did not have his body-worn camera ("BWC") activated.

55.     While transporting Victim A to SMP, Defendant Pena asked Victim A "How freaky do you get?"

9

56.     After processing was completed, at 3:27 a.m., Victim A was placed in Defendant Pena's patrol vehicle to be taken to 4th Avenue Jail.  This time, Victim A was transported to 4th Avenue Jail with her hands cuffed in front of her. Again, Defendant Pena failed to activate his BWC.

57.     It is unknown why Defendant Pena transported Victim A instead of Victim A being transported by a Maricopa County Sheriff's Office ("MCSO") van.

58.     Upon information and belief, while transporting Victim A to Fourth Ave Jail, Defendant Pena again asked Victim A "How freaky do you get?"

59.     Upon information and belief, Victim A told Defendant Pena that she could not go to jail because she had a son and stepmother to take care of.

60.     During the transport to Fourth Avenue Jail, upon information and belief, Defendant Pena used his position of power as a police officer to coerce Victim A to unbutton her shirt and expose her breast; Victim A complied and showed Defendant Pena her breast.

61.     While transporting Victim A to Fourth Ave Jail, there was a MCSO prisoner van in front of Defendant Pena's patrol vehicle.  Prior to reaching the railroad tracks near Buchanan and 3rd Ave, the MCSO prisoner van made a U-turn before reaching the railroad tracks.  Defendant Pena proceeded towards the railroad tracks.

10

62.    At approximately 3:38:26 a.m., Defendant Pena stopped his patrol vehicle near Buchanan and 3rd Ave near the train tracks as the train was passing.

63.    While stopped at the railroad tracks, Defendant Pena told Victim A to again expose her breasts to him; Victim A complied a second time.

64.    While stopped at the railroad tracks, Defendant Pena exited his patrol vehicle and opened the rear driver's side door.  Defendant Pena told Victim A to turn towards Defendant Pena and Defendant Pena exposed his penis through his open pants zipper. Defendant Pena then placed his penis in and out of Victim A's mouth for what Victim A believed to be three minutes.

65.    Defendant Pena then grabbed Victim A's hair and said "Hey, not bad" before pushing her head back into the vehicle.  Defendant Pena told Victim A not to say anything.

66.    Victim A then laid down across the rear seat and cried as Defendant Pena drove to Fourth Ave Jail.

67.    According to Victim A, Defendant Pena did not ejaculate and Defendant Pena did not have pubic hair.

68.    Upon information and belief, surveillance footage confirms that at the time of Victim A's sexual assault, Defendant Pena's patrol vehicle was stopped at the railroad tracks near 3rd Ave and Buchanan, which is merely .2 miles away from Fourth Ave Jail. Defendant Pena's patrol vehicle disappeared for approximately 1 minute and 42 seconds

11

as the vehicle is obstructed by a storage unit until its headlights again appear as the vehicle is turning around.

69.     Records show that Defendant Pena's patrol vehicle was stopped at the railroad tracks from 3:38:26 a.m. to 3:40:08 a.m., which provided Defendant Pena with ample time to sexually assault Victim A. Thus, Defendant COP obtained surveillance footage that did not refute Victim A's allegations and confirmed that Defendant Pena was stopped at the location where Victim A told Defendant COP she was sexually assaulted.

70.     When Victim A was transported to Fourth Ave Jail, Victim A reported the sexual assault to MCSO Jail Staff.

71.     On August 26, 2018, at 10:45 p.m., Defendant COP performed a buccal swab on Victim A.

72.     On August 27, 2018, at 4:00 p.m., Victim A submitted to a sexual assault examination.

73.     Finally, five days after the assault, on August 31, 2018, Phoenix Detective Michael Walker ("Det. Walker") interviewed Defendant Pena.

74.     Defendant Pena lied to Det. Walker when he told Det. Walker that when Defendant Pena arrived at the train tracks, Defendant Pena first claimed he turned around and followed the MCSO van and that the van was "right in front of me the whole time."

12

75.    When Defendant Pena was asked if he ever stopped at any point in time where he was alone with Victim A, Defendant Pena stated "I don't think so. Honestly, I don't know."

76.    When Defendant Pena was advised during the interview that he might be captured on the MCSO van camera if he was right behind the van, Defendant Pena changed his story to state he did not think that he would be on camera because the MCSO van was approximately 100 feet in front of Defendant Pena.

77.    Defendant Pena subsequently admitted that the MCSO van turned around first, and Defendant Pena stopped at the railroad tracks for a period of time before he turned around.

78.    During Defendant Pena's April 10, 2020 PSB Interview, Defendant Pena estimated that he was stopped at the railroad tracks for approximately three (3) minutes.

79.    Defendant Pena originally lied during his interview with Det. Walker when he stated that he was behind the MCSO van the entire time and stated that he was unsure whether he ever stopped during Victim A's transport. It was not until Defendant Pena was told that there might be video footage from the MCSO van that Defendant Pena changed the narrative and claimed he was stopped and had to turn around.

13

80.    Defendant Pena's inconsistent statements should have alerted Det. Walker and any other investigators as every police officer is aware of the significance of a lie and an inconsistent statement made by a suspect.

81.    Det. Walker and any other investigators were, or should have been, aware that a truthful individual does not need to lie and can consistently use their memory to tell a story, whereas someone who is not being truthful can often misremember their lie and/or need to embellish or omit facts to cover up their lie.

82.    At the conclusion of the interview, Defendant Pena was asked whether he would submit to a buccal swab for DNA comparison, but he declined.

83.    On August 31, 2018, Det. Walker finally authored an Affidavit in Support of Order for Obtaining Identifying Evidence.  The Honorable Tracy Nadzieja of the Maricopa County Superior Court issued the Order for Obtaining Evidence, which specifically ordered the procurement of a Buccal Swab from Defendant Pena.

84.    That same day, August 31, 2018, Det. Walker obtained two sets of buccal swabs from Sean Pena.

85.    Shockingly, Det. Walker's report was devoid of all of the crucial information that highlighted Defendant Pena's inconsistent statements concerning whether he stopped at any point while transporting Victim A and whether he followed behind the MCSO van the entire time.

14

86.    Additionally, while Detective Walker's Report did state "I obtained buccal swabs from Pena" it conveniently omitted and failed to mention that Defendant Pena declined to voluntarily submit to a buccal swab and that his DNA was obtained only after a search warrant.

87.    Det. Walker's failure to provide an objective report is consistent with the Blue Code of Silence as more thoroughly described herein and underscores the importance of a third-party investigating an officer-involved offense.

88.    Despite the fact that Defendant Pena forced Victim A to perform oral sex on him through the zipper of his pants, and thus, Plaintiff's saliva would have very likely been found on Defendant Pena's pants and zipper, Defendant COP never sought a search warrant to search Defendant Pena's clothing. Especially when dealing with DNA evidence, quick collection is extremely important to maintain the integrity of the sample and to avoid deterioration/destruction of evidence.

89.    Despite the fact that Victim A told investigators that Defendant Pena did not have pubic hair, upon information and belief, during the initial investigation, Defendant COP failed to ask Defendant Pena whether he had pubic hair or obtain a search warrant to search his pubic area.

15

90.    Instead, the search warrant only sought Defendant Pena's DNA, even though Defendant COP knew that Defendant Pena did not ejaculate and that analysis of buccal swabs without ejaculate is unreliable.

91.    On August 31, 2018, rather than conduct a confrontation call, a City of Phoenix Detective initiated a confrontation text.

92.    Upon information and belief, Defendant COP's confrontation text message deviates from the normal procedure of initiating a phone call.  It is exceedingly unlikely that someone guilty of a crime, especially a police officer who just sexually assaulted a victim, would admit to anything in writing.

93.    Defendant COP ultimately determined that there was "insufficient evidence" and closed the investigation. Phoenix SID closed the investigation on Defendant Pena without even initiating an administrative or Internal Investigation (PSB Investigation).

94.    Defendant COP also failed to report this incident to Maricopa County Attorney's Office for possible charges or to AZPOST (Arizona Peace Officer Standards and Training Board) for possible decertification of Defendant Pena.

95.    Defendant COP closed the investigation without reporting it to any additional departments or entities, despite the fact that Defendant COP could not confirm that Defendant Pena did not sexually assault Victim A, that Defendant Pena was stopped at the railroad tracks at the time Victim A reported the assault, Defendant Pena lied about being

16

behind the MCSO van at all times, and Defendant Pena failed to voluntarily submit to a DNA test.

96.    Defendant COP did nothing more than a cursory and wholly inadequate investigation into Victim A's allegations and did not discipline, terminate, suspend or even increase supervision on Defendant Pena.

97.    Upon information and belief, during the 2018 investigation into Victim A's allegations, Defendant COP never subjected Defendant Pena to a polygraph nor did it even ask Defendant Pena to submit to a polygraph.

98.    Additionally, upon information and belief, neither Defendant Pena's clothing nor his patrol vehicle were tested for DNA.

99.    During the 2018 Investigation, Defendant COP was told by Victim A that Defendant Pena did not have pubic hair, yet upon information and belief, Defendant COP failed to look at or inquire into whether Defendant Pena shaved his genital area and take any photographs thereof.

100.    Defendant COP, through its failures and inactions, helped Defendant Pena destroy crucial evidence. Defendant COP should have promptly investigated the deplorable allegations as soon as they were reported on August 26, 2018.  Instead, Defendant Pena was free to go home where he could shower to remove all trace of Victim A's DNA from

17

his penis and could discard and/or clean his clothes to remove Victim A's DNA from his pants and zipper.

101.    Upon information and belief, Defendant COP failed to question Defendant Pena as to why he transported Victim A and why he transported her without activating his BWC or any inside vehicle camera.

102.    Plaintiff is informed and believes that the investigators into this assault were Phoenix Police Officers and not an outside, unbiased third-party agency.

### Defendant Pena's Sexual Assault Against Victim B.

103.    On November 20, 2019, Victim B reported to Defendant COP that Defendant Pena sexually assaulted her on June 1, 2019.

104.    According to Victim B, while she sat in the back of Defendant COP's patrol vehicle, Defendant Pena sexually harassed Victim B.  Defendant Pena drove Victim B to a vacant lot located on 11th Ave and West Lynne Lane, removed Victim B's handcuffs, and told Victim B to get into the front seat of his City of Phoenix police vehicle.

105.    Defendant Pena used his position as a Police Officer to force sexual conduct with Victim B. Defendant Pena, without consent, grabbed and fondled Victim B's breasts.

106.    Defendant Pena forced Victim B to grab his penis, Defendant Pena told Victim B to masturbate his penis and then forced Victim B's head towards his penis, where

18

1  Defendant Pena demanded Victim B conduct oral sex.  Fearing for her life, Victim B

2  complied.

3

4  107.    Defendant Pena made harassing and intimidating comments to Victim B,

5  including but not limited to telling her that they would do this again and ordering her to

6  meet him at the same spot the following day. Since Defendant Pena knew where Victim B

7  lived, she was in fear for her life.

8

9  108.    A different COP officer, Officer Antonio Felix #10310 ("Officer Felix"), was

10  aware that Defendant Pena's previous investigated for the sexual assault of Victim A.

11  Officer Felix was also at the scene when Victim B was contacted by Defendant Pena and

12  other Phoenix police officers.  NEED TO KNOW WHETHER HE WAS AT Plaintiff's

13

14  residence.

15

16  109.    Victim B reported Defendant Pena to Phoenix police.

17  110.    Finally, PSB investigators were put on notice and investigated Defendant

18  Pena.

19

20  **Defects in the 2018 Internal Investigation and the 2019 PSB Investigation.**

21  111.    Plaintiff was, at minimum, the third victim of Defendant Pena and a proper

22  prior investigation would have prevented her assault.

23

24  112.    Upon information and belief, Defendant COP failed to conduct a polygraph

25  on Defendant Pena after Victim A's assault. Considering Defendant Pena's bias, motive,

26

19

and inconsistent statements during the 2018 cursory investigation into Victim A's assault, a polygraph on Defendant Pena was warranted and essential.

113.    After Victim B came forward with allegations against Defendant Pena, Defendant COP finally asked Officer Pena to voluntarily participate in a polygraph; he declined.

114.    Both Victim A and Victim B reported Defendant Pena did not have pubic hair, yet during Victim A's 2018 investigation, Defendant COP never inquired into whether Defendant Pena had pubic hair.

115.    Upon information and belief, it was not until the 2019 PSB Investigation, which was after Plaintiff's sexual assault, that Defendant Pena was asked about his "grooming standards in his genital area."   Defendant Pena stated it was common for Defendant Pena to shave off his pubic hair with a razor consistent with both Victims descriptions.

116.    Further, it was not until the 2019 PSB Investigation that Defendant COP conducted research into any females being transported by Defendant Pena from March 2019 – November 2019 when Defendant Pena was riding as a single man unit or when BWC was not activated to determine whether there were any additional victims.

117.    However, upon information and belief, Defendant Pena, began his employment with Defendant COP as a police officer in January 2018, not March 2019.

20

Nevertheless, Defendant COP could have investigated whether Defendant Pena had prior victims after Victim A reported Defendant Pena, but Defendant COP chose not to conduct such an investigation.

118.    This "criteria" (when Defendant Pena was patrolling alone or did not have his BWC activated) also underscores Defendant COP's failure to properly supervise Defendant Pena. Defendant COP knew that this criterion could create an environment in which Defendant Pena could act as a sexual predator and commit violent sexual acts, yet failed to enhance Defendant Pena's supervision after Victim A reported the sexual assault.

119.    In fact, during the first year of the body worn cameras being implemented in a California city in 2012, "…the number of complaints filed against officers fell by 88 percent compared with the previous 12 months [and] …[u]se of force by officers fell by almost 60 percent over the same period."

120.    Defendant COP knew that requiring that the BWC be activated at all times would act as a deterrent against sexual misconduct and sexual assault, yet Defendant COP failed to require Defendant Pena to keep his BWC activated at all times and his car video activated at all times, if equipped with one.

121.    It was not until July 23, 2020, that AZPOST opened its investigation into Defendant Pena, which suggests Defendant COP failed to report Defendant Pena to AZPOST until sometime in Summer 2020.

21

**Defendant City of Phoenix**

122.   Plaintiff incorporates all of the proceeding paragraphs as though fully incorporated herein.

123.   Upon information and belief, despite Phoenix's size and rate of population growth, its police department continues to face a shortage of officers on the streets.

124.   Upon information and belief, with less officers patrolling and resources spread thin, Phoenix Law Enforcement Association describes the morale within the Phoenix Police Department as low; the officers feel unsupported from the city and that their collective voice is going unheard.

125.   Upon information and belief, the Phoenix Police Department has over 300 fewer officers compared to ten years ago and remaining officers are working overtime. This reduction is especially acute considering Phoenix's rapid population growth in the last ten years. Thus, the structural deficiencies in the city were exacerbated by growing number of less experienced officers and shortages.

126.   At all relevant times, Jeri Williams ("Williams") was the Chief of Police for the City of Phoenix Police Department ("PPD") with the ultimate authority to control and supervise and is responsible for the actions of its officers and agents. PPD, through Williams, has the authority and responsibility to establish policies, practices, customs, procedures, protocols and training for the PPD.

127.   According to Williams, she believes that in 2020 PPD implemented "substantial changes" that she believes "improves our ability to meet community

22

1    expectations to serve, protect, and reduce crime in Phoenix while treating community

2    members with dignity and respect." Plaintiff was certainly not treated by Defendant Pena

3    nor Defendant COP "with dignity [or] respect."

4

5        128.    Defendant COP's failure to promote an atmosphere conducive to hiring

6    female police officers is an aggravating factor in the number of sexual assault and/or

7    harassment claims against Defendant COP and its officers.

8        129.    The Blue Code of Silence can involve inadequate investigation, failure to

9

10   cooperate and and/or outright lies.  Plaintiff is informed and believes that any investigation

11   into Victim A's allegations should have had nonpolice investigators and outside agencies

12   investigate these heinous offenses by a Phoenix police officer instead of Phoenix Police

13

14   Department with a clear bias and conflict of interest.

15       130.    Defendant COP has a pattern and practice of tolerating misconduct within its

16   department, which underscores the importance of non-Phoenix police officers investigating

17

18   its own officers and the importance of civilian review boards investigating police officers.

19       131.    By way of example, in 2017 officer Christopher Turiano shot a Donald

20

21   Trump protester, Joshua Cobin, in the groin and it was later revealed that a team of officers

22   had created a "challenge coin" memorializing and celebrating the shot. The coin states

23   "MAKING AMERICA GREAT AGAIN, ONE NUT AT A TIME" and "GOOD NIGHT

24

25   LEFT NUT" with an image of Cobin and the date of the protest. Despite knowledge of

26

23

these actions, PPD Chief Williams never reported these incidents; the coin was not discovered by the public until several years later.

132.    In 2021, it was discovered that Phoenix police officers made false statements under oath to a grand jury regarding protestors.

133.    The Blue Code of Silence is a policy and practice of Defendant COP that interferes with the Constitutional rights of victims of police sexual misconduct. This Code practice leads to the police officers groundlessly supporting and backing up one another creating an "us against them" mentality.

134.    The Blue Code of Silence is indicative of police officer's willingness to not only continue with the Code of Silence, but to wrongfully protect fellow officers, such as Defendant Pena.

135.    Defendant COP through PPD knows that according to AZPOST the largest percentage of officers in Arizona lose their AZPOST Certification ("Certification") as police officers because of untruthfulness; yet investigators failed to require Defendant Pena to submit to a polygraph after Victim A's sexual assault.

136.    Defendant COP knows or should have known that according to AZPOST the second most common reason for police officer's loss of Certification involves sexual misconduct by police officers while on duty, yet they failed to adequately investigate Victim A's sexual assault.

24

137.    Defendant COP knows or should have known that police officers have lost Certification due to police officers' failure to investigate cases.

138.    Defendant COP failed to: (1) ensure officer truthfulness; (2) recognize sexual misconduct is rampant and a common reason for loss of AZPOST Certification; and (3) ensure that an adequate and unbiased investigation into Victim A was conducted.

139.    Upon information and belief, Defendant COP failed to adequately ask questions, adequately investigate potential evidence which led to the destruction of pivotal evidence, and otherwise failed to adequately investigate Victim A's allegations.

140.    Furthermore, upon information and belief, Defendant COP conducted the investigation into its own police officer, Defendant Pena, ignored the conflicting and convoluting evidence, and neglected and effectively lost potentially incriminating evidence.

141.    Defendant COP failed to report Defendant Pena to Maricopa County Attorneys' Office for investigation or possible *Brady* list inclusion, to the AZPOST or even refer Victim A's assault to its own Professional Standards Bureau. This is a major structural failure within Defendant COP's investigative system, which provides for internal biases favoring its own officers.

142.    Defendant COP knew or should have known that Defendant Pena was prone to dishonesty, which is a violation of Defendant COP policies and should have been reported to the *Brady* list.

143.    In fact, upon information and belief, on April 7, 2021, the City of Phoenix City Council approved a Memorandum of Understanding ("MOU") between the City and Phoenix Law Enforcement Association ("PLEA") wherein Defendant COP adopted a change that explicitly allows for non-police city of Phoenix investigators, such as civilian oversight committee to investigate officers.

144.    The complete disregard of Victim A and lackadaisical nature of the investigation emboldened Defendant Pena to commit additional acts of sexual violence as it allowed a sexual predator to continue patrolling the streets of Phoenix alone in a single man unit with authority, a weapon and no supervision.

145.    Despite the fact that Defendant COP either knew or should have known that Defendant Pena sexually assaulted Victim A, Defendant Pena maintained his employment with Defendant COP.

146.    Defendant COP had both active and constructive notice that its failure to supervise and terminate Pena would result in additional acts of sexual violence, yet it did nothing to prevent additional acts of sexual violence from occurring, through its failure to

26

1    enhance supervision and oversight over Defendant Pena, terminate Defendant Pena or

2    otherwise discipline and aggressively monitor Defendant Pena.

3        147.    Notwithstanding the fact that Defendant COP failed to adequately investigate

4

5    Victim A's allegations, Defendant COP's faulty investigation did not refute any of the

6    allegations made by Victim A, but instead confirmed the location of the sexual assault and

7    otherwise supported Victim A's sexual assault.

8

9        148.    Defendant COP's investigation did not reveal that Defendant Pena was

10   innocent and that he did not assault Victim A. Nevertheless, Defendant COP did not

11   enhance Defendant Pena's supervision or attempt to determine whether Defendant Pena

12

13   did commit the deplorable acts upon Victim A so to ensure Defendant Pena could not harm

14   other innocent victims.

15

16       149.    Even if Defendant COP could not confirm or refute Victim A's allegations

17   (due to the biased and improper nature of the underlying investigation), Defendant COP

18   should have acted to ensure the public was safe by making sure the conduct did not occur,

19

20   such as requiring Defendant Pena to keep on his body worn camera at all times, requiring

21   Pena to patrol with a partner, requiring Defendant Pena to patrol in a two-man unit,

22   initiating a real confrontation call or otherwise enhance Defendant Pena's supervision or

23

24   continue investigating the allegations as more thoroughly described herein. Instead,

25   Defendant COP failed to increase Defendant Pena's supervision, discontinued

26

27

1    investigating the allegations and did nothing to make sure the conduct did not occur and

2    would not occur.

3        150.    When confronted with officer safety issues after the George Floyd protests,

4
5    Phoenix adopted a two patrolmen per car policy. When confronted with female citizen's

6    safety from Defendant Pena, Phoenix failed to adopt a two patrol per car policy for

7    Defendant Pena.

8
9        151.    Due to Defendant COP's failures, on June 1, 2019, Defendant Pena sexually

10   assaulted Victim B.

11       152.    Due to Defendant COP's failures on August 5, 2019, Defendant Pena

12
13   sexually assaulted Plaintiff.

14

15                    **The City of Phoenix and Phoenix Police Department's**
                     **Notice of Prior Instances of Sexual Misconduct.**
16

17       153.    Plaintiff hereby incorporates by reference all the proceeding paragraphs as

18   though fully set forth herein.

19       154.    Upon information and belief, sexual misconduct by police officers is a

20   significant problem within this Country, which Defendant COP either knows or should

21
22   already know, and Defendant COP must ensure that its policies and procedures are

23   sufficient to prevent its officers from committing sexually related offenses to protect the

24   general public.

25

26

                                          28

155.    In fact, upon information and belief, on April 7, 2021 the City of Phoenix City Council adopted the MOU (Memorandum of Understanding) between the Defendant COP and PLEA (Police Law Enforcement Association) and changed its policy to remove language warning a citizen about possible criminal charges if they file a false complaint about a police officer.

156.    Defendant COP's belated change was made as prior language had the effect of potentially discouraging residents from alerting Defendant COP about police officer misconduct, and thus, chilled the speech of victim's reporting sexual misconduct under the First Amendment and in violation of Due Process under the Fourteenth Amendment.

157.    Policy prior to April 7, 2021, discouraged true reporting of police officer sexual offenses, and thus, Plaintiff will never know how many instances of sexual violence were committed by Phoenix Police Officers because of this policy that Defendant COP finally recognized as intimidation that emboldened its officers to commit sexual offenses.

158.    While knowing that most victims of sexual assault do not report sexual assaults, let alone by police officers as more thoroughly described herein, prior to April 7, 2021, Defendant COP through PPD substantially suppressed reports of sexual misconduct against its officers. This Three Wise Monkeys Policy ("hear no evil, speak no evil, see no evil"), provided a means for Defendant COP to claim that it did not know of its police officer's sexual misconduct.

159.    According to the CATO Institute's National Police Misconduct Reporting Project's 2010 Annual Report, officer-involved sexual misconduct was the second most

29

common form of misconduct reported throughout 2010 and police officers were more than two-times more likely to commit sexual assaults than the general population.

160.    Upon information and belief, Black women are the victims of thirty-five percent (35%) of police officer sexual assaults, although Black women constitute significantly less than thirty-five percent (35%) of the general population.

161.    Upon information and belief, Black women make up approximately three-and one-half percent (3 ½ %) of Phoenix population.

162.    Upon information and belief, some criminals are attracted to what they perceive as "high voltage" occupations. Serving as police officers provides a cover to do as they choose, misusing their positions of authority. Without proper oversight, they become overly confident and eventually indulge their antisocial inclinations.

163.    In fact, a 2015 investigation by the Associated Press found that roughly 1,000 officers lost their badges in a six-year period for rape, sodomy and other sexual assault, sex crimes that included possession of child pornography, or sexual misconduct such as propositioning citizens or having consensual but prohibited on-duty intercourse.

164.    Defendant COP cannot close its eyes to the reality that its police department employs individuals who are statistically more likely to commit sexual assaults than the general public. As such, Phoenix must implement adequate policies and policies in order to protect its citizens, whether through education, training, oversight, body cameras, retention, harsh discipline and other means.

30

165.    In fact, upon information and belief, a study financed by the Department of Justice found a way to ensure accountability regarding sexual assaults committed by police personnel is to include within the department's sexual assault policy "specific policies and procedures [that] should outline the police response to sexual assault in the event that it involves individuals employed by the police agency."[1]

166.    Through Defendant COP's failure to implement adequate policies and procedures to prevent sexual offenses from occurring, Defendant COP has failed to hold its officers accountable and protect victims.

167.    Upon information and belief, Defendant COP is often unwilling to go against police officer associations and oppose the messages stated in press releases and otherwise oppose agenda from these police officer associations.

168.    The Blue Code of Silence is a policy and practice of Defendant COP that interferes with the Constitutional rights of victims of police sexual misconduct. This Code practice leads to the police officers groundlessly supporting and backing up one another creating an "us against them" mentality.

169.    Upon information and belief, challenging this Code can lead to being shunned, losing friends, losing backup, receiving threats or having their own misconduct exposed.  This Code does not punish bad police officers, only good police officers.

---

[1] https://www.policeforum.org/assets/SexualAssaultResponseExecutiveGuidebook.pdf at p. 73 (last visited 04/08/2021)

31

170.    Defendant COP has failed to implement measures to combat the Code, which includes but is not limited to Defendant COP's failure to use polygraphs; physiological evaluation; harsh punishments for violations, including the failure to report; and basic and repeated annual training on ethical duties.

171.    Defendant COP has been subjected to prior lawsuits based on its police officers committing acts of sexual misconduct and Defendant COP has settled lawsuits related thereto.

172.    The Mayor and City Council received notice of each lawsuit filed against the City.

173.    All substantial monetary settlements made by the City must be approved by the City Council.

174.    In 2019, Defendant COP had Notice of a lawsuit against Phoenix Police Officer Marcos Rodriguez and Defendant COP based on Rodriguez's sexual misconduct. In that case, Defendant Rodriguez alerted Plaintiff to pull the vehicle over where Defendant invited Plaintiff to coffee. Defendant then showed up at Plaintiff's home, talked about how his marriage was without passion, sexually harassed Plaintiff by making lude and sexual comments to Plaintiff, including but not limited to comments about anal sex and talking about digitally penetrating Plaintiff's anus during sex, failed to leave Plaintiff's home despite many requests to leave and pointed a gun on Plaintiff. The parties agreed to a settlement. *See* 2:19-cv-03095, Arizona District Court.

32

175.    In 2016, Defendant COP had Notice of a lawsuit against Phoenix Police officer Timothy T. Morris and Defendant COP based on Morris' sexual misconduct. Upon information and belief, Morris forced his victim to perform oral sex while she was handcuffed.  The parties agreed to a settlement. *See* CV2016-090855, Maricopa County Superior Court.

176.    Moreover, upon information and belief, between 1999-2018, Defendant COP has settled 204 claims related to Phoenix Police Departments' excessive force and various related claims.  Defendant COP has agreed to settle the 204 claims for $35,521,401.05.

177.    According    to    publicly    available    information    found    at https://policecrime.bgsu.edu/Home/Map, between 2005-2015 the City of Phoenix employed as police officers eight (8) police officers who were arrested for sexual related offenses. This does not include officers who were disciplined for sexual related offenses, but not charged criminally. **See Exhibit A**.

178.    In 2012, Defendant COP had notice of sexual assault occurring within PPD when Former Phoenix police officer Christopher Wilson was sentenced to twenty-three years in prison and a lifetime of probation for engaging in sex crimes with minors he met through PPD.  He pled guilty to two counts of sexual misconduct with a minor and one count of attempting to commit sexual misconduct with a minor.  The victims were a 17-year-old and 14-year-old boy. *See* CR2012-142112-001

179.    In 2015, Defendant COP had notice of sexual misconduct occurring within PPD when former Phoenix police officer Justin LaClere pled guilty of both luring a minor

33

for sexual exploitation and then having sexual intercourse with her. *See* CR2014-103013-001

180.    Upon information and belief, in 2017 Defendant COP had notice of sexual misconduct within its department when the Professional Standards Bureau was contacted by Gretchen Matteson regarding her ex-husband Officer Robert Sitek ("Sitek") because he was stalking and harassing her. The issue was transferred to SID and FIB. Although SID was unable to establish probable cause regarding the stalking/harassment claim, they found three separate violations of the Arizona Criminal Justice System that were traced to Sitek's Terminal Operator Certification (TOC). During the investigation, Sitek admitted that he had accessed personal information of three individuals for personal reasons. Sitek also admitted that he was aware his actions violated Phoenix Police Department policy and Arizona law, he pled guilty and only received 30 days of non-supervised probation. Sitek is on the *Brady* list.

181.    Upon information and belief, in 2011 Defendant COP had notice of sexual misconduct within its department when it discovered its Officer Sheldon Czegledi, while vacationing in El Paso in 2011, Texas, approached an undercover female deputy and after speaking with her, made an agreement to pay forty-five dollars for sexual intercourse. He was arrested by El Paso County Sheriff's department and booked into jail. Czegledi is on the *Brady* list.

182.    Upon information and belief, in 2011 Defendant COP had notice of sexual misconduct within PPD when Officer Larry White conducted a criminal history records

34

check on a woman that he was romantically involved with, Ms. Adams. When the romantic relationship ended, Officer White attempted to get Ms. Adams' personal information through her friend, Ms. Lukaszewski. Officer White used a PACE search to ascertain Ms. Lukaszewski's exact address. Officer White then showed up to her home and, under the false pretense of a call for service regarding a burglary, Officer White searched her backyard while on-duty. After searching her backyard, Officer White entered the home of Ms. Lukaszewski and had an emotional conversation regarding his recent breakup. While the first search with the system remained unresolved, the other two accusations have been sustained. White is on the *Brady* list.

183.    Upon information and belief, in 2007 and 2010, Defendant COP had notice of instances of sexual misconduct by its officers when an internal investigation revealed Phoenix Police Officer Jeff Gordon was giving and getting oral sex and engaging in other sexual acts on several occasions in 2007 and 2010, while on duty. Remarkably, he received merely a four-day suspension after an internal affairs investigation. There are other allegations that while on duty, Gordon had nonconsensual sexual contact with a city employee when he slipped his hands under the blouse of the employee and actually touched her breasts as he was giving her a massage and also sent her two pornographic video texts. Upon information and belief, "Gordon told investigators that he and the female employee were talking about how stressed out she was, and he started giving her a massage. He admitted that his hands moved from her neck and shoulders to her 'upper chest' around her

35

'clavicles' because 'he believes it feels good when done to him and would serve as a good de-stressor.'"[1]

184. Upon information and belief, Defendant COP had notice of sexual misconduct within its department when in 2009, Investigators from the Professional Standards Bureau ("PSB") were made aware of misconduct by Officer Michael Fernandez. Ms. Arlica Hernandez informed PSB that she had met officer Fernandez on November 5 while he was on duty and engaged in sexual activity with him. Ms. Hernandez says that she met him at a gas station where he asked to see her breasts. With two of her friends present, she removed her shirt and showed her breasts to Officer Fernandez. Officer Fernandez proceeded to touch them and used his cell phone to take a picture. Ms. Hernandez says that they exchanged phone numbers at this time and that Officer Fernandez picked her up from a friend's house later that night, in a fully marked patrol vehicle. Officer Fernandez drove Ms. Hernandez who was in the back seat of the vehicle to an isolated location where they engaged in kissing and Officer Fernandez once again touched Ms. Hernandez's breasts. The next day, November 6, the two met again while Officer Fernandez was both in uniform and on-duty. They engaged in similar sexual conduct and Ms. Hernandez informed Officer Fernandez that she was "buzzed." When she was leaving, Officer Fernandez allowed her to drive away without stopping her.

---

[1] https://www.phoenixnewtimes.com/news/timeline-of-the-phoenix-polices-worst-misconduct-scandals-11309123

36

185.    Officer Fernandez admitted to kissing and touching Ms. Hernandez's breasts on November 5, but denied taking a picture on his cell phone. He also admitted that Ms. Hernandez had informed him that she was drunk on November 6 but claims that he conducted a Horizontal Gaze Nystagmus test, which he had never received any training on, to determine that she was not too inebriated to drive. Moreover, during the investigation of this misconduct, it was revealed that Officer Fernandez had used Mobile Data Computer to look up the personal information of Ms. Hernandez, their mutual friend Angela Moya and Ms. Hernandez's mother, Ophelia Valesquez. While engaging in this misconduct, he found that Ms. Moya had a warrant out for her arrest. Despite knowing that, Officer Fernandez failed to arrest Ms. Moya and admitted to accessing the information for personal gain. Fernandez is on the *Brady* list.

186.    Upon information and belief, in 2006 Defendant COP had notice of misconduct within its department when Officer Jarrett McNeil stopped a vehicle that was swerving within its lane of traffic and flirted with the driver of the vehicle, including commenting on her breast size. The driver provided Officer McNeil with her personal phone number and Officer McNeil released the driver without taking any enforcement action. After the stop, Officer McNeil arrived unannounced at the home of the driver and continued flirting, offering to take her on a ride in his patrol vehicle. She agreed and he put her in the backseat. Officer McNeil drove a short distance to a shadowed area and engaged in sexual activity while in the back seat, including fondling breasts and brushing her vaginal area. Officer McNeil denies having any contact with the vaginal area.

37

187. The next day the woman contacted a different Phoenix Police Officer regarding Officer McNeil's interaction with her. That Officer advised Officer McNeil to contact his supervisor. Officer McNeil proceeded to drive to the woman's residence and question why she reported him. Afterwards, Officer McNeil contacted his supervisor and advised of the traffic stop, purposefully omitting any sexual contact. The PSB interviewed the woman who stated that she felt verbally coerced into the sexual contact. Officer McNeil admitted that he flirted with the driver, that he went to her house after the traffic stop, that he took her to a vacant lot, and that he fondled her breasts. Officer McNeil claims that the interaction was consensual. He also admitted that he intentionally omitted information when reporting to his supervisor. Officer McNeil was only suspended for 16 days. McNeil is on the *Brady* list.

188. Upon information and belief, Phoenix police officers have also faced additional internal complaints for sexual misconduct, lawsuits related to sexual misconduct and other criminal charges have been filed related to sexual misconduct.

**Defendant COP has failed to implement or enforce adequate policies and procedures.**

189. Plaintiff hereby incorporates by reference all the proceeding paragraphs as though fully set forth herein.

190. Defendant COP, through Williams and PPD, has either failed to properly hire, supervise, discipline, monitor and train its employees and/or failed to establish policies and procedures that would prevent individuals that were not fit for duty from being

38

1    hired, employed, employed without supervision and retained as a police officer, within the

2    City of Phoenix Police Department.

3    191.    As such, Defendant COP's alleged policies and procedures led to Plaintiff's

4    injuries as Defendant COP's alleged policies or customs reflect a deliberate indifference to
5
     the constitutional rights of its inhabitants, including Plaintiff, as Defendant COP has
6
7    historically and systemically failed to ensure that its officers are mentally, emotionally,

8    and/or psychologically fit for duty.

9    192.    Upon information and belief, Defendant Pena was hired by Defendant COP
10
     as a Phoenix Police officer in January 2018.
11

12   193.    Upon information and belief, on August 26, 2018, merely eight months after

13   Defendant Pena was hired by Defendant COP as a Phoenix Police Officer, Victim A

14   reported to Phoenix Police that she was sexually assaulted by Defendant Pena.
15
     194.    Victim B was sexually assaulted by Defendant Pena in June 2019.
16

17   195.    Plaintiff was sexually assaulted by Defendant Pena on August 5, 2019.

18   196.    Thus, prior to Plaintiff's sexual assault, not only was Defendant COP aware

19   that it needed adequate policies and procedures to prevent sexual misconduct by its
20
     officers, but it also specifically knew or should have known of Defendant Pena's deplorable
21

22   acts of sexual violence upon Victim A, yet failed to properly investigate the sexual assault,

23   discipline, supervise, monitor, and remove Defendant Pena from his position of power as

24   a Phoenix Police Officer. Instead, Defendant Pena continued to patrol the streets of Phoenix
25

26

alone in a one-man unit free to use his badge, gun, city issued patrol vehicle and police power to commit additional sexual assaults upon the women of Phoenix.

197.    Plaintiff is informed and believes that Defendant COP knew or should have known that the investigation it performed into Defendant Pena's sexual assault against Victim A was woefully inadequate and should have had a nonpolice and non-Phoenix police investigator(s) thoroughly examine Defendant Pena's actions and inactions.

198.    Additionally, Defendant Pena should have been given a lie detector test by an impartial agency and additional investigatory measures should have occurred, especially considering Defendant COP could never refute Victim A's allegations, Pena's inconsistent statements, his failure to voluntarily provide a DNA sample and other reasons more thoroughly described herein.

199.    Despite Defendant COP's knowledge of Victim A's assault, Defendant COP failed to discipline Defendant Pena who was retained by Defendant COP after Victim A's sexual assault, which caused Plaintiff's assault.

200.    Additionally, despite Defendant COP's knowledge of at least Victim A's sexual assault, Defendant COP failed to properly supervise and monitor Defendant Pena as he patrolled the streets of Phoenix alone in a one-man unit. Considering the gross allegations, Defendant COP should have had, at minimum, enforced substantially enhanced supervision, monitoring and oversight.  Instead, Defendant COP through PPD allowed Defendant Pena to roam free as a predator in a single man unit interfacing with the general public and pedestrians.

40

201. Defendant COP has: (1) failed to recruit officers who will not commit constitutional violations on its citizens; (2) failed to train its employees to properly administer employment examinations to determine whether Applicants applying for employment within Phoenix Police Department are fit for duty and failed to train in its officers on how to properly investigate an officer-involved allegation of sexual misconduct; and/or (3) failed to implement adequate hiring and retention policies and procedures to prevent perverse and heinous individuals like Defendant Pena from employment and retention within Defendant COP.

202. Defendant COP failed to properly train and/or supervise its officers who failed to properly investigate Defendant Pena's first sexual assault of Victim A, including but not limited to failing to adequately ask questions, failing to subject Defendant Pena to a lie detector test, failing to ensure the preservation of evidence, document and reporting the evidence, or otherwise failing to adequately investigate Victim A's sexual assault as more thoroughly described herein.

203. Defendant COP failed to implement proper policies and procedures to ensure that a fair and unbiased investigation into a Phoenix police officer was conducted. Defendant COP investigated Victim A's allegations rather than engaging another non-City of Phoenix police agency and/or a nonpolice investigator to conduct the investigation despite the clear conflict of interest.

204. Defendant COP has failed to train and/or supervise its employees regarding investigating officer-involved allegations of sexual misconduct as Defendant COP's failure

41

to adequately investigate Victim A's allegations caused Defendant Pena to remain employed by Defendant COP as a police officer in a single unit, which caused Plaintiff's sexual assault.

205.    Defendant COP's failure to adequately investigate Victim A's allegations, and its failure to discipline and supervise Defendant Pena empowered Defendant Pena to commit additional acts of sexual violence. Thus, Defendant COP had a policy or custom of failing to properly supervise, investigate and discipline officers who had committed prior instances of sexual assault.

206.    Defendant COP's policy and practice of the Blue Code of Silence enabled Defendant Pena to commit acts of sexual violence, including the sexual assault against Plaintiff.

207.    The Blue Code of Silence derives in part from a culture of machismo.

208.    PPD has historically had a low percentage of sworn female police officers and even as of today, only has fourteen percent (14%) sworn female officers, even though women make up slightly more than fifty percent (50%) of Phoenix's population.

209.    Plaintiff is informed and believes that the "Cop Culture" discouraged the recruitment, hiring and retention of women.

210.    Defendant COP failed to provide appropriate leadership, training and oversight. Defendant City of Phoenix's failure to supervise patrol officers' and adequately investigate claims of sexual assault and harassment by its officers has occurred at every level, from front line supervisors (sergeant), investigation and review, to chain of

42

command's secondary review of investigation, to final review by command staff and Chief of Police. Supervisors must take a more proactive role in demanding improved reporting, more careful on scene investigations and more thorough secondary review.

211.    Defendant COP's failure to supervise officers and investigate claims of sexual assault by its officers occurred at every level, from front line supervisors (sergeant), investigation and review, to chain of commands secondary review of investigation, to final review by command staff.

212.    Defendant COP's failure to have appropriate policies to eliminate the Blue Code of Silence created a policy and practice that led to and emboldened a sexual predator, like Defendant Pena, to prey on the citizens of Phoenix.

213.    Despite written requests, Defendant COP has failed to provide full reports regarding any of Defendant Pena's sexual assaults and COP's investigation related to Defendant Pena's three known victims and delayed producing the partial reports. This failure to produce full reports and the delaying actions is consistent with the Blue Code of Silence and contrary to the purported new policy of "transparency."

214.    Defendant COP has failed to develop adequate policies and training relating to sexual assault and harassment by its officers.

215.    Upon information and belief, Defendant COP does not have an adequate sexual misconduct policy, and thus, Defendant COP has failed to implement adequate policies to deter officers from committing sexually motivated offenses.

43

1    216.    Upon information and belief, Defendant COP does not have training

2    regarding sexual misconduct nor does it have heightened discipline for sexual misconduct

3    to be reinforced during training and retention.

4    217.    Defendant COP has failed to develop adequate policies and training relating

5    to sexual assault and harassment by its officers, which includes but is not limited to holding

6

7    supervisors accountable for actions of their subordinates.    When policy does not clearly

8    delineate supervisor responsibilities, supervisors frequently neglect it and upon

9    information and belief there is no watch commander referred for further review.

10

11    218.    Defendant COP does not have appropriate further review when investigating

12    its own officers. Defendant City of Phoenix lacks a disciplined remedial structure and

13    Defendant City of Phoenix does not appropriately hold first line supervisors accountable

14    for inadequate investigation or review of sexual assault and harassment.

15

16    219.    Upon information and belief, Defendant COP does not have first line review

17    of sexual assault and harassment by officers.

18    220.    Upon information and belief, Defendant COP does not have polices to

19    support unbiased, outside or civilian review of sexual assault and harassment by officers.

20

21    221.    Proper leadership, training (including monitoring) and oversight were

22    ignored by Defendant COP.

23    222.    Upon information and belief, there is: (1) inadequate first line review of

24    sexual assault and harassment by officers; (2) insufficient on scene investigations; and (3)

25

26    no requirement that supervisors thoroughly investigate all allegations of sexual assault and

44

harassment; (4) inadequate policies to support unbiased review of complaints against officers.

## DAMAGES

223.    Plaintiff hereby incorporates by reference all paragraphs as though fully set forth herein.

224.    As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer severe emotional distress, for which she has sought mental health treatment and counseling.

225.    As a result of Defendants' conduct, Plaintiff's emotional trauma includes, but is not limited to: suicidal thoughts; horrific memories, flashbacks and nightmares about the traumatizing events; difficulties working and interacting with friends and family; sexual issues; a feeling of anger, helplessness, guilt and loneliness; fear of diseases that could significantly impact her health and life; fear of retaliation from Defendant COP or other individual officers; it has also caused Plaintiff to have difficulties trusting other people, especially those with authority, and has impacted her relationship with her fiancé.

226.    As a direct result of Defendants' conduct, Plaintiff's relationship with her family has been negatively affected.

227.    As a result of Defendants' conduct, Plaintiff has incurred medical expenses, diminution in earning capacity, emotional, psychological and mental damages, lost wages, future and past medical treatment and has developed a fear of the police.

## COUNT I

45

**Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Violation of Fourteenth Amendment Substantive Due Process) –** *By Plaintiff against Defendant Pena individually and in his official capacity.*

228.    Plaintiff hereby incorporates by reference all paragraphs as though fully set forth herein.

229.    As a citizen of the United States, Plaintiff is entitled to the protection and benefit of the laws and Constitution of the United States of America.

230.    The Fourteenth Amendment of the United States Constitution declares "nor shall any State deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. Amend. 14.

231.    At all relevant times, Defendant Pena was a state actor whose conduct is subject to 42 U.S.C. § 1983 and the 14th Amendment of the United States Constitution.

232.    Plaintiff has a liberty interest in her life, body integrity, and liberty.

233.    The circumstances of Defendant Pena's encounter with Plaintiff shock the conscience and constitute a deprivation of Plaintiff's liberty interest in violation of the due process clause of the Fourteenth Amendment and was excessive and unreasonable force in violation of the Fourth Amendment.

234.    Defendant Pena was deliberately indifferent to Plaintiff's life, safety, health and body integrity when without Plaintiff's consent Defendant Pena forced Plaintiff to touch his penis on two different occasions, fondled Plaintiff's breasts and forced Plaintiff to engage in masturbatory penile conduct.    This caused Plaintiff actual harm and substantially increased Plaintiff's risk of harm.

46

235. Defendant Pena was also deliberately indifferent to Plaintiff's life, safety, health and integrity when he intimidated Plaintiff and insinuated that she or her family would be targeted if she did not comply with Defendant Pena's demands. Thus, Defendant Pena used actual unlawful force and coercion to achieve his goals.

236. Defendant Pena was afforded time to deliberate over whether his sexual misconduct and verbal coercion and threats were in violation of Plaintiff's liberty interest and despite this opportunity, Defendant Pena committed deplorable and sadistic acts against Plaintiff, including fondling Plaintiff's breasts, forcing Plaintiff to engage in masturbatory penile conduct; and, making lude and harassing comments to Plaintiff both while she was unlawfully seized and when she was not seized as more thoroughly described herein.

237. Defendant Pena acted with a purpose to harm unrelated to any legitimate law enforcement objective.

238. As a direct and proximate result of Defendant Pena's actions, Plaintiff suffered severe personal injuries as more thoroughly described herein.

239. Plaintiff's substantive due process rights were violated and she sustained damages as fully set forth herein.

## COUNT II
**Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Excessive Force) –** *By*
*Plaintiff against Defendant Pena individually and in his official capacity.*

240. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

47

241.    The acts and conduct of Defendant Pena constituted an illegal and unconstitutional use of force under the Fourth and Fourteenth Amendments.

242.    At all material times, Defendant Pena was acting under the color of state law, as an agent of City of Phoenix, and within the course and scope of his employment and authority as a duly certified law enforcement officer of the City of Phoenix.

243.    Every reasonable officer would have known that using physical force to place Plaintiff's hand on Defendant Pena's exposed penis constitutes excessive and unreasonable force in violation of the Fourth Amendment.

244.    Every reasonable officer would have known that using coercion, intimidation, fear and other types of verbal force and physical force to force sexual contact with Plaintiff as more thoroughly described herein constitutes excessive and unreasonable force.

245.    Defendant Pena's conduct as more thoroughly described herein was objectively unreasonable and violated clearly established law.

246.    The excessive and unreasonable force occurred both while Plaintiff was unlawfully seized and when she was not seized as more thoroughly described herein.

247.    As a direct and proximate result of the excessive and unreasonable force, Plaintiff sustained the damages more fully described herein.

**COUNT III**
**Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Unlawful seizure)**
*–Plaintiff against Defendant Pena individually and in his official capacity.*

48

248.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

249.    The Fourth and Fourteenth Amendments protect the right of the people to be secure in their persons against unreasonable seizures.

250.    At all material times, Defendant Pena was acting under the color of state law, as an agent of City of Phoenix, and within the course and scope of his employment and authority as a duly certified law enforcement officer of the City of Phoenix.

251.    Defendant Pena unlawfully restrained Plaintiff's freedom of movement such that she was not free to leave.

252.    The acts committed by Defendant Pena constituted an unreasonable seizure as there was no probable cause to believe Plaintiff committed a crime.

253.    Using his position as a law enforcement officer, Defendant Pena unlawfully seized Plaintiff on at least two separate occasions as more thoroughly described herein. Plaintiff was initially seized when Defendant Pena assaulted and battered Plaintiff when he grabbed Plaintiff's hand and forced contact with his exposed penis as more thoroughly described herein. Plaintiff was also seized when Defendant Pena forced Plaintiff to leave her home and to go to the vacant lot, pulled Plaintiff toward Defendant Pena so that Plaintiff was trapped between the driver's side door and the driver's seat where Defendant Pena demanded oral sex, but agreed to masturbation while he exposed himself and fondled Plaintiff's breast until he ejaculated on Plaintiff's breast and dress.

49

254.    At all relevant times, Plaintiff was in fear for her life and the life of her daughter and felt that she was not free to leave without Defendant Pena's permission.

255.    As a direct and proximate result of the unlawful seizure, Plaintiff sustained the damages more fully described herein.

## COUNT IV

***Monell* Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Excessive Force, Sexual Misconduct and Sexual Harassment) Unconstitutional Policy and Custom; Failure to Supervise & Discipline; Failure to Train; Negligent Hiring; Negligent Retention**
***Plaintiff against Defendant City of Phoenix.***

168.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

169.    Prior to the August 5, 2019, sexual misconduct/sexual assault against Plaintiff, Defendant COP was aware or should have known of an internal problem within the Department of employing, failing to supervise and retaining individuals as Phoenix police officers who commit sexual related offenses against its citizenry as more thoroughly described herein.

170.    Prior to the August 5, 2019 sexual misconduct/sexual assault against Plaintiff, Defendant COP either knew or should have known that recently AZPOST found that officer-involved sexual misconduct was the second most common form of misconduct reported throughout 2010.

171.    Prior to the August 5, 2019, sexual misconduct/sexual assault against Plaintiff, Defendant COP either knew or should have known that police officers were more than two-times more likely to commit sexual assaults than the general population.

172.    Prior to the August 5, 2019, sexual misconduct/sexual assault upon Plaintiff, Defendant COP either knew or should have known it has employed officers who have been criminally charged for sexual misconduct.

173.    Prior to the August 5, 2019, sexual misconduct/sexual assault against Plaintiff, Defendant COP either knew or should have known that it has settled claims with victims of Phoenix police officers related to instances of sexual assault, sexual harassment, and other types of sexual misconduct.

174.    Prior to the August 5, 2019, sexual misconduct/sexual assault against Plaintiff, Defendant COP either knew or should have known that Defendant Pena was a dangerous sexual predator who had at minimum sexually assaulted Victim A.

175.    Defendant COP knew, or should have known, that it could not sit blindly by while its officers sexually violate its citizens' rights, and it must take a proactive approach to combat sexual misconduct by its officers.

176.    Instead, upon information and belief, before the sexual assault upon Plaintiff, Defendant COP did virtually nothing to prevent sexual assault, sexual harassment and other types of sexual misconduct by the hands of its officers.

51

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

177.    Prior to the August 5, 2019, sexual misconduct/sexual assault on Plaintiff, and as early as August 26, 2018, Defendant COP knew or should have known Defendant Pena sexually assaulted Victim A.

178.    As such, prior to the August 5, 2019, sexual assault, sexual harassment and sexual misconduct against Plaintiff, Defendant COP through PPD knew that if it did not have adequate policies and procedures to hire, monitor, train, retain/terminate and supervise its officers that such would result in the deprivation of United States citizens' constitutional rights, specifically the right to be free from sexual assault, sexual misconduct, sexual harassment, unlawful seizure and excessive force at the hands of law enforcement officers.

179.    As such, prior to the August 5, 2019, sexual assault against Plaintiff, sexual harassment and sexual misconduct against Plaintiff, Defendant COP through PPD knew that if it did not have adequate policies and procedures to ensure that its officers were mentally and emotionally fit for duty, and to implement policies and procedures to make sure its Officers would not commit the deplorable acts described herein, that such would result in the deprivation of United States citizens' constitutional rights, specifically the right to be free from sexual assault, sexual misconduct, sexual harassment, unlawful seizure and excessive force at the hands of law enforcement officers.

52

180.     As such, prior to the August 5, 2019, sexual assault against Plaintiff, sexual harassment and sexual misconduct against Plaintiff, Defendant COP through PPD knew that if it did not have adequate policies and procedures to investigate police officer misconduct, including sexual misconduct, that such would result in the deprivation of United States citizens' constitutional rights, specifically the right to be free from sexual assault, sexual misconduct, sexual harassment, unlawful seizure and excessive force at the hands of law enforcement officers.

181.     As such, prior to the August 5, 2019, sexual assault against Plaintiff, sexual harassment and sexual misconduct against Plaintiff, Defendant COP through PPD knew that if it did not have adequate policies and procedures to terminate and/or supervise police officers who have committed sexual misconduct that such would result in the deprivation of United States citizens' constitutional rights, specifically the right to be free from sexual assault, sexual misconduct, sexual harassment, unlawful seizure and excessive force at the hands of law enforcement officers.

182.     PPD's final policymakers, including its Chief of Police, and therefore also Defendant COP, deliberately and consciously adopted unconstitutional policies and procedures of: (1) failing to adequately screen and vet potential Phoenix Police Department candidates, whether by its failure to have adequate policies or procedures and/or failing to train those employees tasked with Phoenix Police Officer's employment as more

thoroughly described herein; (2) failing to adequately investigate allegations of sexual misconduct, whether by its failure to have adequate policies or procedures and/or failing to train those employees tasked with investigating allegations of sexual misconduct of a newly hired police officer as more thoroughly described herein; (3) failing to adequately supervise Defendant Pena, especially after Defendant COP was on notice of a prior sexual assault, and instead allowed Defendant Pena to patrol the streets in a one man unit as more thoroughly described herein and/or failing to have adequate policies and procures regarding actions to take if Defendant COP cannot refute allegations of sexual assault; (4) failing to discipline and terminate Defendant Pena from his employment with Defendant COP as more thoroughly described herein and/or inadequate policies and procedures related to officer termination; (5) attempting to and suppressing victims of PPD officer crimes by Defendant COP's policy of intimidation through threatening criminal prosecution of victims for false reporting; and (6) failing to eliminate/substantially reduce the Blue Code of Silence that provides for an environment that values law-breaking officers over the citizens they are sworn to protect.

**(A) COP's failure to implement policies and procedures to ensure officer's fitness for duty through failing to hire competent police officers.**

183.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

184.    Defendant COP through PPD has failed to implement policies and procedures to ensure only those with the moral and ethical character required to act as a police officers are hired, which amounts to a policy or custom of failing to hire only those who will not violate the constitutional rights of its citizenry as more thoroughly described herein.

185.    Defendant COP through PPD has also failed to train its officers on how to adequately screen potential law enforcement Applicants prior to hiring Applicants and during their employment to ensure officer fitness for duty, including but not limited to psychological, mental and emotional fitness as more thoroughly described herein.

186.    Defendant COP is also liable for its failure to train.  Defendant COP failed to train its employees on how to properly administer employment applications to determine hiring eligibility and fitness for duty.

187.    The deprivation of Plaintiff's constitutional rights would have been avoided if Defendant COP did not hire or retain Defendant Pena in its employ, which would have occurred had Defendant COP properly trained its officers to vet, screen and investigate individuals prior to, and during their employment with City of Phoenix and properly trained its officers on how to adequately investigate officer related allegations of sexual assault and their subsequent retention, and referred serious allegations of Phoenix Police

1  Department employee misconduct allegations to non-Phoenix Police Department agencies

2  for investigation.

3      188.    The deprivation of Plaintiff's constitutional rights would have been avoided

4

5  if Defendant COP had adequate policies and procedures to ensure only those officers who

6  are fit for duty are employed as police officers, whether through requirements and/or

7  qualifications.

8

9  **(B) Defendant COP's failure to implement adequate policies and procedures related to investigating Phoenix police officer's misconduct and/or failure to train its officers how to investigate Phoenix police officer's sexual misconduct.**

10

11      189.    Plaintiff hereby incorporates by reference the preceding paragraphs as

12  though fully set forth herein.

13

14      190.    Defendant COP through PPD has failed to implement policies and

15  procedures to adequately investigate allegations of sexual misconduct within its Police

16  Department (such as a third-party agency or non-police officer investigation) and/or has

17

18  failed to train its officers how to investigate sexual misconduct by its police officers as

19  more thoroughly described herein, which amounted to a deliberate indifference to the

20

21  Constitutional rights of Plaintiff.

22      191.    Part of Defendant COP's unconstitutional policy and custom has resulted in

23  and part of the Code of Blue Silence.  Defendant COP either knew or should have known

24

25  a nonpolice investigation was warranted to facilitate nonbiased policing, or even, at a bare

26

minimum, a non-Phoenix Police Department should have investigated serious crimes involving its officers.

192.    Defendant COP has a pattern and practice of tolerating misconduct within its department, which underscores the importance of non-Phoenix police officers investigating its own officers.

193.    By way of example, in 2017 officer Christopher Turiano shot a Donald Trump protester, Joshua Cobin, in the groin and it was later revealed that a team of officers had created a "challenge coin" memorializing and celebrating the shot. The coin states "MAKING AMERICA GREAT AGAIN, ONE NUT AT A TIME" and "GOOD NIGHT LEFT NUT" with an image of Cobin and the date of the protest. Despite Williams having known about the coin, she did not immediately reveal it or act to discipline anyone.

194.    In 2021, it was discovered that Phoenix police officers made false statements under oath to a grand jury regarding protestors which resulted in the dismissal of many of the charges.

195.    Recently, it was uncovered that City of Phoenix police officers had fabricated a "gang" to classify protestors as gang members. The gang was entered into statewide database called GangNet as "ACAB" and 17 protestors were arrested for criminal street gang charges. By allowing officers to charge people with exaggerated offenses because of

57

their own biases, Defendant COP does not have the best interests of the citizens of Phoenix and is failing to supervise its offers on several different levels.[1]

196.    It has recently been brought to light that Phoenix officers purposefully embellished case facts when an officer claimed that a protester stabbed him with the sharpened tip of an umbrella. Evidence, photos and a video from the incident in question show that the protestor never stabbed at the officer and the umbrella did not have a sharpened tip. This incident highlights the institutionalized acceptance, tolerance and encouragement of lying within the Defendant COP.[2]

197.    On May 19, 2021, COP finally created a civilian police oversight office to independently investigate incidents through the Office of Accountability and Transparency (OAT). According to Defendant COP, the Office "…will independently investigate allegations and create greater transparency for the Phoenix Police Department." Defendant COP claims that "…there is still much work to be done to dismantle the systemic inequities." A program like this, if enacted earlier, could have saved Plaintiff from being sexually assaulted, humiliated, and irreparably damaged.

---

[1] https://www.abc15.com/news/local-news/investigations/protest-arrests/prime-for-abuse-lack-of-oversight-lets-phoenix-police-add-protesters-to-gang-database
[2] https://www.abc15.com/news/local-news/investigations/protest-arrests/phoenix-police-department-falsely-claimed-protester-stabbed-officer-with-sharpened-umbrella

198.    The Blue Code of Silence is indicative of police officer's willingness to not only continue with the Blue Code of Silence, but to wrongfully protect fellow officers, such as Defendant Pena.

199.    Phoenix Det. Walker's report is evidence of this Blue Code of Silence as it was devoid of all of the crucial information that highlighted Defendant Pena's inconsistent statements concerning whether he stopped at any point while transporting Victim A and whether he followed behind the MCSO van the entire time, and that Defendant Pena refused the buccal swab.

200.    When Det. Walker ascertained that Pena had lied about turning around the police car and immediately following the MCSO van, Det. Walker should have required that Pena immediately take a lie detector test or otherwise investigate. Det. Walker never even asked Pena to take a lie detector test, and thus, perpetuated the Blue Code of Silence.

201.    Defendant COP, through its inadequate investigation in Victim, A failed to do at least the following: (1) properly interrogate Defendant Pena through thoroughly asking questions; (2) promptly investigating and obtaining crucial evidence concerning Victim A's assault (i.e. promptly obtaining a search warrant to search Defendant Pena's clothing and person; (3) subjecting Defendant Pena to a lie detector test; (4) researching and communicating with other potential victims; (5) interviewing potential witnesses (i.e. driver of the MCSO van); (6) refer the sexual assault to PSB, a third party police agency,

a non-police civilian review committee; (7) other failures more thoroughly discussed herein. Rather, Defendant COP through its failure to train, supervise or failure to enact proper policies and procedures regarding police officer investigations gave Defendant Pena preferential treatment and a favorable bias merely because he was a police officer.

202.    PPD's final policymakers, including its Chief of Police, and therefore also Defendant COP, deliberately and consciously adopted unconstitutional policies that emboldened Defendant Pena to commit additional acts of sexual violence. Through Defendant COP's failure to properly investigate Victim A's allegations and Defendant COP's failure to enhance Defendant Pena's supervision after he was accused of a serious sexual offense, Defendant COP enabled and emboldened Defendant Pena to commit additional acts of sexual violence.

203.    By way of example, during the claimed investigation into Victim A's sexual assault, Defendant COP failed to use or request polygraph testing on Defendant Pena despite Defendant Pena lying about following the MCSO van at all times and despite his refusal to provide a DNA sample. Additionally, upon information and belief, Defendant COP: (1) failed to search Defendant Pena's penis area, clothing or vehicle for DNA; (2) failed to adequately ask questions, including but not limited to failing to determine why Defendant Pena did not have his BWC activated, why he lied about following the MCSO van at all times, etc.; (3) failed to conduct a Confrontation Call and instead conducted a

Confrontation Text when any reasonable officer knows that a police officer would never admit to anything in writing, especially if he committed a sexual assault; (4) failed to have an outside agency investigate the allegations; (5) failed to submit Victim A's investigation to AZPOST, or MCAO's office prior to Victim B and Plaintiff's sexual assault and failed to conduct an administrative and internal investigation into Victim A's assault; (6) delayed five days before speaking with and searching Defendant Pena; (7) omitted crucial facts within the investigatory report; and, (8) committed other failures within the investigation as more thoroughly described herein.

204.    Upon information and belief, Defendant COP does not have an adequate sexual misconduct policy, and thus, Defendant COP has failed to implement adequate policies to deter officers from committing sexually motivated offenses.

205.    Defendant COP through PPD has failed to train or failed to supervise its employees to ensure proper conduct between its officers and citizens and has failed to implement mandatory training in regard to proper procedures for detention and interactions with citizens as more thoroughly described herein, including but not limited to the use of BWC and video/audio in the patrol car while transporting citizens.

206.    Defendant COP has failed to develop adequate policies and training relating to sexual assault and harassment by its officers, which includes but is not limited to holding supervisors accountable for actions of their subordinates.  Upon information and belief,

there is: (1) inadequate first line review of sexual assault and harassment by officers; (2) insufficient on scene investigations; (3) no requirement that supervisors thoroughly investigate all allegations of sexual assault and harassment or appropriate further review when investigating its own officers; (4) no disciplined remedial structure; and (5) Defendant COP does not appropriately hold first line supervisors accountable for inadequate investigation or review of sexual assault and harassment as more thoroughly described herein.

207.    Defendant COP failed to provide appropriate leadership, training, and oversight. Defendant City of Phoenix's failure to supervise patrol officers and adequately investigate claims of sexual assault and harassment by its officers has occurred at every level, from front line supervisors (sergeant), investigation and review, to chain of command's secondary review of investigation, to final review by command staff. Supervisors must take a more active role in demanding improved reporting, more careful on scene investigations and more thorough secondary review.

**(C) Defendant COP failed to supervise and terminate Defendant Pena from his position as a Phoenix Police Officer, which enabled and emboldened Defendant Pena to commit additional acts of sexual violence.**

208.    Plaintiff incorporates by reference all proceeding paragraphs as though fully set forth herein.

62

209. Defendant COP has developed, enacted, and tolerated policies and procedures that led to its failure to discipline, supervise and terminate officers who are accused of sexual misconduct, which amounts to a policy, practice, or custom of failing to employ and retain only those who will not violate the constitutional rights of its citizenry.

210. Defendant COP through PPD has failed to implement policies and procedures to adequately terminate and otherwise discipline and remove from a position of power in law enforcement those officers who sexually assault citizens, such as Defendant Pena, and failed to implement and enforce policies and procedures so that officers like Defendant Pena are not retained as more thoroughly described herein.

211. Even after Victim A reported the sexual misconduct, not only was Defendant Pena retained, but Defendant COP failed to even enhance his supervision and oversight.

212. Despite Defendant COP's apparent intention to clear Defendant Pena, Defendant COP could not confirm that Defendant Pena did not commit the assault against Victim A.

213. Despite Defendant Pena's lies, omissions, coverups and his failure to voluntarily submit to a buccal swab, compounded by Victim A's consistent statements that could not be disproven, Defendant Pena continued to patrol the streets in a single man unit with absolutely no additional supervision such as the requirement to have his BWC and vehicle camera activated at all times, patrol with another police officer, etc.

63

214. In other words, despite the heinous allegations that could not be disproven, Defendant Pena roamed free to sexually violate other victims without reproach.

215. Through Defendant COP's failure to properly investigate Victim A's allegations as more thoroughly described herein, Defendant COP's failure to enhance Defendant Pena's supervision after he was accused of a serious and heinous sexual offense as more thoroughly described herein, and Defendant COP's failure to terminate Defendant Pena as more thoroughly described herein, Defendant COP emboldened Defendant Pena to commit additional acts of sexual violence.

216. Thus, Defendant COP through its actions and inactions, has tolerated, encouraged, ratified, and acted with a deliberate indifference to the policies, or patterns, practices, and customs, as well as its deliberate indifference to the need for more or differently improved policies and procedures.

217. PPD final policymakers, including Chief Williams, and therefore also Defendant COP, made deliberate and conscious decisions to create inadequate policies and procedures, if any at all. Defendant City of Phoenix was recklessly and/or deliberately indifferent to the rights of individuals like Plaintiff.

218. PPD's final policymakers, including its Chief of Police, and therefore also Defendant COP, deliberately and consciously adopted unconstitutional policies of retaining police officers who have committed sexual assaults or who were otherwise

engaged in sexual misconduct, which it knew would lead to the deprivation of liberty interest and rights of individuals, including Plaintiff's rights.

219.    Notwithstanding Defendant COP's knowledge, PPD final policymakers, including its Chief of Police, and therefore also Defendant City of Phoenix, deliberately and consciously adopted unconstitutional policies and/or encouraged, tolerated, or ratified unconstitutional widespread PPD practices and customs.

220.    The policies or customs/practices of Defendant City of Phoenix directly and proximately caused the violation of Plaintiff's constitutional rights and other damages as more fully set forth herein.

221.    The Defendant City of Phoenix directly and proximately caused the violation of Plaintiff's constitutional rights and other damages as more fully set forth herein, with its encouragement, toleration, ratification, and deliberate indifference to the policies, or patterns, practices, and customs, as well as its deliberate indifference to the need for more or different employment screening, training, monitoring, supervision, investigation or discipline.

**(D) Defendant COP implemented unconstitutional policies and procedures that curtailed and suppressed victims of PPD's officer crimes to report misconduct through its policy of intimidation.**

222.    Plaintiff hereby incorporates by reference the proceeding paragraphs as though fully set forth herein.

65

223.     As more thoroughly stated herein, on April 7, 2021, the City of Phoenix City Council approved a MOU between the Defendant COP and PLEA wherein Defendant COP adopted a change that explicitly allows for non-police city of Phoenix investigators, such as a civilian oversight committee to investigate officers.

224.     The MOU between the Defendant COP and PLEA also belatedly changed COP and PPD's policy to remove language warning citizens about possible criminal charges if they file a false complaint about a police officer as the language had the effect of potentially discouraging and chilling residents from alerting Defendant COP about police officer misconduct.

225.     This was an unconstitutional policy that discouraged true reporting of police officer sexual offenses, and thus, Plaintiff will never know how exactly many instances of sexual violence were committed by Phoenix Police Officers. This former policy interfered with due process rights and chilled the First Amendment rights of the victims of police misconduct.

226.     This policy, that Defendant COP finally recognized on April 7, 2021 as intimidation, that emboldened its officers to commit sexual offenses, has led to officers walking the streets with the means to harm innocent civilians while knowing that they will very likely not be caught or punished, like Defendant Pena.

66

1     227.    Considering most victims of sexual assault do not report sexual assaults, let

2    alone sexual assaults by police officers as more thoroughly described herein, Defendant

3    COP through PPD substantially suppressed reports of sexual misconduct against its

4

5    officers. This Policy provided a means for Defendant COP to claim that it did not know of

6    its police officer's sexual misconduct and provided a means which empowered and enabled

7    Defendant Pena to sexually assault his victims, like Plaintiff, without fear of recourse.

8

9                       **PRAYER FOR RELIEF**

10        WHEREFORE, for the foregoing reasons, Plaintiff requests the following against

11    all Defendants:

12        A.    Judgment in favor of Plaintiff in an amount to be proven at trial, including

13    compensatory damages; expenses for past and future medical expenses; emotional

14    damages; loss of enjoyment of life; loss of wages; and diminution in earning capacity;

15        B.    Pre and post judgment interest at the highest permissible rate;

16        C.    Punitive damages as allowed by law against Individual Defendants in an

17    amount to be determined at trial;

18        C.    Incurred costs;

19        D.    An award of attorney fees pursuant to U.S.C. § 1988(b);

20        D.    Trial by jury as to all issues so triable; and

21        E.    For such relief to which Plaintiff is entitled and is just and proper.

22

23        DATED this __st day of May, 2021.

24

25                                 **DOW LAW OFFICE**

26                        By:   */s/ David W. Dow*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

David W. Dow
Jennifer L. Ghidotti
**DOW LAW OFFICE**
3104 E. Camelback #281
Phoenix, Arizona 85016
*Attorneys for Plaintiff*

68